UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court, District of Columbia.

April 20, 1983.

See also, D.C., 552 F.Supp. 131; D.C., 569 F.Supp. 1057.

James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Jack D. Sidorov, Alan L. Silverstein, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Howard J. Trienens, Alfred A. Green, Jim G. Kilpatric, Patrick F. Walsh, New York City, Lee M. Mitchell, Washington, D.C., for defendants.

OPINION

HAROLD H. GREENE, District Judge.

On August 24, 1982, a final judgment with modifications was entered in this case in accordance with an Opinion published on August 11, 1982.[1] One of the modifications included in the decree concerned the Court's role in reviewing the plan of reorganization by which the divestiture of the Bell Operating Companies from AT & T is to be accomplished. As the Court stated on August 11, the question "[w]hether this decree will, in fact, provide the benefits which underlie the Court's public interest determination depends upon . . . the provisions of the plan of reorganization" 552 F.Supp. at 216. For that reason, the Court conditioned its approval of the proposed decree upon a modification requiring judicial approval of that plan as a prerequisite to its implementation. The decree, accordingly, was entered as a final judgment with the proviso that the "plan of reorganization shall not be implemented until approved by the Court as be-

---

1. *United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* —— U.S. ——, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

ing consistent with the provisions and principles of the decree." Section VIII(J).[2]

On the parties' recommendation,[3] the Court agreed on September 14, 1982, to undertake the review of the plan of reorganization in two stages. The first stage, presently before the Court, concerns the division of all Bell territory in the United States into geographically-based "exchange" areas, or LATAs.[4] The second stage will deal with the remainder of the plan of reorganization.

On October 4, 1982, AT & T submitted its LATA application to the Court.[5] The intervenors had an opportunity thereafter to comment on that proposal; the Department of Justice submitted its own approvals, disapprovals, and comments;[6] the Operating Companies responded to the intervenor comments; and several intervenors filed

further replies.[7] All of these documents are presently on file with the Court. Before discussing the substantive issues presented by these filings, it is useful to explain initially the basic terminology employed herein and to delineate the standards the Court is applying in passing upon the AT & T-Department of Justice submissions.

I

*General Considerations*

A. *The LATA Concept*

It is perhaps most important, first of all, to describe what a LATA is and also what it is not.

Pursuant to the decree, all Bell territory [8] in the continental United States is divided into LATAs,[9] generally centering upon a

**2.** References herein to particular sections, unless otherwise specified, are to sections of the final decree entered on August 24, 1982.

**3.** Joint Memorandum of AT & T and the Department of Justice dated August 31, 1982.

**4.** The term "LATA" stands for Local Access and Transport Area. For an explanation, see note 9 *infra*.

**5.** It appears that the submissions were prepared by the various local Bell Operating Companies (also referred to as the BOCs), based on guidelines distributed by AT & T.

**6.** The decree provides that "[n]ot later than six months after the effective date of [the decree, AT & T] shall submit to the Department of Justice for its approval . . . a plan of reorganization." Section I(A).

**7.** There were some additional filings by the Department, the Operating Companies, and intervenors relating to specific LATAs.

**8.** The Bell System provides basic telephone service to 80 percent of all telephone subscribers in the Continental United States, including to 243 of the 323 regions of the country densely populated enough to be designated a Standard Metropolitan Statistical Area (SMSA). Geographically, however, independent telephone companies serve a much larger proportion of the United States than does the Bell System. Of the approximately 18,000 local exchanges in the United States, approximately 7,000 are served by the Bell Operating Companies while the remaining 11,000 local exchanges are served by the independent companies. Reply

Comments of Southern Pacific Communications Co.

Simply put, an SMSA is an U.S. Department of Commerce designation that includes a core city and its suburbs. All SMSAs have a population of at least 50,000. The 50,000 number is reached by adding to a core city with a population of at least 25,000 the population of outlying areas having a density of at least 1,000 persons per square mile, or it may be satisfied by a city which itself has 50,000 or more inhabitants. Since the LATA application was filed, four additional SMSAs have been designated as a result of the 1980 census. Executive Office of the President, Office of Management and Budget, Information Releases OMB–83–1, OMB–83–11. Two of these, Ft. Pierce, Fla. and Houma-Thibidaux, La., fall within Bell territory. Their new status as SMSAs will be considered by the Court in reviewing the LATAs proposed for those respective states.

**9.** The acronym "LATA" stands for "Local Access and Transport Area." Unfortunately, as drafted by the parties, the decree speaks of the areas in which the Operating Companies will provide post-divestiture services as "exchange areas." Since traditionally regulators have used the term "exchange area" in an entirely different sense, this terminology in the decree has led to a considerable amount of confusion. Regulators have expressed uncertainty over the decree's interrelationship with their traditional areas of responsibility, and various intervenors have accused AT & T of ignoring the terms of the decree because the number of LATAs it has proposed—161—is so much smaller than the number of Bell local exchanges—some 7,000. The confusion occasioned by the dual usage of

city or other identifiable community of interest.[10]  Most simply, a LATA marks the boundaries beyond which a Bell Operating Company [11] may not carry telephone calls. What the Operating Companies will do in the services field after divestiture is (1) to engage in exchange telecommunications, that is, to transport traffic between telephones located within a LATA,[12] and (2) to provide exchange access within a LATA, that is, to link a subscriber's telephone to the nearest transmission facility of AT & T or one of AT & T's long-haul competitors.[13]

Once the divestiture is completed, the Operating Companies will be allowed to transport communications only to and from telephones and other apparatuses located within the same LATA (intra-LATA traffic);  because of their local monopoly position, the decree does not permit the Operating Companies to carry calls between different LATAs (inter-LATA traffic).[14]  Only AT & T and its intercity competitors [15] —such as MCI, Sprint, and Satellite Business Systems—may carry telecommunications traffic which originates in one LATA and terminates in another.[16]

Thus, contrary to much popular and even industry understanding, the purpose of the

the term "exchange" prompted AT & T to suggest in its October application that the phrase "local access and transport area," with the acronym LATA, be employed when referring to the exchange area that is the creation of this antitrust decree, to distinguish it from the traditional exchange area defined by the various local regulators.  The Court, the Department of Justice, and the various intervenors have adopted this terminology, and it will consistently be used herein.

10.  AT & T has proposed that there be a total of 161 LATAs.  Of these, 11 would not encompass an SMSA, meaning that they contain mostly rural, sparsely populated regions.  Another 83 would include one SMSA, and 67 would include two or more SMSAs.  In this Opinion reference will also be made to SCSAs (Standard Consolidated Statistical Areas) which are combinations of SMSAs adjacent to one another.  The densities of these SCSAs give them some of the attributes of a single economic community.

11.  The Bell Operating Companies are the local arms of the Bell System which will be divested from AT & T on or shortly after January 1, 1984.  The 22 existing Operating Companies will be controlled after the reorganization by seven regional holding companies.

12.  "Exchange telecommunications" means the transmission of information between points within a LATA by means of electromagnetic transmission.  Section IV(O).  This is the traditional telephone call which originates and terminates within one LATA.

13.  "Exchange access" means any activity or function performed by an Operating Company in connection with the origination or termination of inter-LATA telecommunications.  Section IV(F).

The Operating Companies must deliver traffic originating or terminating within a LATA to a point of presence (POP) within the LATA designated by an interexchange carrier for the connection of its facilities with those of the Operating Company.  This is how the long-haul carrier will obtain access to the local "loop." The Operating Companies are required to file cost-justified tariffs for their exchange and access services; and revenues collected pursuant to these tariffs will substitute for funds currently received by the Operating Companies under the division of revenue process, which until now has allocated interstate toll revenues between the Operating Companies and AT & T's Long Lines Division.  552 F.Supp. at 196 n. 271.  See also pp. 998–1000 infra.

14.  A telephone call which originates in one LATA and terminates in another is an "interexchange telecommunication" under section IV(K), and may not be handled by an Operating Company even if it performs services in both LATAs.  Section II(D)(1).  The decree requires that an asset be transferred to a separated Operating Company if its predominant use is to provide service for intraexchange traffic and exchange access, as opposed to service for interexchange traffic.  Section VIII(G).  Because LATA boundaries define what will be interexchange or intraexchange traffic after reorganization, establishment of the LATAs is a necessary predicate to the division of Bell System assets.

15.  Also referred to as interexchange carriers, inter-LATA carriers, or other common carriers (OCCs).

16.  However, the interexchange carriers are not prohibited from engaging also in intra-LATA traffic.  Fair competition among these interexchange carriers will be promoted by the requirement of the decree that the Operating Companies provide the interexchange competitors with access to the local networks equal in price and quality to that provided to AT & T.

establishment of the LATAs is only [17] to delineate the areas in which the various telecommunications companies will operate; it is not to distinguish the area in which a telephone call will be "local" from that in which it becomes a "toll" or long distance call. To put it another way, the LATA is not an entity designed to supplant the local "exchange" as telephone users know it,[18] nor will the establishment of the borders of the LATAs affect what is commonly known as the local calling area, *i.e.,* those areas, typically combining more than one local exchange, within which subscribers may place telephone calls without paying an extra charge. *The distance at which a local call becomes a long distance toll call has been, and will continue to be, determined exclusively by the various state regulatory bodies.* After divestiture, calls placed within any one LATA may still be either "local" or "toll" depending upon the requirements or rates established by state regulators. Neither the LATAs nor the decree in this case changes that situation in any way.[19]

**17.** In addition to such non-service purposes as the division of assets.

**18.** A local exchange is identified by the first three digits of the average telephone number.

**19.** See, *e.g.,* Response of the United States to Public Comments on the Proposed Modification of Final Judgment, May 20, 1982, at 77 ("even where [LATA] boundaries may be drawn in a manner inconsistent with current local calling areas, the [decree] leaves undisturbed the jurisdiction of the states to prescribe rate structures that preserve existing pricing patterns").

**20.** Although the discussion here is couched in terms of the relative advantages to interexchange carriers and Operating Companies, as is apparent from the discussion at pp. 996–997 below, the decisions with regard to the respective positions also have important consequences for consumers and the rates they will be paying.

**21.** As will be seen below (pp. 1004–1006) the interexchange carriers will be in competition with the local Operating Companies for a significant amount of intra-LATA telecommunications traffic.

**22.** Several intervenors argue that the establishment of large LATAs will disadvantage the Operating Companies in the division of Bell

## B. *Purposes of the Decree and of the Plan of Reorganization*

The LATA line-drawing process pursuant to the decree implicates significant policy choices revolving primarily around the size of the LATAs. As a general matter, and in somewhat oversimplified form (see note 24 *infra*), it may be said that the establishment of many relatively small LATAs would tend to favor the various interexchange competitors (*e.g.,* MCI, Sprint), principally because among the consequences of such a choice [20] would be a diminution of the number of points between which any particular local Bell Operating Company—a potential competitor of the interexchange carriers for intra-LATA traffic—may carry telecommunications.[21] On the other hand, the creation of relatively few, relatively large LATAs would tend to favor the Operating Companies,[22] inasmuch as such a choice would increase the area in which these local companies may carry telecommunications, thus augmenting their financial viability [23] and, not incidentally, decreasing the pressure for rate increases.[24]

System assets. See, *e.g.,* Reply Comments of Southern Pacific Communications Co., Appendix C. It appears, however, that large LATAs will benefit the Operating Companies even in this regard. The larger the LATAs the more traffic will be intra-LATA and, pursuant to the "predominant use" test of the decree (section VIII(G)), and the more facilities (including particularly switches performing Class Four functions) will be assigned to the Operating Companies.

**23.** The larger the LATAs, the more intrastate toll traffic will be intra-LATA, and, it will thus generate a significant source of revenue for the Operating Companies. It has been estimated that the toll portion of intra-LATA traffic will be over $5 billion annually.

The establishment of relatively large LATAs is also likely to result in greater efficiencies in the provision of exchange services and the avoidance of significant rearrangement costs that would otherwise be incurred if integrated local networks were severed by LATA boundaries. This, too, will enhance the viability of the Operating Companies and alleviate pressure on basic service rates.

**24.** The dichotomy of small versus large is not quite that simple, however, since large LATAs also have some procompetitive features (*e.g.,*

For these reasons, the primary controversy over the LATA applications revolves around the size of the areas thus being carved out and, not surprisingly, the answers provided by a party to the question whether a particular LATA is too large or too small depends to a considerable extent on how that party ranks the various policies and interests underlying the decree in accordance with its own self interest.[25] The comments filed by States and state regulatory bodies tend to be concerned with the future financial security of the Operating Companies and the protection of low telephone rates, and they therefore opt most frequently in favor of large LATAs. Others, especially the existing and prospective competitors of AT & T, are primarily interested in advancing the more obviously competitive purposes of the decree,[26] especially as far as interexchange service is concerned, and they urge the establishment of many small LATAs.

Since the plan of reorganization is required to conform to the provisions and principles of the decree, the Court necessarily must consider, and it has considered, whether the choices which were made by AT & T and the Department of Justice with regard to these issues correctly reflect these provisions and principles, especially in the areas of competition and Operating Company viability.[27]

As its approval of the decree and the basic divestiture plan indicates, the Court believes not only that competition in telecommunications services and products markets is required by law but also that such competition will be healthy and will benefit the American people, including particularly the American consumer.[28] The Court is

---

they tend to reduce the number of facilities AT & T's competitors will have to build as well as the number of telecommunications facilities AT & T will own after divestiture). Moreover, the objective of reducing AT & T's dominance does not always go hand-in-hand with the objective of promoting competition. The former may dictate a larger LATA in order to give the Operating Companies, rather than AT & T, control over important "bottleneck" facilities, while the latter might militate in favor of a smaller LATA so as to minimize the territory within which a relatively small interexchange carrier would have to compete with an Operating Company.

**25.** The views of various entities regarding the precise configurations of various LATAs aside from their size are affected by more diverse and localized factors.

**26.** The antitrust laws and the objective of free and fair competition may not automatically be equated with the strengthening of interexchange carriers at the expense of the Operating Companies.

Since the lawsuit and the allegedly anticompetitive practices concerned primarily AT & T, and since AT & T, even after divestiture, will be far larger and more powerful than any of the individual Operating Companies, the safer course from the point of view of the objectives of the antitrust laws is to vest control of bottleneck facilities in the Operating Companies. Moreover, although the Operating Companies will to some extent be in competition with interexchange carriers, that competition will be far less significant than that between the other interexchange carriers and AT & T.

The Department of Justice correctly notes that there may be a conflict in particular situations between the decree's objective of ensuring (1) that the Operating Companies (rather than AT & T) retain the bottleneck local distribution function, and (2) that interexchange carriers (rather than the Operating Companies) retain potentially competitive communications markets. The Department reasonably takes the position that with respect to such cases
> [W]here the choice is between retaining an element of AT & T's monopoly and potentially adding in a marginal way to that of [an Operating Company], the Department believes that the choice the decree takes is to remove the risk of continued AT & T monopoly power.

Response of the United States to Comments Received on the BOC LATA Proposals, November 23, 1982, at 7 (hereinafter Department of Justice Response to Comments).

**27.** Among other relevant factors are the minimization of service disruption to telephone subscribers; the avoidance of costly network rearrangement; and the establishment of LATAs of sufficient size to attract several interexchange carriers.

**28.** See generally, 552 F.Supp. at 160–70. Competition in the telecommunications industry has already borne some fruit. For example, the price of telephones and related equipment has declined in recent months, and a far greater variety of such equipment is now available than in the days when the Bell System, secure in its monopoly position, manufactured only limited types of equipment and refused to sell

continuing strongly to foster the objective of competition, including by such measures as the conditioning of judicial approval of exceptions from the standard provisions of the decree upon the grant by the Operating Companies of fair and equal access to carriers who wish to compete for the intra-LATA business. See pp. 1004–1006 *infra.* In a similar vein, the Court intends to see to it that the division of AT & T's assets will not leave the Operating Companies with out-dated equipment for the access of the smaller interexchange carriers while AT & T retains the most modern, the most efficient switches and other facilities.[29]

At the same time, the Court also expects to do what it legitimately can to strengthen the ability of the Operating Companies to function as viable entities, not dependent upon inordinate rate increases for their survival. Some, particularly MCI, maintain that the health of the Operating Companies is not a legitimate concern of the Court.[30] But the Court has taken similar factors into account before,[31] and it will do so again now. Under established legal principles, the Court is clearly free to consider the public interest in its broad sense as long as such consideration does not negate the objectives of the antitrust laws. 552 F.Supp. at 150–51.

There can be no doubt that the continued viability of the Operating Companies is in the public interest. These companies will next January assume the responsibility of providing basic local telephone service, and it is upon them, too, that will depend the realization of the goal of universal service; *i.e.,* the goal of providing affordable telephone service to all, including those who are not affluent or who reside in relatively isolated areas.[32] That objective will retain all of its vitality after the reorganization of AT & T. The Court will therefore approve LATAs which tend to preserve the effectiveness and the viability of the Operating Companies.[33]

It may appropriately be generalized that local telephone service is relatively more relied upon by individuals and that long distance is more business-oriented.[34] If the objective of telephone service available at reasonable rates to all is not to be jeopardized, it is therefore most important that local rates not be burdened by unnecessary increases. As the Court repeatedly pointed out in its August 11, 1982, Opinion (especially in connection with the discussion of the access charge issue (see *infra* )) there is no legitimate basis for using the reorganization of the Bell System as a means for

---

telephones but offered them only on a lease basis.

**29.** Although the division of assets will directly be considered only in the next stage of the plan of reorganization, the Court is serving notice in connection with its discussion of a number of LATAs (see below) that its approval of certain LATA boundaries is contingent upon an allocation of equipment that is fair both in regard to quantity and quality.

**30.** Reply Comments of MCI at 16–17.

**31.** See, *e.g.,* 552 F.Supp. at 150 n. 81, 191–94, 224.

**32.** *E.g.,* in some of the western and midwestern states, where the cost of providing service far exceeds that of connecting up telephones in densely-populated cities.

**33.** This should not be taken to mean, of course, that large LATAs will be approved, or that the

consolidation of additional LATAs will be required, without consideration of countervailing considerations or of the standards discussed at pp. 1000–1003 *infra.* As indicated, the Court's role is limited to ensuring that reasonable decisions have been taken in implementation of the provisions, principles, and purposes of the decree, and the question of the size of the LATAs, in its various ramifications, is being considered in light of that overall standard. Within that framework, the Court is exercising its role under the decree with the above-stated considerations in mind.

**34.** See, *e.g.,* Department of Justice Response to Comments at 31 ("most long-distance calls are generated by businesses and a relatively small percentage of residential customers"). Certainly, commercial entities use local telephone service and individuals make long distance calls; but the generalization referred to above is nonetheless true.

undermining the universal service objective or as an excuse for raising local rates.[35]

The Court has therefore noted with considerable surprise and some dismay that the Federal Communications Commission, far from using the access charge tool as a means for easing the burdens on the users of local telephone service,[36] has opted instead, in a major decision issued since the Court's approval of the consent decree, to saddle the local subscribers with the access costs of interexchange carriers.[37] Curiously, although the FCC cites that decree and ostensibly regards its decision as assisting in its implementation, the agency's action runs directly counter to one of the decree's principal assumptions and purposes—that the fostering of competition in the telecommunications field need not and should not be the cause of increases in local telephone rates.

**35.** As discussed below, regulatory methods are readily available to protect local rates; all that is required are federal and state regulators willing to use these methods.

**36.** It has been predicted that the FCC's decision, by levying access charges directly on the consumers, will eventually reduce the number of households with telephone service by substantial percentages, particularly among the black, the young, and the rural poor. See, *e.g., National Journal,* January 15, 1983, at 109. The FCC appears to have recognized the seriously adverse effects its decision may have in this regard, but the various mechanisms referred to in the decision to alleviate the problem (*e.g.,* a universal service fund and the possibility of waivers) are far too narrow and contingent to be significant. Since the issuance of the decision, a Federal-State Joint Board, which includes three members of the FCC, recommended in further recognition of this issue that some relief be provided to rural customers. See *Washington Post,* April 16, 1983, at p. D–10. The decision itself, however, provides no such relief, and the rural poor are, of course, only one aspect of a broader problem.

**37.** See *In the Matter of MTS and WATS Market Structure,* CC Docket No. 78–72, Phase I (adopted December 22, 1982). Under that decision, beginning next January 1 all owners of phone lines will be assessed a flat fee estimated initially to be at least $2.00 per residential line and $4.00 per business line per month. This charge will go toward the cost of non-traffic sensitive plant, *i.e.,* for equipment which serves both local and long distance purposes. Interexchange carriers will also pay a portion of these

The Commission's action is undergirded by two premises: first, that long-distance revenues have been subsidizing local rates, and second, that the burden of the Operating Companies' new revenue needs to compensate for the lost "subsidy" must for reasons of policy and economics[38] be borne primarily by the residential subscribers. There is no basis for either of these premises.

In the first place, it is not at all clear that the subsidy assumed by the FCC has ever existed.[39] In its extended oversight of AT & T, and in investigations extending over many years, the Commission was never able to determine whether, in fact, local rates had been subsidized by long distance rates. In spite of that record, the FCC in its December 1982 decision simply ignored the subsidy problem and went on to decide that,

fixed costs at first, but gradually the customer share (and the amounts customers will pay) will rise and the carrier portion will fall until in 1989 the customers will bear all of the fixed costs and the carriers will bear none. In addition to the flat fee, both customers and carriers will also pay a fee per interstate and foreign call made.

**38.** The Commission's primary economic justification appears to be that the Operating Companies must be protected from the loss of business that would be occasioned by a widespread abandonment of the local system by business customers in favor of so-called "bypass" technologies. There is no indication that this technology has suddenly become such an imminent threat to the Operating Companies that large increases in local rates have become an immediate, imperative necessity.

**39.** To be sure, the Operating Companies have been receiving revenues from the Bell System under a division of revenue process, which allocated interstate toll revenues between the Operating Companies and Bell's Long Lines division. See 552 F.Supp. 196 n. 271. Whether this allocation was a "subsidy," that is, whether the Operating Companies received more than they earned or deserved, has never been proved. At the trial of this case, witnesses for the Bell System stated that there was such a subsidy; government witnesses contended that, in reality, the situation was the reverse: that local telephone revenues have been subsidizing AT & T's intercity rates. As the Court has observed, "[s]ince the trial was aborted by the settlement, no final decision was reached on this issue." 552 F.Supp. 169 n. 160.

subsidy or not, the telecommunications system's fixed costs (see note 37 *supra* ) shall ultimately be borne by the individual subscribers.[40] These subscribers, moreover, will bear this burden regardless of how frequently, if at all, they make use of their instruments for long distance calls.

Second, even if it be assumed that there was such a subsidy, it is quite clear that means other than rate increases for residential subscribers are available to make up for the lost funds. It was considered by everyone concerned,[41] including this Court when it approved the decree,[42] that if it were ever determined that AT & T's interstate rates had, in fact, been subsidizing local service, compliance with the law's universal service objective could and would be achieved by replacing the subsidy with access charges levied on the interexchange carriers. Thus, the Court stated in the August 11, 1982, Opinion [43] that the decree

> leave[s] state and federal regulators with a mechanism—access charges—by which to require a subsidy *from intercity service*

*to local service.* By means of these access charges, the regulators would be free to maintain local rates at current levels or they could so set the charges as to increase or decrease local rates (emphasis added).[44]

The Court again emphasized in the concluding part of its Opinion that the Operating Companies would be permitted, under the supervision of state and federal regulators, "to levy access charges *upon long distance carriers* " [45] for use as a subsidy for local telephone rates (emphasis added). 552 F.Supp. at 224 n. 376.

During the public interest proceeding which preceded the entry of the decree no one—including the FCC—suggested that access charges should be shifted from the interexchange carriers (which require access to the local networks to enable them to do business) to the local users (who are already paying for those local networks through their telephone rates).[46] In the

---

**40.** This holding is essentially consistent with one of two theories: (1) that there is and always has been a subsidy of local traffic by long distance rates (*but see note 39 supra* ), or (2) that local subscribers should pay not only for all the costs associated with local service but also for the fixed costs of long distance service (compare the text to note 34 *supra* ). If there was and is no subsidy, the individual residential subscribers will be required, under the FCC plan, to bear costs which are not legitimately attributable to services they receive.

**41.** See, *e.g.,* Competitive Impact Statement of the United States filed February 10, 1982 at 48 ("The substitution of access charges for the division of revenues process need not, therefore, produce any change in the level of compensation for the use of local exchange facilities, since federal and state agencies will continue to set the level of contribution to local exchange costs *paid by* both intrastate and interstate *interexchange carriers.*") (emphasis added).

**42.** As a matter of law, the FCC is not bound by the Court's decisions or assumptions in regard to access charges. However, as indicated below, the availability of the access charge in the form used by the Commission is directly tied to the decree in this case. Moreover, it might reasonably be expected that the Commission would not operate at cross purposes with the objectives of the decree in an area where the

FCC itself failed for many years to achieve effective regulation in the public interest. See 552 F.Supp. at 168.

**43.** 552 F.Supp. at 169.

**44.** The Court went on to say (552 F.Supp. at 169 n. 161) that "if [in setting the access charges] the regulators chose to retain the cost allocation presently used in the separations and settlements process, the subsidy, if any, from interexchange revenues to local rates would remain at current levels."

**45.** And companies providing information services.

**46.** In a brief filed with the Court prior to the entry of the decree in this case, the FCC itself referred to access charges as charges paid by various carriers to the local Operating Companies to compensate these companies for the access to the local exchange facilities the local companies provide to the carriers. Brief of FCC on Stipulation and Modification of Final Judgment, April 20, 1982, at 11–12. The FCC's own concept of the access charge was turned on its head by the Commission's recent action, which is based on the view that access charges should be paid instead by end users or subscribers (on the theory that the Operating Companies perform a service for these subscribers by permitting them to interconnect with inte-

context of the objective of prescribing low local telephone rates and the goal of universal service that would have made no sense.[47] Yet, that is precisely what the Commission has now decided to do.

The Court has considered it necessary to comment on this FCC action because that action significantly impacts on the Court's own responsibilities in three respects: (1) by its approval of the decree, the Court sought to establish machinery for ratepayer protection that is being jettisoned by the FCC; (2) the FCC action appears to be an effort unjustifiably to assign to the divestiture responsibility for a reallocation of charges which the Commission has decided upon for its own reasons;[48] and (3) the Court is making a considerable effort herein to protect the local rates of telephone subscribers, and it finds it unfortunate that the Commission's decision will tend to defeat that objective.

In any event, irrespective of what others may do, the Court will continue to be guided in its consideration of the subjects before it now, as well as those which will come before it in the subsequent phases of the plan of reorganization, by the objective of achieving fair competition, on the one hand, and the protection of rates which will permit all segments of the population to enjoy telephone service, on the other.[49]  In the context of the LATA applications, an appropriate resolution of these conflicting claims and purposes naturally also depends in many instances upon various local factors.  These controversies are accordingly examined in specific detail in Parts V through X *infra,* where a LATA examination is conducted on a state-by-state basis.

## II

### *Standard of Review*

As a preliminary to the specific decisions which must be made with respect to the LATA applications, it is appropriate to delineate the standard by which the Court is judging the AT & T-Justice submissions as well as the proper distribution of the burden of demonstrating whether that standard has been met.

The Court's power to review the LATA application follows from its basic authority to evaluate the settlement under the Tunney Act (15 U.S.C. § 16(e)–(h)).  Several intervenors argue that, since the Tunney Act places the independent responsibility for a public interest determination on the judiciary, "the Court must determine whether AT & T's proposal provides the most effective means of furthering the [de-

---

rexchange carriers). *In the Matter of MTS and WATS Market Structure, supra* at ¶ 23.

This fundamental change in the concept of access charges and the resulting shift in the manner in which costs of non-traffic sensitive plant will be paid for is clearly not necessitated by the divestiture.  The FCC acknowledged that the decree will not affect the allocation of the costs of such plant between the local and long-distance networks.  See Brief of the FCC on the Stipulation and Modification of Final Judgment, April 20, 1982, at 18–19. ("The relative rates that local and long-distance users pay should not change unless the cost allocation formula [set by the FCC and state commissions] is changed.  Divestiture as such will not affect the allocation formula.")

47.  It may be the FCC's view that if the end users did not pay the access charges directly they would have to pay for them indirectly in the form of higher rates for interexchange service.  Such a theory would, *inter alia,* fail to consider that (1) not all users of telecommunications require equal quantity or quality of access to the interexchange carriers and (2) these carriers could absorb the access charges in some other way (*e.g.,* by passing the charges on to long distance or business customers or by requiring their own stockholders to shoulder some or all of the burden).

48.  As indicated, the FCC refers in its decision repeatedly to the decree in this case.  It is worth noting also that the Commission's imposition of an access charge directly on consumers is to take effect on January 1, 1984, contemporaneously with the expected date of the implementation of the decree.

49.  The Court's third primary objective—to preserve AT & T as a vigorous, innovative organization, capable of competing effectively in high technology markets both here and abroad—is being promoted by the provisions of the decree which uphold the unity of Bell Laboratories, Western Electric, and Long Lines within the "new" AT & T and by those which lift the restrictions imposed upon the Bell System by the 1956 consent decree.

cree's] competitive goals consistent with the Communications Act's universal service mandate." [50]  That formulation of the standard by which the AT & T-Justice submission is to be judged is incorrect.

The purpose of requiring the parties to submit the plan of reorganization to the Court for its approval was not to provide the Court with a means for substituting its judgment for that of AT & T and the Department of Justice with respect to subjects susceptible of more than one reasonable resolution.  That was not the Court's intention nor, indeed, would it have the authority under the Tunney Act and the decree to make such decisions.  Rather, the Court retained jurisdiction over the plan of reorganization in order to provide a process by which departures from the letter and the spirit of the decree could be identified and rectified.

The Court will accordingly apply a standard akin to that employed in the basic proceeding, that is whether, given the language and the objectives of the decree, the LATAs proposed by AT & T and approved by the Department of Justice are consistent with that decree, or more simply, whether, considering the terms of the decree, the

LATAs have been drawn in a reasonable manner.

For purposes of the "burden of proof" questions, the LATA applications fall into three categories.

First.  With respect to many LATAs, some of the opposing intervenors have neither filed information nor advanced persuasive arguments.  Instead, they stand on the proposition that the burden of persuasion is on AT & T and the Department of Justice, that these entities have failed to submit adequate information affirmatively to demonstrate consistency with the decree, and that the proposed LATA should therefore be disapproved.[51]  In light of the standards discussed above, this argument fails to take account of the intrinsic presumption of reasonableness of the LATA applications, and it is therefore not well taken.[52]  Accordingly, those LATAs not involving exceptions (see *infra*) and not appearing on their face to be unreasonable, will be approved as proposed.[53]

Second.  The situation is different with respect to the LATAs which have been proposed pursuant to section IV(G)(3) of the decree.[54]  That provision requires the ex-

---

**50.**  See, *e.g.,* Reply Comments of Black Citizens for a Fair Media, the National Association for the Advancement of Colored People, the National Latino Media Coalition, the National Association for Better Broadcasting, the National Citizens Committee for Broadcasting, and Congress Watch at 2 n. 1.

**51.**  See, *e.g.,* Reply Comments of Southern Pacific Communications Co. at 4 n. 3;  Reply Comments of Satellite Business Systems at 5;  Comments of Western Union Telegraph Co. at 13.

**52.**  Moreover, except as otherwise noted *infra,* postponement of the approval of the LATAs until the specific information sought by some intervenors is made available—such as information relating to the division of Bell System assets and the manner in which the Operating Companies will meet their exchange access obligations—would be hopelessly circular.  The configuration of LATAs logically comes first, and other aspects of the plan of reorganization can properly be implemented only thereafter.

**53.**  The documents submitted to the Court indicate that Department of Justice exercised actu-

al oversight over the drawing of LATA boundaries and did not act simply as a "rubber stamp."  In fact, some LATAs were enlarged based on the Department of Justice review, others were reduced in size.

**54.**  Another, similar provision of the decree— section IV(G)(4)—requires Court approval of LATAs which cross state lines.  The proposed LATAs in this category fall into three groups:
(1) adjustments made to preserve arrangements whereby customers located near the border of one state are served by an Operating Company wire center near the border of an adjacent state;
(2) adjustments made which will permit a continuation of service to Operating Company local exchanges which are located near a state border, and which typically home on an Operating Company office located across that border in an adjoining state;  and
(3) LATAs based on a single statistical area which itself extends across state boundaries (*e.g.,* the Kansas City LATA, which includes Kansas City, Missouri, and Kansas City, Kansas).
Few objections have been raised with respect to the state line crossings because, while nu-

press consent of the Court with respect to the establishment of LATAs which include substantial parts of more than one standard metropolitan statistical area (SMSA).[55] It may reasonably be inferred from this requirement that LATAs in these categories should be permitted only upon an affirma-

tive showing of consistency with the principles of the decree, and the Court is therefore requiring such a showing as a precondition of its approval.

Third. Where it is clear that, irrespective of category, additional information is essential to informed decision-making,[56] the LA-

merous, they are generally minor in scope, and the number of telephone subscribers affected is small. The Operating Companies have proposed these crossings, and the Department of Justice has approved them, on the ground that they are necessary to avoid service disruption and rearrangement costs which would occur if isolated customers near one state's border could not be included in a LATA which covers territory predominantly located in an adjoining state. Application of the American Telephone and Telegraph Co. and the Bell System Operating Companies for Approval of Exchange Areas or Local Access and Transport Areas (LATAs) Established Pursuant to the Modification of Final Judgment, October 4, 1982, at 15–16 (hereinafter AT & T Application); Department of Justice Response to Comments at 58.

The Operating Companies have also proposed, and the Department of Justice has also approved, two additional exceptions to the general criteria of the decree. Both exceptions would permit the Operating Companies to carry traffic that crosses LATA boundaries in limited situations, despite the general prohibition on such crossings contained in section II(D)(1) of the decree. The first of these exceptions would preserve what are referred to as "Local Calling and Non-optional Extended Area Service (EAS) arrangements." These arrangements, which arose over time under state regulatory auspices, are intended to provide local calling routes and rates within nearby local exchanges. See note 18 supra. The Operating Companies propose to continue these serving arrangements in order to avoid disruption of local routing and rate arrangements, even when the routes are intersected by LATA boundaries. Non-optional EAS customers pay no extra charge for this service over and above their established monthly service charge, but if this service became inter-LATA, an additional charge or higher rates would probably result. No comments were received objecting to this requested exception, either generally or with regard to a specific LATA.

The Court finds that AT & T and the Department of Justice have demonstrated that this exception is consistent with the purposes of the decree, because of its limited scope, the additional charges that would be imposed on ratepayers if these service arrangements were disputed, and because it is unlikely that toll traffic potentially subject to competition will be affected. Department of Justice Response to Comments at 58. Accordingly, where excep-

tions to preserve local calling and non-optional extended area service (EAS) arrangements are proposed, they will be granted. See Parts V through IX infra. In so doing, the Court will not modify this exception, as requested by some intervenors, to include optional Extended Area Service arrangements. (These arrangements give customers the option of paying an additional flat fee to obtain an extended local calling area, thus enabling those who opt for this service to make what otherwise would be toll calls without incurring an additional charge.) Unlike non-optional EAS, optional EAS is provided primarily over toll switching routes instead of direct end office trunks. Thus, because these services are provided through the use of essentially interexchange facilities, interexchange carriers are in as good a position efficiently to carry these calls as are the Operating Companies. Id. at 59–60.

The second proposed exception to Section II(D)(1) is referred to as the "limited corridor exception." This exception is sought in order to permit three Operating Companies to continue their longstanding interstate serving arrangements in two areas: (1) between New York City and Northern New Jersey; and (2) between Philadelphia and Camden, New Jersey. The Operating Companies state that they have proposed this exception on account of an established community of interest in each of these corridors and in order to avoid costly trunking rearrangements and abandonment costs which would otherwise be incurred by the affected Operating Companies. AT & T Application at 13. These corridor exceptions are discussed in more detail below in the context of the review of the proposed New York, Philadelphia, and Florida LATAs.

55. See note 8 supra.

56. The Department of Justice has stated, for example, that even if an area is already large enough to attract several interexchange carriers, it should be enlarged further if this would significantly minimize the costs associated with rearranging the networks. It is in this area particularly that the Court undertakes the most careful scrutiny, particularly since the Department of Justice has been furnished evidence underlying particular conclusions by AT & T, but the Court and the intervenors have not seen that evidence. To the extent that technical information is voluminous, summaries may be submitted to the Court and the intervenors.

TAs involved will not presently be approved or disapproved. AT & T and the Department of Justice will be required to submit the necessary information, and the Court will then promptly make the necessary decisions.

### III

### *Large vs. Small LATAs*

As stated above (pp. 995–996) the objection that has most frequently been raised against the proposals of AT & T and the Department of Justice is that the proposed LATAs, or at least some of them, are too large.[57]

MCI and Southern Pacific Communications Company, to date AT & T's most successful competitors in the interexchange market, argue that all of the proposed LATAs are too large.[58] Other intervenors do not go quite that far, many of them suggesting only that AT & T and the Department of Justice have in specific states departed from the standard contemplated by the decree. A variety of arguments have been made to support the contention that proposed LATAs are too large, and these will now be considered in turn.

### A. *Proper Geographic Basis of LATAs*

The assertion that all the LATAs as proposed by AT & T are based on an erroneous

standard and are therefore vastly larger than what was envisioned throughout the public interest proceedings is simply wrong.

MCI and Southern Pacific suggest that all the LATAs be reconfigured to render them coextensive with the local calling areas on the ground that this is the standard envisioned by the decree.[59] As indicated at pp. 993–995 *supra*, LATAs were established as a new territorial measure wholly unrelated to existing exchanges or calling areas. The calling areas reflect historic rate policies; these policies and hence the size of the areas involved have nothing to do with, or have only a coincidental relationship to, the characteristics of social and economic communities of interest that are made relevant to the configuration of LATAs by section IV(G)(1) of the decree. That section IV(G)(1) provides that

> any [LATA] shall encompass one or more contiguous local exchange areas serving common social, economic, and other purposes, even where such configuration transcends municipal or other local governmental boundaries.

There is nothing in that definition to require adherence to regulatory exchange concepts. Thus, the MCI-Southern Pacific contention is based on an erroneous reading of the decree's language and purpose.[60]

---

**57.** Several states or state regulatory bodies argue that some LATAs are too small and should be consolidated into larger entities. These arguments are discussed below in the state-by-state review.

**58.** The suggestions that the LATAs are all too large have a somewhat ironic ring. Prior to approval by the Court of the decree, there was a general concern that AT & T would use its period of control over the Operating Companies to reduce the size of LATAs and to increase their number, and thereby to increase the burden on other carriers attempting to compete with AT & T. See, *e.g.,* Comments of Western Union Telegraph Co. on the Proposed Decree, April 20, 1982, at 21. The supposition then seemed to be that small, numerous LATAs would aid AT & T and disadvantage the other interexchange carriers. Now that relatively larger LATAs have been proposed by AT & T (or the Operating Companies) those critical of the LATA applications maintain that large LATAs will, on balance, work to AT & T's advantage.

**59.** Local calling areas (also referred to as local service areas) are areas designated by regulators, within which a call may be made without incurring a toll charge. Local calling areas are combinations of one or more local exchanges. See p. 995 *supra*.

There are approximately 18,000 local exchanges in the United States, 7,000 of them served by the Bell Operating Companies. Reply Comments of Southern Pacific Communications Co., filed Dec. 8, 1982, at 8. The remaining local exchanges are served by independent telephone companies.

**60.** The decree *does not refer to local calling areas at all;* rather, it provides in section IV(G)(1) only that LATAs are to be combinations of "one or more" local exchange areas. LATAs based on local calling areas would be smaller than the areas served by Class Four switches, and they would therefore be inconsistent with that part of the decree which requires that the Operating Companies own the

Moreover, if the contention of these intervenors were adopted as the appropriate standard, perhaps as many as one thousand LATAs would have to be established [61]—a development that would have unfortunate practical consequences. A division of responsibility based on the local calling area boundaries would most likely have as one result that there would simply be no competitive entry into remote regions of the country,[62] placing AT & T as a practical matter in a monopoly position,[63] and leaving these areas in a precarious situation with respect to both service and rates. Another by-product of the proliferation of LATAs would be that many integrated networks would have to be divided into a number of

entities,[64] with the consequence that significant inefficiencies would be introduced into the telecommunications networks.[65] Thus, the simplistic approach of equating LATA boundaries with local calling areas must be rejected.

### B. Exchange Access for Intra-LATA Toll Service

Several intervenors argue that the establishment of larger LATAs will have as its consequence a significant reduction in competition among the interexchange carriers because under the decree the Operating Companies are not expressly obligated to provide any exchange access to these carriers for intra-LATA toll service.[66] In view

transmission facilities connecting end offices to Class Four switches. Section IV(F).

**61.** Southern Pacific simply states, without elaboration, that fewer than 1,000 LATAs would result if the Court adopted its argument. Reply Comments of Southern Pacific Communications Co. at 9.

**62.** An interexchange carrier need only establish one point of presence per LATA to be in a position to offer its services to all residential and business telephone users within that LATA. No carrier has as many existing points of presence as AT & T. If a LATA were so small as to leave room for only one interexchange carrier efficiently to serve that region through its own facilities, and if AT & T had a point of presence already established in that region, there would be little incentive to a competitor to undertake the expense involved in establishing its own point of presence in this small market area. Hence, the objective of competition would be defeated and AT & T might be left in control of facilities or markets having bottleneck monopoly characteristics.

In this respect, large LATAs could promote competition in the long-distance market. However, depending on how regulators set the access charges to be levied on interexchange carriers, it may not be economically feasible for a long-distance provider to serve all customers in a LATA from a single point of presence. Thus AT & T's competitors may have no choice but to incur the expense of building as many points of presence as AT & T currently maintains in order to compete to serve as many subscribers as AT & T serves. Under such circumstances, however, large LATAs could have anticompetitive effects, in that even if a competitor of AT & T may have points of presence matching those of AT & T, the Operating Company may attempt to provide access to the local network for AT & T's competitors only from one point

per LATA (*i.e.*, one access tandem switch). As a result, the interexchange carrier's call might travel so long a distance from its point of presence to the Operating Company's exchange access facility and back again into the home or business of the carrier's subscriber that the quality of the transmission would fall below an acceptable level and fail to be competitive with the quality of the transmissions that AT & T, using its point of presence which has been designed to lead directly onto the local network, will be in a position to offer. This latter problem of the distance which the interexchange carrier's transmission must travel will be referred to as "backhauling." In its review of the LATA boundaries the Court has attempted to minimize the potentially anticompetitive effects of backhauling.

**63.** This result may not matter to the interexchange competitors of AT & T because the remote areas are unlikely to be profitable to them, at least for the foreseeable future. But of course it matters to the Court in the performance of its public interest function.

**64.** To be sure, a fragmentation of the areas to be served by the Operating Companies might aid AT & T's competitors in the long-haul telecommunications market in a variety of ways, but obviously that aid to interexchange competition is not the only relevant consideration.

**65.** Local calling areas, which in many locations overlap, do not necessarily reflect the manner in which local telephone networks are structured in an engineering sense.

**66.** Section IV(F) of the decree provides that the "exchange access" which the Operating Companies must provide means only the provision of exchange services for the purpose of origi-

of that omission, it is claimed, the larger the LATAs, the more potentially lucrative toll traffic might be wholly beyond the reach of beneficial competition.[67] It follows, so the argument goes, that the proposed LATAs should be significantly reduced in size and increased in number.

It is quite true that under the AT & T-Department of Justice plan, 50 percent of all intrastate toll revenues would be generated by calls within LATAs.[68] Several of the intervenors argue that it would be impossible for competition to develop for this intra-LATA toll traffic if the interexchange carriers were not guaranteed equal access with respect thereto.[69]

The Court agrees with the intervenors that the lack of competition in this market would constitute an intolerable development. The opening up of competition lies at the heart of this lawsuit and of the decree entered at its conclusion, and the significant amount of the traffic that is both intrastate and intra-LATA should not be reserved to the monopoly carrier. However, the solution need not be the fragmentation of the proposed LATAs, for a remedy short of that measure and much more readily tailored to the equal access problem is readily available.

■ The Court has previously noted that intrastate as well as intra-LATA regulation is not preempted by the decree and, hence, that state regulatory bodies will control traffic within the LATAs themselves.[70] The Court, therefore, lacks the authority to require the opening-up of states and LATAs to internal competition over the objections of the states or their regulatory agencies. However, the Court does have the power to make certain that the Operating Companies themselves will not block competition for intra-LATA toll routes where such competition is permitted under state law—as it is in almost all the states.[71] Hence, in order to open up intra-LATA traffic to competition,[72] the Court has decided to exercise its power with respect to the Operating Companies.[73]

nating or terminating *interexchange* telecommunications.

**67.** Under the proposal submitted by AT & T, eight states will be covered by a single LATA each. Several other states have requested this Court to combine several LATAs so that they, too, will be served by a single LATA.

**68.** These are the revenues that would be generated by the so-called MTS—(measured telephone service) and the WATS—(side area telephone service) type lines. The toll portion of this intra-LATA traffic has been estimated by some to be over $5 billion annually. Comments of MCI at 3. Although AT & T's competitors have generally not entered the intrastate toll markets to date (see Reply Comments of Black Citizens for a Fair Media, et al. at 2) several intervenors argue that new technologies will make it increasingly attractive for them to do so, and some have already done so. See, *e.g.,* p. —— *infra;* Comments of Western Union Telegraph Co. at 9.

**69.** Subscribers would then have no choice but to look to the Operating Companies for handling all intra-LATA calls—which in some states could be all intrastate calls. See note 67 *supra.*

**70.** See 552 F.Supp. at 159 n. 117 (states may continue to require a regulated monopoly in

local telephone service and intrastate toll service).

**71.** It appears that the Commonwealth of Virginia is the only state which prohibits competition for intrastate phone calls. While it is unclear whether Virginia will adhere to this policy—which after divestiture could mean that AT & T will have a monopoly for inter-LATA calls, see pp. 1026–1027 *infra*—the trend among the states has been toward encouraging intrastate competition. Thus, the Court need not consider at this point what measures could or should be taken under the decree or otherwise if states attempted on a significant scale to impede the development of the competitive environment envisioned by the decree.

**72.** Notwithstanding the failure of the decree explicitly to provide for equal access with respect to intra-LATA toll traffic generated by interexchange carriers, competition with respect to all toll traffic was always contemplated.

**73.** Initially, the Department of Justice stated that it might condition its approvals of LATAs combining more than one SMSA upon agreements by the Operating Companies to provide equal access to carriers wishing to carry traffic between points within a LATA. See May 20, 1982 Response of the United States to Public

The Court will accordingly decline to grant the approvals required by section IV(G)(3) for the consolidation of statistical areas into one LATA or for any other exception (see note 54 *supra*) unless the Operating Company having control of the area in which the LATA is to be established files a written commitment that it will provide equal access to the interexchange carriers with respect to all LATAs within its control, on a non-discriminatory basis, for intra-LATA as well as for inter-LATA traffic.[74] All such commitments shall be filed by the Operating Companies within 15 days of the date of this Opinion, and all approvals for such consolidations or other exceptions granted herein are hereby made contingent upon such filings.

### C. Competition from Operating Companies

It has been suggested that even if interexchange carriers will be theoretically free to carry intra-LATA toll traffic, they may, as a practical matter, be deterred from doing so because of competition from the Operating Companies themselves. The interexchange carriers will have to depend upon access to the local network that will be provided by competitors—the Operating Companies—and this dependency, it is said,

will create an incentive for the local companies to discriminate against the interexchange carriers and thereby to subvert the equal access requirements of the decree. Only much smaller LATAs will avoid this, according to some of the intervenors, who quote from the Court's August 11, 1982 Opinion, to the effect that "[t]o permit the Operating Companies to compete in [the interexchange market] would be to undermine the very purpose of the proposed decree—to create a truly competitive environment in the telecommunications industry." 552 F.Supp. at 188.

The Operating Companies will not compete at all in any inter-LATA markets,[75] and they will have a strong incentive to promote overall interexchange carrier access in order to maximize access revenues. Indeed, through the access charges they will collect, these companies would obtain revenue even from the intra-LATA traffic handled by interexchange carriers—and exchange access charges will most probably be a major component of the economic value of any intra-LATA toll call.[76] Because of that factor, the Operating Companies should not have a substantial incentive to subvert their exchange access obligations in this area, and they may therefore be expected not to do so.[77]

---

Comments on the Proposed Modification of Final Judgment at 78–80. Subsequently, the Department ignored this option, and it now simply points out that regulatory commissions are free to make the decree's equal access provisions applicable to intra-LATA traffic. Department of Justice Response to Comments at 8. The Court finds, however, that the decree's objective of opening-up toll traffic to competition is so fundamental that, in the absence of Justice Department action, it must condition its approval of the various requested exceptions (measures expressly prohibited absent court approval) upon commitments by the Operating Companies to provide equal access for all toll routes. In view of the availability of this authority, there is no need at this time for the Court to exercise the power granted to it by sections VII and VIII(I) to issue orders to modify the decree.

**74.** If an Operating Company is affirmatively prohibited from granting such access by a command of a state regulatory body acting under state law, its failure to abide by its commitment will be deemed excused.

**75.** Two minor exceptions to this general rule are the non-optional EAS arrangements and the limited corridor exceptions discussed in note 54 *supra.*

**76.** Because intra-LATA toll calls will usually be intrastate calls, access charges for intra-LATA traffic will often be set by state regulators.

**77.** As for the statements from the August 11, 1982, Opinion referred to above, they explain only the Court's decision not to alter the decree to permit the Operating Companies to carry *inter-LATA* traffic in competition with AT & T and other interexchange carriers; they cannot be regarded as a rule prohibiting the Operating Companies from engaging in short-haul toll operations within a LATA. This distinction was recognized at the time the proposed decree was submitted to the Court for its approval. See, *e.g.,* Response of the United States to Public Comments on the Proposed Modification of Final Judgment, May 20, 1982, at 111 n. *.

In a similar vein, a number of intervenors contend that the establishment of relatively large LATAs increases the likelihood that access charges will be computed in such a way as to disadvantage AT & T's competitors. In this regard, it is claimed that the proposed LATAs will increase the number and variety of local facilities the costs of which could be manipulated, particularly by averaging, so that interexchange carriers will be forced to bear costs exceeding those of the transport facilities they actually utilize.

AT & T's competitors currently do not serve many higher-than-average-cost areas and, with fewer points of presence, they are more dependent than AT & T on Operating Company local access facilities. Depending upon how access charges are computed, it is argued, the establishment of large LATAs could result in the payment of higher charges by the interexchange carriers to reach their subscribers than would be the case with smaller LATAs (where presumably the carriers could, at least temporarily, forego serving less densely populated, and therefore less profitable, areas).[78]

As we have seen (pp. 998–999 *supra*), the Federal Communications Commission has set the access charges under its jurisdiction to benefit the interexchange carriers and their commercial customers rather than the Operating Companies and the local rate-payers. In this respect at least, the fears of AT & T's competitors have already been proved to be unfounded.[79]

Insofar as local regulation is concerned, the decree, to be sure, "leaves to the [local] regulators the decision as to what costs should be included in this calculation."[80] However, it may reasonably be expected that these regulators will be sensitive to the possibility that interexchange carriers, which are vital to the economic and social life of the various states, might be disadvantaged by the setting of access charges. In any event, it is these regulators, rather than the Court, which have jurisdiction to resolve the policy issues involved in the calculation of access charges.

Approval of the LATAs cannot, as a practical matter, be postponed until more is known about the level of the access charges, because by necessity the LATAs must be configured first so that access charges may be calculated on the basis of the fixed costs of the facilities which will be used by the Operating Companies to provide access to the local networks.[81] In view of the uncertainties created by contingencies within the

---

78. See, *e.g.*, Reply Comments of MCI at 11; Reply Comments of Southern Pacific Communications Co. at 12, 17–19. Intra-LATA transport facilities vary considerably in terms of traffic densities and other characteristics; and the cost of carrying traffic to less populated areas, where currently only AT & T provides long distance service, often exceeds the cost of transporting calls in more densely populated areas.

79. Some of AT & T's competitors argue that if access charges are based on the average costs incurred by the Operating Company to transport calls within each particular LATA it serves, then these competitors will, in effect, be paying for the facilities in rural areas where only AT & T currently serves. AT & T's competitors note the problems they will face if they attempt to serve such remote areas in the near future, and they argue therefore that the Court should require that many of the larger LATAs be severed so that higher-than-average-cost areas are not combined with lower-than-average-cost areas. However, it appears that the FCC has decided that access charges for interstate calls will not be set on a LATA-specific basis, but rather will be based on the total costs of the Operating Company for all territory it serves. See *In the Matter of MTS and WATS Market Structure*, CC Docket No. 78–72, Phase I (adopted December 22, 1982) at ¶¶ 323–26. Thus, it appears that the size of the LATAs will have little effect on the establishment of access charges for interstate calls.

80. 552 F.Supp. at 169 n. 161; see also, 552 F.Supp. 196 at n. 271.

81. The same reasoning applies to the arguments made by other intervenors that more information is needed concerning the manner in which the Operating Companies will meet their exchange access obligations. The LATA boundaries must be drawn first so that Bell System assets may be divided under the "predominant use" test of section VIII(G). Moreover, the decree itself provides that each Operating Company will individually decide how it plans on providing exchange access, and will submit this plan to the Court six months *after* divestiture. Section II(C).

control of the regulators, as well as the fact that the same intervenors who point to the possible dangers of large LATAs with respect to the setting of access charges acknowledge that it is also possible that large LATAs will actually promote competitive entry,[82] a peremptory rejection of the proposed LATAs on this basis is not justified. However, as indicated elsewhere herein, the Court is closely scrutinizing those proposed LATAs which would involve consolidations of statistical areas, and which for that reason require express Court approval under section IV(G)(3) of the decree, in order to determine whether the consolidations are reasonable in light of the potential for anticompetitive practices or effects.

## IV

### Relationship With Independent Telephone Companies

What remains to be considered as part of this general review are two aspects of the relationship between LATAs and Independent Telephone Companies (ITCs):[83] (1) whether the Court should require that the ITCs be given greater opportunity than is presently provided for participating in the process of classifying telecommunications traffic between their territories and the LATAs as either interexchange or intraexchange[84] under the decree; and (2) whether

the plan submitted to the Court is faulty because a number of LATAs are not composed of contiguous areas.

### A. *ITC Role in Classification of Traffic*

The decree does not impose any obligations or restrictions on the ITCs, either directly or by way of the configuration of LATAs.[85] However, there now is and there obviously will continue to be telecommunications traffic between the LATAs and ITC territories. It clearly is necessary for purposes of the decree to classify this traffic as either "interexchange" or "intraexchange" because (1) if certain traffic is classified as "interexchange" it may not be carried by the Operating Companies (a prohibition which applies to interexchange traffic involving ITC territory as to all other interexchange traffic),[86] and (2) Bell System assets will be assigned at the time of the divestiture to either AT & T or the Operating Companies depending upon whether the predominant use of those assets is to provide interexchange or intraexchange service.[87]

A procedure has been established whereby Bell-to-ITC classifications have been submitted to the Court for purposes of public comment and approval.[88] A number of ITCs, however, desire more than the oppor-

---

**82.** Large LATAs could promote competition in the long-distance market by reducing the number of facilities which AT & T's competitors may have to build. See note 62 *supra.*

**83.** There are some 1,459 independent telephone companies, serving over 35 million telephones in the United States. Comments of United States Independent Telephone Association at 1. GTE Corporation (GTE) is the largest of the ITCs, serving 16 million telephones in 29 states. Comments of GTE at 1–2.

**84.** "Interexchange" as defined in section IV(K) of the decree is identical to what has generally herein been referred to as inter-LATA"; and "intraexchange" is identical to "intra-LATA."

**85.** The LATAs will not include any ITC areas. This is consistent with the decree which requires only that all points served by the Bell Operating Companies be included in a LATA. Section IV(G)(2). The LATAs were drawn without reference to the ITC areas to ensure

that the decree could not be construed as imposing any obligations or restrictions on the ITCs themselves.

**86.** Section II(D)(I).

**87.** Section VIII(G). If certain Bell-to-ITC traffic is classified as "intraexchange," the Operating Company which is involved in that traffic will normally be assigned the Bell System facilities devoted to serving that traffic, but AT & T will be assigned those facilities if the traffic is classified as "interexchange."

**88.** By order of this Court dated February 23, 1983, the intervenors (including many of the ITCs) were granted 20 days from that date to comment on the Operating Company classifications of Bell-to-ITC traffic. Thereafter, AT & T had ten days during which it filed its response, followed by an additional ten days during which the Department of Justice filed its response and recommendations.

tunity to comment; they seek an order directing the Operating Companies to negotiate the treatment of the Bell-to-ITC traffic with the independents before any proposals are submitted to the Court.[89]

■ The proposed ITC procedure will not be accepted, for several reasons. In the first place, the procedure suggested for the proposed negotiations is so amorphous as to be incapable of judicial enforcement.[90] Further, as indicated above, under the procedures established by the Court, the independents have a right and the opportunity to express their views to the Court with respect to the Bell-to-ITC traffic classifications.[91] Finally, although the division of particular Bell System assets is dependent upon the classification of Bell-to-ITC traffic, the ownership of independent telephone company facilities will in no way be affected, nor will the classification of such traffic as either interexchange or intraexchange

under the decree limit the ability of independents to identify and serve their own territories in whatever manner they may choose.

The proposed classifications will determine only whether the Bell Operating Companies may provide service between their LATAs and certain ITC territories. If an Operating Company is permitted to carry certain traffic between its LATA and an ITC's territory because that traffic is classified as "intraexchange," this does not exclude such service by AT & T or other interexchange carriers,[92] and the ITCs will retain the ability to deal directly with any such interexchange carrier.[93] On the other hand, if certain traffic is classified as "interexchange" under the decree, no negotiated agreement can overcome the prohibition on Operating Company transport of such traffic. Finally, regardless whether traffic is classified as interexchange or intraexchange, an ITC will have the option of

---

**89.** The basic argument of the independents appears to be that it would be unfair to allow the Operating Companies unilaterally to classify Bell-to-ITC traffic without ITC participation.

The intervenors also contend that the completion of the comment and review process of the Bell-to-ITC traffic classifications should precede the Court's decision on the LATA proposals. Such a delay is unnecessary. The Operating Company classifications of Bell-to-ITC traffic filed with the Court on February 17, 1983 involve no change in the previously proposed LATA boundaries, with the exception of minor changes in Illinois that are discussed *infra;* and there is no "inclusion" or "incorporation" of ITC territory into the LATAs. See Submission of Operating Company Determinations Concerning the IntraLATA or InterLATA Character of Bell Independent Traffic at 2, 7. Court review of the Bell-to-ITC traffic classifications should not, except in relatively few circumstances, affect the validity of the LATA proposals themselves. Moreover, Court approval of the LATAs is only tentative; the Court may require changes in LATA boundaries if this becomes necessary due to other aspects of the plan of reorganization.

**90.** GTE seeks a court order directing that "each BOC shall negotiate in good faith with and take into account the views of the independents." Further, the requested order would require the submission by each Operating Company of a statement agreed upon with the independents "to the extent possible," and it would also require the Department of Justice to monitor

compliance with the Operating Company's negotiation requirement.

**91.** On March 15, 1983, numerous intervenors filed comments on the February 17, 1983, AT & T submissions concerning the character of Bell-to-ITC traffic.

**92.** Because the decree does not require as such that an Operating Company provide service to areas which it may serve, it is possible that an Operating Company and AT & T may agree that AT & T will provide service to areas which the decree would also permit the Operating Company to serve. The Department of Justice has stated that, for its part, it would not object to such arrangements as long as there would be no impairment of the Operating Company's ability to fulfill its exchange access functions under the decree. Department of Justice Memorandum in response to GTE's motion at 6 n. **\*\***; Letter from James P. Denvir to Jim G. Kilpatric, November 17, 1982 at 7.

**93.** There appears to be no basis for GTE's contention that once an ITC's exchanges are associated with a LATA because the traffic between them is classified "intraexchange," the ITCs will lose all meaningful say with respect to the manner in which it will deal with interexchange carriers. Regardless of the classifications, the ITCs will retain the option of offering exchange access to their areas independently of the Bell Operating Companies serving arrangements and access charge tariffs. Department of Justice Response to Comments at 55.

establishing a relationship with the Operating Company whereby the ITC would be the carrier of traffic between the Operating Company LATA and the ITC's territory.[94] Thus, it is not true, as some have argued, that the Operating Companies will be classifying the independent's own traffic, for the classifications will restrict only the Operating Companies, not the ITCs.[95]

### B. *The Contiguity Requirement*

Section IV(G)(1) of the decree provides that LATAs "shall encompass one or more contiguous local exchange areas . . . ." Several intervenors argue that many of the LATAs violate this requirement. For example, MCI claims that the commonly-accepted meaning of "contiguous" is "being in actual contact," and it argues that many LATAs are not in actual contact. According to MCI, the result is the establishment of LATAs which encompass considerable long-distance traffic, such as the Provo LATA (which consists of 19 segments extending over 400 miles) and the Witchita LATA (which consists of 18 segments and also extends some 400 miles). All these arguments rest on a flawed premise.

The fact is that the proposed LATAs represent only Bell System territory, and areas served by independent telephone companies, which in one sense may be said to interrupt the contiguity, are therefore irrelevant in judging contiguity for purposes of the decree. None of the LATAs proposed by AT & T is interrupted by territory from a different LATA and accordingly the LATAs as proposed fully satisfy the purposes of the contiguity requirement. The LATAs could well have been drawn so that every point in each state, including the areas served by the independent telephone companies, was within a LATA, in which case all of the proposed LATAs would be contiguous, uninterrupted territories. Instead— apparently out of a desire to ensure that the decree not be interpreted as imposing obligations on the independent telephone companies—AT & T proposed LATAs which

---

**94.** *Id.* at 55 n. *.

**95.** In addition, GTE asks the Court to rule that where an ITC is the main provider of local service in what GTE terms a "market area," Bell exchanges within that market area should be "associated" with the ITC territory. What this means, in layman's language, is that the Bell subscribers in these exchanges would gain access to the long distance network by means of independent-owned facilities rather than Bell facilities.

GTE explains that in the past few years changes in population patterns have prompted it and other independent companies to begin to invest in toll centers and other facilities to enhance service to their own subscribers. These new facilities, it is said, may be able to provide more efficient switching services to nearby Bell exchanges than can existing Bell facilities located further away. GTE is concerned (1) that divestiture not disturb existing arrangements where Bell exchanges home on (*i.e.,* are connected to) independent facilities and (2) that divestiture not prevent future rehoming of Bell exchanges onto independent facilities where both the Operating Company and the independent company agree that this would achieve more efficient serving arrangements and be in the interests of the ratepayers.

The decree neither requires nor prevents such joint Operating Company-ITC arrangements, and there is no need to modify the decree to incorporate the "market area" concept as GTE suggests. The Department of Justice has already indicated that it believes that in certain cases the Court should approve such arrangements (which would necessitate the creation of separate LATAs for the affected Bell exchanges) provided that the relevant ITC makes a commitment to provide equal access to both the Bell and non-Bell exchanges that it then would serve. Memorandum of the United States in response to GTE motion at 8; Department of Justice Response to Comments at 53, 54 & n. *. This procedure seems to constitute an appropriate mechanism. Therefore, if and when the Department of Justice has received the assurances it seeks, it should submit a single application to the Court requesting modification of the LATA boundaries to accommodate these joint homing arrangements. At that time, the Court will consider granting the necessary judicial approval. The Court expects that in most cases the modifications will be minor, affecting but a few exchanges (an exception is San Luis Obispo County, a relatively large area which California regulators believe should be included within GTE's Santa Barbara territory). The Department of Justice should inform the Court within 15 days of its intentions in this regard, and of the status of its negotiations with GTE and other ITCs concerning their assurances about the provision of equal access.

encompassed only Bell System territory. That was an appropriate choice.

The purpose of the contiguity requirement is to guarantee that the Operating Companies will not have the ability to structure the LATAs in such a way as to permit them to re-enter the interexchange market by means of a gerrymander of LATA boundaries.[96] That requirement was not intended to compel a drawing of LATA lines in such a way as to isolate Operating Company exchanges too small to stand on their own as local distribution networks. If LATAs were to be limited to contiguous Bell System territories, many integrated local networks would have to be splintered,[97] and separate LATAs would have to be created for areas that are far too small to be attractive to several interexchange carriers. Moreover, such an approach would lead to many LATAs smaller than the areas served by Class Four switches, producing inefficiencies which would be likely seriously to undermine the viability of the Operating Companies. The requests of the intervenors regarding the contiguity requirement are accordingly rejected.

## V

### New England

The states of Maine, New Hampshire, Vermont, Rhode Island, and Massachusetts[98] are served by the New England Telephone Company. Except for issues concerning Boston, the New England area LATAs are relatively noncontroversial. The Court approves five of the LATAs as proposed and orders a division of the proposed Eastern Massachusetts LATA, for a total of seven LATAs in New England.

#### 1. Maine, New Hampshire, Vermont

New England Telephone (NET) has proposed that one LATA be formed for each of these three New England states, and the Department of Justice concurs in that proposal. No one has objected to the size of the three LATAs or to the SMSA consolidations[99] that would be required in New Hampshire[100] and in Maine[101] to arrive at single LATAs in those states. The Court approves the application to establish a single LATA each in Maine, New Hampshire, and Vermont. A single LATA is reasonable with respect to each of these states in view of the number of towns and telephone networking arrangements that would have to be divided were there instate LATA boundaries, and the high access charges that would be likely to result from smaller LATAs given the relatively sparse populations and the concomitant high cost of local facilities capable of serving the rural subscribers.

**96.** See Department of Justice Response to Comments at 43.

**97.** A state such as Montana would have 35 LATAs instead of the two which are proposed; and 18 LATAs in Utah would have an average population of 8,000 each. Department of Justice Response to Comments at 44–45.

**98.** Connecticut, which is usually regarded as a New England state, is practically devoid of Bell territory. Its residents and businesses, with only a few exceptions, do not receive telephone service from a Bell Operating Company. The exceptions are treated under the Mid-Atlantic heading.

**99.** The decree provides that no exchange area "which includes part or all of one standard metropolitan statistical area (or a consolidated statistical area . . .) shall include a substantial part of any other standard metropolitan statistical area (or a consolidated statistical area

. . .) unless the Court shall otherwise allow." Section IV(G)(3). In discussing the proposed SMSA consolidations the Court will refer to the number of main and equivalent main stations, i.e., access lines, as the number of "subscribers."

**100.** The Portsmouth-Dover-Rochester SMSA, with 124,000 subscribers, would be consolidated with the Manchester-Nashua SMSA, which has 258,000 subscribers. The two areas are 36 miles apart.

**101.** The proposed consolidation of Bangor with Portland initially gave the Department of Justice pause. Bangor has 116,000 subscribers and is 109 miles from Portland, which has 240,000 subscribers. The Department states that it was persuaded by NET to approve the consolidation in the interest of efficient provision of access. Lewiston, with 32,000 subscribers, also would be consolidated with Bangor and Portland.

Various exceptions requested by the Operating Company and the Department of Justice to extend the three LATAs beyond state boundaries in certain places are another matter, however. As proposed, the New Hampshire LATA would include seven Maine border communities [102] and ten Vermont areas; [103] the Vermont LATA would encompass seven New Hampshire communities [104] and one Massachusetts town; [105] and two other Vermont towns would be located within the Albany (New York) [106] and Western Massachusetts LATAs,[107] respectively. The states of Vermont and Maine and their respective public service commissions object to these proposed state line crossings [108] and request the Court to require that the LATAs conform to the perimeters of their states. Maine adds that, should New England Telephone's contention that facilities do not presently exist to accommodate the request prove to be correct, then the state line exceptions should be allowed but only on a temporary basis, and they should only be as broad as is necessary to be "consistent with economical construction planning."

All the interested parties appear generally to agree that the placement of the 26

communities at issue in or out of their own states' LATAs would not affect the competitive purposes of the decree. In fact, the neutral impact of the state line exceptions on competition is the reason the Justice Department is largely indifferent to them.[109] However, as indicated in Part II *supra,* the decree implicates interests in addition to the promotion of competition, and as to two of these interests—universal service and the equitable treatment of ratepayers—the States of Vermont and Maine are clearly not indifferent.[110] Nor is the Court.

Both states interpret the requested state line exceptions to mean that a call placed from a telephone in one of the affected border communities to a telephone outside that community but in the same state would become an inter-LATA call, capable of transmission only by an interexchange carrier. They opine that all services previously supplied to such communities by NET would have to be furnished after divestiture by an interexchange carrier, if at all.[111] In this regard, the states posit regulatory problems, and they speculate that telephone

---

**102.** Ashland, Berwick, Eliot, Kittery, South Lebanon, and Wilson's Mills.

**103.** Canaan, Lemington, Bloomfield, Maidstone, Guildhall, Wells River, Thetford, Norwick, Weathersfield, and Westminster.

**104.** Monroe, North Walpole, Oxford, Piermont, Plainfield, West Chesterfield, and West Lebanon.

**105.** Monroe Bridge.

**106.** Town of Wells.

**107.** Town of Stamford.

**108.** The decree provides that "except with approval of the Court, no exchange area located in one State shall include any point located within another State." Section IV(G)(4).

**109.** Department of Justice Response to Comments at 59. The indifference is somewhat disingenuous, however, when one finds that the Department's various averments that it discusses the concerns expressed by Vermont and Maine in other sections of the response prove to be illusory. In the section of its comments

devoted to Maine, the Department refers the reader to New Hampshire. The New Hampshire discussion, however, merely refers the reader to the Department's general discussion of the state line exceptions in the preface to its state-by-state analysis. Meanwhile, the discussion devoted to Vermont claims that the concerns expressed by Vermont "are dealt with in the discussions of the other LATAs (New Hampshire, Western Massachusetts and Albany)." Like the discussion devoted to New Hampshire, those relating to Western Massachusetts and Albany also refer the reader simply to the general preface. The result is that the concerns expressed in the filings of Maine and Vermont are nowhere directly responded to by the Department.

**110.** Vermont observes that "It does not seem logical that the [decree] should be enforced in a manner that increases costs to [those] local ratepayers ... who stand the least to gain from any increases in competition brought about by this settlement." December 10 Comments at 5.

**111.** These services include private lines, alarm service, and optional calling services.

users in these 26 areas [112] may experience reductions and disruptions in services, as well as increases in rates—all because New England Telephone finds it practical to deliver them their dial tones from wire centers located in adjacent states.

The Court will approve the requested state line exceptions only if New England Telephone and the Department of Justice apprise the Court of their response to the concerns expressed by Maine and Vermont, stating in particular the impact the exceptions are likely to have on residents of the 26 affected communities.[113] Specifically, the Court expects the Operating Company and the Department, either jointly or separately, to provide it with information within 15 days of the date of this Opinion [114] on the question whether telephone users in these areas will, after divestiture, continue to be offered the same bundles of services at prices no different from other Maine and Vermont residents and, should the answer be in the negative, what variations are probable.[115]

112. The areas include approximately 17,000 subscribers.

113. Various state line exceptions are sought and approved by the Court without special requirements elsewhere in the nation. However, except in these New England instances, few comments were targeted to this issue, and one may properly infer from the special interest expressed by Vermont and Maine that state line exceptions pose particular problems for telephone users in these states not felt elsewhere.

114. Maine and Vermont may respond within ten days after the filings are effected, and the Department of Justice and New England Telephone may reply five days thereafter. See note 41 *supra*.

115. New England Telephone claims that the alternative to the extensions of the LATAs beyond state boundaries is disruption of service resulting from the need to rewire these areas to wire centers within their own states. Another alternative not requiring rewiring would appear to be to allow NET to continue to serve the areas from the existing wire centers but to grant "mini-corridor" exceptions so that a call from a Vermont household served by a New

### 2. Rhode Island

A single LATA has been proposed for Rhode Island by New England Telephone Company and approved by the Department of Justice. No intervenor has adversely commented on this proposal; it appears to the Court to be fully justified; [116] and it is hereby approved with the boundary exceptions proposed which are necessary to preserve existing wire center serving arrangements and existing local calling and non-optional EAS arrangements.

### 3. Massachusetts

The principal issue pertaining to Massachusetts is whether the extremely large Eastern Massachusetts LATA [117] should be divided, and if so, whether the division should result in two or three LATAs, the areas involved being those surrounding Boston, Worcester, and New Bedford. Since all three of these areas are New England County Metropolitan Areas (NECMAs),[118] if two or more of them are to be combined, it could be done only on the basis of the grant of an exception by the Court.[119]

Hampshire wire center to another Vermont household served by a Vermont wire center could be carried by the Operating Company. This alternative may raise problems of its own, and it may require a kind of regulatory oversight that is not practical. Nevertheless, in the interest of informed decision-making, the Court expects the Operating Company and the Department to comment on its advisability and on the feasibility of the other suggestions contained in the Vermont and Maine filings, including the option of temporary exceptions pending conversion to LATAs coextensive with the three states' boundaries.

116. The LATA would include the single New England Consolidated Metropolitan Area of Providence-Warwick-Pawtucket.

117. There is little problem with respect to the Operating Company's proposal for a single western LATA, which would include the Pittsfield and Springfield NECMAs. See *infra*.

118. NECMA is a concept used only in New England which may, depending upon the context, be equated with what elsewhere would be an SMSA or, in the case of Boston, an SCSA.

119. See pp. 1001–1002 *supra*.

When the New England Telephone Company proposed only one LATA for eastern Massachusetts, the Department of Justice refused to approve that proposal pending the receipt and review of further information. Having conducted that review, the Department informed the Court that it would not approve the consolidation of the Worcester-Fitchburg-Leominster NECMA with the Boston-Lowell-Brockton-Lawrence-Haverhill NECMA, but that it would approve a combination of the Boston NECMA and the New Bedford-Fall River NECMA.[120] New England Telephone and the Massachusetts Public Service Commission urge the Court to require the consolidation of all three regions into one LATA,[121] while several intervenors point to the Eastern Massachusetts LATA as one of the grossest departures from the terms of the decree and ask the Court not to approve it.[122]

The Department of Justice, in a careful analysis balancing the competing interests, concluded that the establishment of one LATA for this area would be unreasonable, and the Court, in the main, agrees with this conclusion. It would constitute a substan-tial departure from the decree's single community of interest standard to combine all three of these long-established, varied, and active cities into one LATA, and it would give the decree little effect in Massachusetts, one of the more urbanized and populous states in the country.

As concerns the proposed consolidation of Worcester with the Boston-New Bedford area, the available information indicates that New England Telephone is exaggerating the costs associated with establishing a separate Worcester LATA. Not all trunking will have to be rearranged since non-optional EAS routes will be retained by Operating Companies after divestiture.[123] Moreover, to the extent that the costs are associated with the provision of access to subscribers in a separate Worcester LATA, the Court is not persuaded that NET would have to build an entirely new switch in Worcester in order to provide equal access to all interexchange carriers. The No. 4 cross bar AT & T switch located in Worcester appears to be ideal for the provision of access according to several interexchange competitors.[124] NET would merely have to

120. Memorandum of the United States concerning the proposed Denver, Miami, and Boston LATAs, December 22, 1982.

121. NET contends that separating the Worcester NECMA would entail the following costs: (1) necessary one-time trunk rearrangements costing $11.1 million; (2) $700,000 per year for 28 years to maintain an additional digital switch in Worcester rather than to serve Worcester from a central switch in Framingham (the Framingham switch has been contemplated but construction of it has not started); and (3) $2 million to modernize four small central offices in the separate Worcester LATA. The company claims that it "would have to generate additional annual revenues in excess of four million dollars per year for twenty years to support these expenditures," and that these costs would divert capital needed to upgrade equipment to meet its equal access obligations, resulting in lower quality access. The Department and the intervenors, in contrast, argue that access to Worcester subscribers will be cheaper and of a higher quality if Worcester is a separate LATA.

122. These include the United Church of Christ, *et al.* and several of AT & T's competitors, *e.g.,* Satellite Business Systems, GTE, MCI, and U.S. Telephone Communications, Inc.

123. In addition, the Department of Justice points out that rearrangements would occur as well under NET's plan to rehome exchanges onto a new Framingham switch, yet NET does not supply (1) the costs that would be incurred in both plans, or (2) the costs that would be incurred only in connection with the Framingham consolidation but would be avoided under the Department's alternative.

124. Aside from the No. 4ESS switch, the most technologically advanced of all the Bell System switches, "the only really suitable switch for handling toll traffic is the No. 4 cross bar," according to Southern Pacific Communications Company. Reply Comments, Appendix C, at 9. The company states that despite the switch's age, "because of its capacity and the fact that it is a 4-wire switch with stored program control, it is still a useful toll switch." Satellite Business Systems, in its comments, also identifies the existing Class 4 office in Worcester as suitable for upgrading to an access tandem. AT & T is noticeably silent about the No. 4 cross bar switch in its filing entitled Current Planning for Equal Access. Perhaps this is because AT & T has slated nearly all of these switches, 43 of 52, to belong to it after divestiture, including the Worcester No. 4 cross bar. AT & T refers to modifications that could be made to the No.

lease the space necessary for access [125] until such time as it became necessary and financially feasible to build a new facility. To be sure, it will cost something to dismantle parts of the Boston area system, but that is primarily due to the fact that this system was designed to operate as a monopoly and has been so operated for many years. Worcester is a large community with a clearly defined separate identity from Boston, and it is appropriately placed in a separate LATA.

It is reasonable, however, to consolidate New Bedford and Boston. Although located at a greater distance from Boston than Worcester, New Bedford has about 70,000 fewer subscribers than Worcester (181,000 compared with 250,000). Thus, the consolidation of Boston with New Bedford has less anticompetitive potential viewed purely in terms of numbers than would that of Boston with Worcester. More important, the new No. 4ESS switch soon to be completed in Brockton, which is located between Boston and New Bedford, will enhance the efficiency of the Massachusetts telephone system since it will be able effectively to perform both intra-LATA transport and inter-LATA exchange functions for the Boston and New Bedford areas. Drawing a LATA boundary between Boston and New Bedford would limit the area the switch could serve, deny to many ratepayers the benefits of NET's modernization, and oblige all NET ratepayers to absorb the sunken investment for this switch.

For the reasons stated, the Court approves the Department of Justice's recommendation that there be established in eastern Massachusetts two LATAs, one drawn around Boston and New Bedford,[126] the other centering on Worcester. The precise boundaries of these LATAs shall be drawn by New England Telephone [127] and submitted to the Court and the Department of Justice within 15 days of this Opinion.[128]

The Western Massachusetts LATA, while far less controversial than that for eastern Massachusetts, nevertheless requires specific Court approval, for it would consolidate the Pittsfield NECMA and the Springfield-Chicopee-Holyoke NECMA. No comments were received objecting to the consolida-

5XB and No. 1XB, but Southern Pacific states that these are among the switches that would impose additional costs on competitors, and diminish the quality of access, if they are used by the Operating Companies as the primary means of providing access. This is because they are 2-wire switches according to Southern Pacific. "Since long haul transmission for all carriers is generally 4-wire, switching for local access will require 2 to 4-wire conversions which cause transmission quality signal problems through the introduction of echo." Reply Comments, Appendix C, at 11. Although the division of assets will occur in the next stage of review of the reorganization plan, in some cases it is helpful to look at the switching situation and the various means by which access might be provided in order to draw LATA boundaries that will assist in the formation of a truly competitive environment.

125. See section I(A)(2). In addition, NET contends that only if the entire area were to be in a single LATA could it retain the new No. 4 ESS switch in Brockton, which it states is necessary for efficient equal access in the Boston and New Bedford areas, predicting that if Worcester were eliminated from the LATA, this switch would have to be awarded to AT & T under the predominant use test due to the diminished intra-LATA traffic that would result from Worcester's exclusion. This argument overlooks the fact that under the decree the predominant use test may be disregarded and a facility allocated to an Operating Company when it is necessary for the provision of equal access. Section I(A)(1); VIII(G); Opinion at 552 F.Supp. 200, 206. When it comes time to allocate assets, the Court may order that NET receive control of the Brockton switch.

126. This LATA will include, from south to north, all of southeastern Massachusetts—including Cape Cod, Nantucket, and Martha's Vineyard—Boston and Cambridge and their surrounding towns, and the areas to the north of Boston, such as Manchester and Andover.

127. NET is in the best position to draw the new LATA boundaries, taking into consideration its existing trunking and service arrangements.

128. The Department should inform the Court of its views within ten days after its receipt of the NET proposal, and intervenors may also submit their views by that deadline. NET and the Department should attempt to reach agreement on the transitional exceptions that would allow the Operating Company to spread the costs of rearrangement over a period of years.

tion,[129] and it is fully justified by the fact that all of western Massachusetts either now receives, or shortly will receive, its Class Four tandem access from the No. 4ESS switch in Springfield. The consolidation will therefore be accorded an exemption, and the LATA is approved together with the requested exceptions for non-optional EAS.

## VI

### *Mid-Atlantic*

■ The Mid-Atlantic states of New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, and the District of Columbia are served by several Operating Companies. Two of the LATAs proposed for these states, New York Metro and Philadelphia, are among the largest and most controversial of all the LATAs contained in the AT & T application. In all, AT & T proposed 19 LATAs for these states, 13 of which would require exceptions for the consolidation of two or more major cities. The Court approves 16 LATAs as proposed, withholds approval of two LATAs pending receipt of additional information, and orders division of the proposed New York Metro area into two LATAs, for a total of 18 LATAs in the Mid-Atlantic states.

1. *New York State*

a. *New York Metropolitan Area*

The LATA proposed by the New York Telephone Company for the southeastern portion of New York encompassing New York City, Westchester County, and Long Island is the largest of the proposed 161

LATAs by most measures. If approved in its current form, it would include 12 million individuals, six million main and equivalent main stations, 23 toll switches and parts of 22 congressional districts. It would reach from the tip of Suffolk County in Long Island westward some ninety miles to the Hudson River, and from lower Manhattan northward to the Newburgh-Middletown and Poughkeepsie SMSAs, a distance of over 70 miles. Not only would the New York Telephone Company be able to transport a call between any two points in this expanse, but under the terms of a proposed "limited corridor" exception, it could also carry telecommunications traffic between New York City and five Northern New Jersey counties.[130]

In its November 23, 1982 response to the Operating Company proposal, the Department of Justice formally announced its disapproval of the inclusion of the Poughkeepsie SMSA in the New York Metro LATA. New York Telephone has since advised the Court that it "will not continue to insist" on joinder of Poughkeepsie and New York City,[131] but the New York State Public Service Commission still advocates the joinder.

The exclusion of Poughkeepsie from the New York Metro LATA was originally urged by six intervenors, including the New York State Consumer Protection Board,[132] and with good reason. Given its size, its distance from New York City, and its status as an autonomous hub of commercial, engineering, agricultural, and educational activity, Poughkeepsie is clearly a viable market for interexchange competition.[133] At the same time, the arguments in favor of con-

---

**129.** The objection of the Vermont Public Service Commission with respect to the inclusion of one of its border town in this LATA is addressed at pp. 1012–1013 *supra.*

**130.** The five counties are Passaic, Bergen, Hudson, Essex and Union.

**131.** AT & T Response to Comments and Objections Relating to Proposed LATA Configuration, Filed November 23, 1982, Appendix A (Responses of Individual BOCs), tab 2 at 2 n. * * * [hereinafter AT & T Response to Comments].

**132.** The other five intervenors are Satellite Business Systems, MCI, Rochester Telephone Corp., United Church of Christ, *et al.,* and Local Area Telecommunications, Inc.

**133.** Poughkeepsie has over 225,000 subscribers. Two interexchange carriers—MCI and Satellite Business Systems—have already announced plans to enter the Poughkeepsie market.

solidation are not weighty. The cost projections advanced by New York Telephone and the Public Service Commission are too sketchy to be regarded as reliable.[134] Moreover, New York Telephone has traditionally treated Poughkeepsie as part of its upstate territory for ratemaking purposes. Finally, even if the highest cost estimate of $22.6 million (see note 134 *supra*) were certain, it is not high enough, given the already massive size of the New York Metro LATA, to warrant consolidation.[135] For these reasons, the Court approves the recommendation of the Department of Justice that the application for an SMSA exception be denied.[136]

Several intervenors argue that the New York Metro LATA should be divided further. Thus, the Consumer Protection Board would separate Long Island, New York City, and New York's immediate upstate suburbs, for a total of three LATAs, and Local Area Telecommunications, Inc. would create four LATAs in addition to Poughkeepsie.

In the view of the Court, the short distances between New York's boroughs render a division of the city itself impractical and, most likely, detrimental to telephone users. While it is true that the distances between New York City and most of Long Island are greater than those within the city itself, Long Island's "bedroom suburbs" share a long-recognized community of interest with New York City, and Long Island telephone subscribers are accustomed to calling New York on a message unit rather than toll-call basis. Moreover, interexchange competitors already serve Long Island, and the Public Service Commission represents in its filings with the Court that "interexchange carriers are free to offer switched and private line alternatives within LATAs," subject to state regulation. Given the strong ratepayer interests in having New York Telephone continue to carry traffic between Long Island and New York City,[137] the Court approves[138] the inclusion of all of these areas in the same LATA.[139]

**134.** New York Telephone states in its application that the cost of "rearranging the network to create separate LATAs" would total over $12 million. At another point in the same application, however, it implies that the cost of providing a separate access tandem in Poughkeepsie will alone cost $12 million, to which the cost of rehoming private line and trunk circuits should be added. The Public Service Commission provides yet a third version of what a separate Poughkeepsie LATA would cost. It offers a cost of $22.6 million, faulting the Department's estimate of $12 million for "fail[ing] to recognize AT & T's reintegration expenses." Neither the Operating Company nor the Public Service Commission addresses the question whether the efficiencies associated with providing equal access for interexchange carriers to the Poughkeepsie area from a Poughkeepsie access tandem will in time result in counterbalancing savings.

**135.** The Department of Justice considered an estimated pricetag of over $12 million to be insufficient, in its view, to warrant consolidation of Boston and Worcester in the same LATA. Together those two cities would have resulted in a LATA far smaller than the proposed New York Metro LATA.

**136.** Presumably the Operating Company is at work drawing the boundaries of a proposed separate Poughkeepsie LATA. In view of the huge size of the New York Metro LATA, the Court expects that New York Telephone will draw the Poughkeepsie LATA so as to absorb as much of the 914 number plan area as network considerations will allow. The configuration of the new LATA should be submitted to the Department of Justice and to the Court within 15 days of the date of this Opinion, and the Department will thereafter have ten days in which to submit further comments.

The State Public Service Commission's request for a limited corridor exception running between the new Poughkeepsie LATA and the remaining Metro LATA will also be denied. Limited corridor exceptions represent the most extreme departure from the provisions of the decree of all the exceptions requested by AT & T. A corridor exception is justifiable only when an entire network arrangement reflects such a high investment and such entrenched usage that it would be irrational to order the fragmentation of the network. That is clearly not the situation here.

**137.** New York ratepayers have a strong interest not only in the efficiencies stemming from a consolidated LATA but also in the likelihood that such a LATA will reduce otherwise existing pressures for substantial rate increases.

**138.** As indicated at pp. 1004–1006 *supra*, New York Telephone will have to agree in writing that it will offer equal access to interexchange carriers wishing to compete for intra-LATA calls within the New York Metro LATA and all other New York State LATAs.

**139.** All boroughs of New York City and all of Long Island will be included within this LATA.

The final major issue with respect to the New York metropolitan area revolves around the proposed limited corridor exception into New Jersey.[140] The exception would allow the New York Telephone Company and New Jersey Bell to continue their direct switching of traffic and private line demand between New York and New Jersey via Class Five, local trunks.[141] New York Telephone states that interruption of the New York-New Jersey privileged business arrangement would cost the companies a total of $150 million in new capital and construction and $50 million in one-time rearrangement expense. While these figures are not specifically documented, the Court is convinced that the cost is of a magnitude unequalled in other cases, so that, even if the Operating Company's figures are marginally incorrect, an enormous expenditure may be envisioned.

As concerns the effect of a corridor exception on competition,[142] the Court notes that non-Bell carriers are unlikely to be deterred from entering this unique and densely populated area by the prospect of competing with the Operating Companies. Moreover, since Northern New Jersey and New York will be in separate LATAs,[143] the decree's equal access provisions will apply to calls carried between the two LATAs, including those within the corridor.[144]

It cannot be determined at this time how much of Westchester and Putnam Counties will be included in the Metro LATA and how much in the new Poughkeepsie LATA until New York Telephone submits its proposed boundaries for that LATA. See note 136 *supra.*

**140.** This is one of two corridor exceptions proposed by AT & T. See note 54 *supra.*

**141.** The current "privileged business" arrangement would be scaled down, however, because it would apply only to service between the five New Jersey counties (see note 130 *supra*) and the 212 number plan area comprising the five boroughs of New York City. Formerly direct switching reached also into the 516 (Long Island) and 914 (Westchester and north) areas.

**142.** The corridor exception has definite anticompetitive features, since it places interexchange carriers which choose to carry this interstate traffic in competition with Operating Companies, arguably giving the Operating Companies the same incentive to discriminate against the new entrants that they had while part of the integrated Bell System. However, the alternative would be to prevent the Operating Companies from transporting this traffic, thereby handing to AT & T and other interexchange carriers a highly profitable market, while asking New Jersey's and New York's local ratepayers to absorb particularly huge rearrangement costs and to relinquish an efficient, convenient service. For a variety of factors including numbers of subscribers and frequency of interstate calling, New York-New Jersey is likely to be a more attractive market than is Philadelphia-Camden, the location of the other proposed limited corridor exception, discussed at pp. 1023–1024 *infra.*

**143.** Initially, AT & T intended to propose that Northern New Jersey be part of the New York Metro LATA. This was modified after an early objection by the Department of Justice.

**144.** This raises issues that have not been adequately addressed by either AT & T or the Department of Justice. What will be the relationship between the access charge the Operating Companies "charge" themselves when they transport a call via the corridor and the access charge they will assess an interexchange carrier? Similarly, what will be the relationship between the access charge levied on interexchange carriers operating in an area within the corridor and the charge on an interexchange carrier operating within the same LATA but outside the corridor? Some intervenors state that the Communications Act, 47 U.S.C. §§ 201, 202, arguably makes it illegal to charge a different access rate for interstate and intrastate services within the same LATA. Further, in terms of the decree's equal access provisions, and the strictures of the Communications Act, what is the effect of a decision that New Jersey Bell and New York Telephone may carry calls between Northern New Jersey and New York City but that they are inter-LATA calls. The Court expects a response within 15 days from the Department of Justice and AT & T addressed to these questions, both with respect to the New York-New Jersey corridor and the Pennsylvania-New Jersey corridor.

Answers to these questions would help also to resolve the concerns raised by the International Communications Association. ICA has stressed that the treatment to be accorded calls between New York-Northern New Jersey and Philadelphia-Camden is different from that proposed for other multi-state urban areas, such as Washington, D.C., and it opines that the treatment "will cause considerably higher telecommunications prices" for customers in these two areas. ICA is incorrect if the corridor will

Unlike the exceptions for consolidating statistical areas or crossing state lines, the limited corridor exception is not mentioned in the decree as an exception available upon the Court's approval. Rather, the Court is technically being asked to modify the decree, pursuant to section VII, to allow limited inter-LATA service by the Operating Companies.[145] The modification is justified in this specific case by the peculiarities of the long-established relationship between the people and the telephone networks of northern New Jersey and New York City. Accordingly, the corridor exception will be approved provisionally subject to reevaluation should the answers to the questions raised in note 144 *supra* warrant disapproval.

New York Telephone Company has applied for, and the Department of Justice has approved, various minor exceptions to enable New York Telephone to continue to serve Byram and Greenwich, Connecticut, and to preserve local calling arrangements into isolated parts of Connecticut, Pennsylvania and New Jersey. These exceptions are also approved by the Court.

b. *New York State*

Three of the four other LATAs proposed by New York Telephone for New York State involve consolidations of two SMSAs and hence require specific Court approval.[146] One of these, the combination of Elmira and Binghampton into a Binghampton LATA, is unobjectionable since Elmira con-

tains but 48,000 subscribers. When added to Binghampton's 117,000 subscribers, the LATA would have a total of 165,000 subscribers, clearly not an inordinately high number. The Court therefore approves this consolidation.

By contrast, the consolidations of Albany with Glens Falls and of Syracuse with Utica raise substantial problems and will not be approved unless and until additional information is supplied to the Court by AT & T and the Department of Justice.

The Department of Justice refers to the Syracuse-Utica consolidation as a "borderline" case but nevertheless recommends its approval. Syracuse has 420,000 subscribers while Utica, the population of which decreased between 1970 and 1980, includes 120,000 subscribers.[147] The two cities are 47 miles apart. If the proposed combination of Syracuse and Utica presents a borderline case—which the Court agrees it does—then Albany and Glens Falls would have to register on the side of the border favoring separation. Albany has 400,000 subscribers and Glens Falls has some 200,000, and indeed the population of the Glens Falls SMSA increased from 1970 to 1980.[148]

Thus, by the Department's own criteria of distance and size,[149] both Utica and Glens Falls should stand on their own, as should Albany and Syracuse, in order to achieve consistency with the decree, with Glens Falls presenting a greater likelihood of attracting competitive interexchange carriers

allow the two Operating Companies to continue offering their essentially "local" service but it has not been demonstrated that they may do this legally without charging interexchange carriers the same low rates that they "charge" themselves.

**145.** This is true, as well, with regard to the exception for Extended Area Service.

**146.** The fourth LATA, Buffalo, is based solely on the Buffalo SMSA and requires only a minor exception to preserve existing local calling arrangements into two areas in Pennsylvania. That exception and the establishment of the Buffalo LATA are hereby approved. The LATA runs from the Pennsylvania border north to Lake Ontario; it is bounded on the east by the territory of a non-Bell Company, and it

shares a short boundary with the Binghampton LATA in northeast Allegany County.

**147.** Both areas include more subscribers if independently served telephones are also considered.

**148.** The central city experienced a slight decrease.

**149.** The Department has stated that it regards 100,000 stations as "the guideline minimum size for an exchange area," and that it "viewed with increasing concern requests for consolidation involving SMSA-based exchange areas within more than 125,000 main and equivalent main stations that were more than 25 miles apart." Department of Justice Response to Comments at 16, 19.

than does Utica. The Department, however, opines that such competition is unlikely, based on the fact that no competing interexchange carrier currently serves these areas, a predictive basis the reliability of which has been challenged.[150] As a consequence, the Department, having balanced the interests, prefers the outcome that would result in sure avoidance of rearrangement costs over that which would impose such costs for what the Department believes is only the speculation that long-term competitive gains would result.

This may well be a defensible position and one that the Court ultimately will adopt. There are indications that the demographics of Glens Falls are such that the area might not present a viable interexchange market.[151] In addition, there are indications that the cost of establishing Glens Falls as a separate LATA would be particularly high.[152] At this stage, however, on the basis of the inconclusive information that has been provided, the Court has difficulty in approving both the Utica-Syracuse and the Albany-Glens Falls consolidations when the resulting LATAs would not only require specific exceptions but also would depart from the very criteria the Department of Justice itself has established

to evaluate the soundness of such exceptions.[153] If there are reasons why competitors would not locate points of presence in Utica and Glens Falls, despite the apparent adequacy of their respective populations, the Court and the intervenors should be told what they are. If the basis for the recommendations of the Department of Justice is its preference for avoiding unnecessary disturbances to the existing networks, more supporting data should be submitted. The Court expects the necessary documentation to be filed by both the Department and New York Telephone within 15 days, and any responses by the State Public Service Department or other interested parties to be filed within ten days thereafter.

### 2. New Jersey

The Bell territory in New Jersey would be divided into three LATAs: Delaware Valley, North Jersey, and Atlantic Coastal.

Only one of the LATAs proposed by New Jersey Bell—Delaware Valley—requires an exception to consolidate more than one SMSA, that is, the SMSA of Vineland-Millville-Bridgeton with the New Jersey portion of the SCSA of Philadelphia-Wilmington-Trenton. No comments were received ob-

---

**150.** See, e.g., Comments of Church of Christ, et al., MCI, Western Union, Satellite Business Systems. If one of the objectives of the decree is to accelerate competition that is only now beginning to occur naturally, it may not be sensible to place much weight on the fact that competition has not occurred to date in a particular area. On the other hand, competitors do plan in advance and their avowed intentions to locate or not locate in a given area may be deserving of some weight. The Department has come under attack from MCI, Western Union, Satellite Business Systems and others, however, for positing a five percent market share as the minimum necessary to sustain a competitor. The experience of MCI and Western Union in particular belies this assumption, so that determinations about market viability made by the Department are suspect to the extent that they have been informed by this assumption.

**151.** In contrast with Poughkeepsie, for example, Glens Falls does not have its own airport but relies upon Albany for much of its transportation and medical needs. Albany residents turn to the Glens Falls area for many recreational opportunities. These are some characteristics of a "community of interest" absent from the relationship between Poughkeepsie and New York City.

**152.** New York Telephone estimates that the cost of creating a separate Glens Falls LATA would be far higher per Glens Falls resident than the cost per Poughkeepsie resident of creating a separate Poughkeepsie LATA.

**153.** Indeed, one of the intervenors selected the proposed Albany-Glens Falls consolidation as an example of the inconsistencies apparent in the LATA applications and the Department's responses thereto. The intervenor, the United Church of Christ, et al., observes that Glens Falls has a population larger than many LATAs based on single SMSAs and larger also than the total populations of 13 other LATAs involving two or more SMSAs. Comments on proposed LATAs at 9, 19–22. Accordingly, this intervenor asks—if Glens Falls cannot support its own LATA, how can the populations of these other areas?

jecting to this consolidation. Moreover, the Court has independently determined that the consolidation is reasonable since all Vineland exchanges home on a Class Four switch in Camden, which is part of the Philadelphia SCSA.[154]

Local Area Telecommunications, Inc. objects to the proposed North Jersey LATA on the basis that it combines parts of seven different SMSAs and will, so it is asserted, impede the growth of local competition. As the intervenor concedes, however, the LATA is based exclusively on the New Jersey portion of the New York-Newark SCSA (except for an insubstantial portion of the Allentown-Bethlehem-Easton SMSA) and it therefore conforms to the decree's definition of an exchange area. Although Local Area Telecommunications might prefer more, smaller LATAs in northern New Jersey, the Court cannot declare the LATA unreasonable on this ground alone.[155]

The third LATA, Atlantic Coastal, neither requires an SMSA consolidation nor was it adversely commented upon, and it is hereby approved.[156] The exceptions for non-optional local calling areas requested for all three LATAs are also approved, as is the minor state line exception to include Black Eddy, Pennsylvania, in the North Jersey LATA.[157]

### 3. *Pennsylvania and Delaware*

The states of Pennsylvania and Delaware are treated together because, under the proposal submitted jointly by the Bell Telephone Company of Pennsylvania and the Diamond State Telephone Company, Delaware would in its entirety be included within the same LATA as Philadelphia, and it would thus be the only state lacking at least one autonomous LATA. Another unusual aspect of the Philadelphia LATA is that of a proposal for a limited corridor exception [158] which would enable Pennsylvania Bell, in conjunction with New Jersey Bell, to carry interstate traffic between five Pennsylvania counties [159] and three adjacent New Jersey counties.[160] The Philadelphia LATA would further consolidate the Philadelphia-Wilmington SCSA with the additional SMSAs of Allentown and Reading. Pennsylvania Bell proposes four additional Pennsylvania LATAs: Altoona, Capital, Northeast, and Pittsburgh. Each of these would involve a consolidation of SMSAs, and each therefore requires specific Court approval.

The Court has carefully scrutinized the application for the Philadelphia LATA and the comments received with respect thereto, since this LATA, on its face, departs significantly from the terms of the decree. The LATA dimensions would allow the Operating Companies [161] to transport calls within a vast area stretching from north of Allentown, Pennsylvania, to the southern Delaware border, and from southeast Pennsylvania into southwest New Jersey. Any in-

154. The Delaware Valley LATA includes the counties of Mercer, Burlington, Camden, Salem, Gloucester, and Cumberland, and the western portions of Middlesex, Monmouth, and Ocean counties.

155. The North Jersey LATA runs from Passaic and Bergen counties in the north to Toms River in the south.

156. The LATA includes the southern half of Ocean County and the counties of Atlantic and Cape May.

157. The corridor exceptions into New York to the north and into Pennsylvania to the southwest are discussed in the sections on New York and Pennsylvania, respectively.

158. See note 54 *supra*.

159. The counties are Philadelphia, Bucks, Montgomery, Chester and Delaware.

160. The counties are Camden, Burlington and Gloucester. All eight counties are within the Philadelphia-Camden SMSA.

161. It is unclear from the joint filings to what extent the two Operating Companies will pool their services and revenues if the bi-state LATA is approved. For instance, if access to Delaware telephones is to be provided from one point in Philadelphia, as the filings suggest, will the access charge be divided between Pennsylvania Bell and Diamond Bell? The Court assumes that the provision of intra-LATA transport and exchange access would not be encumbered by the participation of two Operating Companies as opposed to the usual one.

terexchange carriers wishing to carry a call between points in Delaware and southeastern Pennsylvania, including several distinct cities in Pennsylvania, would therefore operate in competition with two Operating Companies.

To justify this exceptional LATA, the Operating Companies maintain that the points within the LATA are either already part of a single network, or are scheduled to become part of their networks by 1985; that to respect the integrity of the network would have the effect of allowing the most efficient provision of exchange access and intra-LATA transport; and that splintering the LATA would be very costly.[162]

The Operating Companies disparage the criticism made by a number of intervenors[163] that such a large LATA will be anticompetitive because of the Operating Companies' presence in the intercity market and because the LATA would afford AT & T an advantage over its interexchange competitors.[164] They argue that, to the contrary, the large, bi-state LATA would be advantageous to existing and prospective

competitors and would therefore be procompetitive because of the efficient manner in which they will be able to offer connection to all telephones in the Delaware-southeast Pennsylvania area. The Operating Companies further argue that a single LATA is in the public interest because if the toll consolidation now under way was disturbed, rate increases would be the inevitable result (see note 162 *supra* ), and that the corridor exception is justified because of the highly efficient connections they currently maintain between phones on either side of the New Jersey-Pennsylvania border. To disapprove the corridor exception, they state, would penalize ratepayers who are accustomed to calling across the border to and from the counties involved.[165] The Department of Justice, acknowledging that the large size of the LATA initially gave it pause, also recommends approval.

The Court agrees with the Department and the Operating Companies that a fragmentation of the area into several LATAs would jeopardize valuable efficiencies and therefore lead to significant rate increase which, as the Court indicated at pp. 995–

**162.** The Operating Companies explain that a toll consolidation has been under way since 1976, and that, when it is completed in 1985, it will have pared the number of Class Four offices in the bi-state area from 16 to two. All end offices in the LATA will at this point home on one or the other of these No. 4ESS switches, and there will be "virtually" no need to carry traffic between these two switches due to the extensive direct trunking between end offices that has been completed or is in the process of being completed. What this appears to mean in layman's language is that any call placed from a telephone within the LATA to another telephone within the LATA will be subject to a minimal amount of switching from one trunk to another, making for generally higher quality and less costly transmissions. If the LATA is divided, the Operating Companies assert, these efficiencies will be diminished because the Operating Companies would not be able to carry those calls that crossed the smaller LATAs' boundaries. Interexchange carriers would have to carry them instead, and there would of necessity be a greater number of interconnections. The Operating Companies estimate that dividing the LATA would cost $5.9 to $6.4 million "resulting from facility rearrangements, additional switching capacity, and increased termination costs." AT & T Response to Comments, Appendix A, tab 4 at 5.

As for access, the Operating Companies argue that the centralized arrangement described in the preceding paragraph will diminish the number of blocked calls and otherwise allow the Operating Companies to make efficient interconnections between interexchange carriers' facilities and subscribers' telephones.

**163.** This criticism is contained in comments filed by several competitors of AT & T: MCI, Satellite Business Systems, GTE, Local Area Telecommunications, Inc., and Western Union.

**164.** AT & T arguably would have an advantage because it may own the two No. 4ESS switches referred to in note 162 *supra,* thereby being well-connected to all access lines in the LATA.

**165.** The companies estimate that "[r]econfiguring the network to eliminate the current serving arrangements would cost approximately $12 million ($5 million of capital and $7 million of expense)." AT & T Response to Comments, Appendix A, tab 4 at 16. Requiring interexchange carriers to carry this traffic instead of the Operating Companies would place an additional load on the AT & T switches mentioned above and would also speed up the date on which a new tandem switch would be needed.

998 *supra,* should be avoided if it is possible to do so consistently with the other objectives of the decree. It is apparent from the comprehensive and detailed filings of Pennsylvania Bell and Diamond Telephone that they have made a genuine effort to inform the Court and to document in detail the costs of network readjustments.

The Court concludes that these would be real, and it accordingly approves the SMSA consolidations as well as the state line exception for Delaware [166] on the condition, however, that the Operating Companies provide written assurance within 15 days that access will be made available to AT & T's interexchange competitors by means of at least one of the two existing No. 4ESS switches [167] until such time as the Operating Companies have installed their own No. 4ESS or comparable switch for the provision of access. It would be inappropriate to deprive local ratepayers of the efficiencies that will be realized from toll consolidation projects such as the Philadelphia 4ESS project,[168] but at the same time it would be inconsistent with the competitive purposes of the decree to deprive interexchange carriers of these benefits.[169]

The limited corridor exception is more problematic. To grant this exception may be tantamount to giving to the Operating Companies a monopoly over certain interstate traffic, for interstate carriers would be hard pressed to underprice the Operating Companies given the fact that the method used by these companies for carrying calls between the five Pennsylvania counties is based heavily on direct trunking between end offices.[170] On the other hand, while there is a great deal of traffic between these eight counties, they comprise but a tiny fraction of the available profitable routes in the country.

In the end, the proposed limited corridor exception demands a hard policy choice—a choice that involves weighing the impact from a denial of the exception on the makers of calls in these counties against the adverse impact on competition if the exception were allowed. The Department of Justice has approved the exception, and the Court concludes that this approval represents a reasonable policy choice.[171] The exception is therefore approved.[172]

The Operating Companies also cite the efficient provision of access, and network configurations generally, to support the SMSA consolidations requested for the four other proposed Pennsylvania LATAs. Unfortunately, the asserted costs and benefits are not nearly as well documented with respect to these LATAs as they are with regard to the Philadelphia LATA. At the same time, however, far fewer comments objecting to these LATAs were received.[173]

---

**166.** Thus, this LATA will include Allentown, Bethlehem, Reading, Pottstown, and Philadelphia as well as the entire State of Delaware.

**167.** This could be accomplished in one of two ways. The Court could disregard the predominant use test if it finds that one of the switches is necessary for the provision of access and direct that it be owned by the Operating Company after divestiture, or the switch could be owned by' AT & T but space leased by the Operating Company. The specifics will be settled at a later stage in the divestiture process.

**168.** Like projects have been going on throughout the country. See, *e.g.,* Seattle, Wash.; Detroit, Mich.; Grand Rapids, Mich.

**169.** This, of course, would be the case if AT & T could connect to the local network through the technologically superior No. 4ESS switch while its competitors would be relegated to technically inferior, smaller access tandems.

**170.** See also pp. 1017–1019 *supra.*

**171.** The Court, too, if considering the matter *ab initio* would conclude that denial of the exception would weigh heavily against achievement of the purposes of the decree, while the grant of the exception would have only a relatively slight disadvantageous effect.

**172.** One intervenor, the International Communications Association, advocates that the corridor be even larger, just as it did with respect to the New York-New Jersey corridor. The Court agrees with the Justice Department that a more extensive displacement of competition is unwarranted.

**173.** Satellite Business Systems criticizes the proposed consolidation of Lancaster with Harrisburg in the Capital LATA; yet of the four consolidations this is one that seems most justified due to the rehoming of Lancaster's end offices on the Harrisburg Class Four office that

As for the proposed consolidations of the State College SMSA in the Altoona LATA (total of 250,000 access lines), and the inclusion of Williamsport in the Northeast LATA (total of 450,000 access lines), no comments at all were received.[174]

The Court notes that only two of the LATAs will contain No. 4ESS switches immediately upon divestiture—Capital and Pittsburgh. As with the two No. 4ESS switches in the Philadelphia area, the Projected Switch Ownership Study posits that they will belong to AT & T under the predominant use test. For the reasons given above, the Court imposes the same condition on the approval of these LATAs as it does with regard to Philadelphia: an assurance must be provided within 15 days that equal access will be granted by means of these switches, at least initially, in order to neutralize the advantage the large size of the LATA would otherwise hold for AT & T.[175]

#### 4. *Maryland*

Chesapeake & Potomac Telephone Co. has proposed three LATAs for Maryland: Baltimore, Salisbury, and Hagerstown. The Hagerstown LATA requires an exception in order to include the Cumberland SMSA, having 54,000 subscribers, in the LATA.

The only comment received with respect to the Maryland LATAs was one in support of the state line exception proposed for the Hagerstown LATA, filed by the West Virginia Public Service Commission. That exception would allow the eastern portion of West Virginia to continue to receive telephone service from facilities in the Hagerstown LATA. Since no comments were received objecting to the Hagerstown LATA and the consolidation appears to the Court to be reasonable, it will be approved. The Court also grants the requested state line exception for the Hagerstown LATA, the various exceptions sought to preserve local calling areas outside of all three LATAs, and the state line exception to enable C&P to continue serving Delmar (Delaware) from the Salisbury LATA.

#### 5. *District of Columbia*

The LATA proposed for Washington, D.C. would include areas of Virginia and Maryland. If approved, the LATA would contain what is at present largely one SMSA and one local calling area. Of the areas which are not within the current Washington, D.C. local calling area, none is a major population center, and all of them are suburbs traditionally associated with Washington.[176] The Court approves the

---

began in 1980. MCI criticizes the inclusion of the SMSA of Sharon, Ohio in the Pittsburgh LATA, but the Operating Company counters that with only 4,800 access lines leading into Sharon, the city does not present a large enough core market around which to draw a separate LATA.

**174.** The Department of Justice recommends the approval of all the proposed LATAs.

**175.** Both the Pennsylvania Public Utility Commission and the Pennsylvania Office of Consumer Advocate endorse all of the LATAs as proposed by the Operating Company, except that the latter wishes the Court to grant two additional exemptions: for an optional EAS from the Newtown exchange to the Trenton and Ewing exchanges (involving calls to and from the Philadelphia LATA to the New Jersey Bell Delaware Valley LATA) and for selective exchange calling between Lowellville (in the Youngstown LATA) to Bessemer (in the Pittsburgh LATA).

The first exemption will be denied since these calls are not completed by direct trunking, but

rather through switching. Thus, interexchange carriers should be in as good a position to provide such service as would be the Operating Companies. Moreover, optional EAS is to be distinguished from non-optional EAS. See note 54 *supra*. Bell of Pennsylvania itself states that the latter discount calling service would not be appropriate for its retention since "this service is presently routed over Ohio Bell, AT & T and Bell of Pennsylvania facilities as an ordinary interstate call." On this basis the Court will also deny this exception.

**176.** The LATA includes 2.1 million access lines in the following 35 exchanges: Washington, D.C., Ashton, Berwyn, Bethesda, Bowie-Glenn Dale, Brandywine, Capital Heights, Clinton, Damascus, Gaithersburg, Hughesville, Hyattsville, Indian Head, Kensington, La Plata, Laurel, Layhill, Leonardtown, Lexington Park-Great Mills, Marlboro, Mechanicsville, Nanjemoy, Oxon Hill, Poolesville, Ridge, Rockville, Silver Spring, Tompkinsville, Waldorf (all in Maryland), Alexandria-Arlington, Braddock, Engleside, Fairfax-Vienna, Falls Church-McLean, Herndon (all in Virginia).

Washington LATA together with the EAS exceptions [177] requested and the special exception for metropolitan foreign exchange service [178] that will enable some 3,800 subscribers in two exchanges to continue to take advantage of Baltimore's local calling areas.[179]

### 6. West Virginia

Chesapeake & Potomac of West Virginia proposes that the state be divided into two LATAs—roughly a northeast LATA centered on Clarksburg and a southwest LATA based on Charleston. The Clarksburg LATA would consolidate the tiny SMSA of Weirton (24,000 subscribers) with the Wheeling SMSA.[180] The Charleston LATA would combine C & P's portions of the three SMSAs of Charleston, Huntington-Ashland, and Parkersburg-Marietta, the latter two areas having 62,000 and 51,000 subscribers respectively.[181]

The West Virginia Public Service Commission asks the Court to merge the proposed two LATAs into one, and the Commission's second choice would be two LATAs configured differently.[182] The Operating Company would prefer one LATA to two configured differently because in its view changes proposed by the Public Service Commission "would require expensive network rearrangements that are not warranted." [183] The Justice Department wholly rejects the idea of one LATA, because of the size of the two LATAs and its conclusion that "there are essentially separate local networks in West Virginia—the major hubs appear to be at Charleston and Clarksburg, with smaller hubs elsewhere."

The Court will not approve the consolidation of the two LATAs as requested by the Public Service Commission for reasons in addition to those advanced by the Justice Department. By its own analysis of calling between the Clarksburg and Charleston LATAs, the Commission demonstrates that little community of interest exists between these two regions of West Virginia.[184] This

**177.** The Loudon County Board of Supervisors submitted a resolution asking that the part of the county east of Broad Run Creek continue to enjoy toll free access to northern Virginia and Washington, D.C. The Court sees no problem with this request but, since this part of the county is served by a non-Bell company, this issue is more appropriately addressed in the classification proceeding. See Department of Justice Response to Comments at 96. See also p. 999 *supra*.

**178.** This service is unique because it switches the Washington exchange subscribers onto the local Baltimore loop, thereby treating the Washington customers as though they were served from the designated exchange in the Baltimore LATA. AT & T Application, Appendix at E–8. The Department of Justice approves of this exception, and no comments were received objecting to it.

**179.** Noting the large number of telephone stations in Maryland and Virginia that would be included in the District of Columbia LATA, Satellite Business Systems was reluctant to endorse that LATA until additional information was available regarding the method by which equal access will be provided and the rates that will be charged therefor. As discussed at pp. 1007–1008 *supra*, uncertainty over access methods and rates, while a concern of many parties, is an insufficient reason to withhold LATA approval at this time.

**180.** Clarksburg is itself not an SMSA. The total number of subscribers in the proposed Clarksburg LATA is 205,000.

**181.** The total number of subscribers would be 386,000.

**182.** The Commission objects to the fact that the communities of Gassaway, Middlebourne, Cowen, and Pennsboro are located in the LATA other than the one to which their residents would most frequently call. Once divestiture occurs, these calls would have to be carried by an interexchange company, the Commission therefore would like to see the LATA boundaries reconfigured to ally these communities with the areas that their residents call more frequently.

**183.** C & P adds that "Network considerations were paramount in C & P's decision to place the exchanges at issue in one rather than the other LATA. C & P placed each exchange in the LATA from which it receives toll service." AT & T Response to Comments, Appendix A, tab 5 at 7.

**184.** The Commission states, for example, that 96.4 percent of the subscribers in Charleston made no calls to Wheeling, the major SMSA in the Clarksburg LATA, during the period sampled by the October 1981 West Virginia Point-to-Point Calling Summary.

factor, of course, militates in favor of separate LATAs.[185] Moreover, the Commission's speculation that no interexchange competitor would be interested in serving the Clarksburg LATA—a speculation based largely on the absence of an existing competitor—is undercut by the submission of MCI. MCI's filings show that it regards a large area around Clarksburg as one of its intended markets for the near future.[186]

To be sure, under this arrangement some ratepayers would henceforth have to rely on interexchange carriers to reach areas they previously dialed through the Operating Company, see note 182 *supra,* but this is a necessary consequence of the divestiture and one that will occur in a number of areas throughout the country. It is thus an insufficient basis upon which to consolidate the areas into a single LATA.

Finally, as concerns the Commission's proposal that the two LATAs be configured differently, both the Operating Company and the Department of Justice have stated that it would be expensive to draw the boundaries of the LATA differently because of the rehoming of exchanges that would be involved. Accordingly, the Court approves the division of West Virginia into two LATAs, and it rejects the Public Service Commission's proposal that the two LATAs be configured differently.[187]

The West Virginia LATAs also involve several state line exceptions. The Court takes note of the agreement reached between the Operating Company and the Public Service Commission pursuant to which three communities previously slated to be included in out-of-state LATAs are to be included in the West Virginia LATAs instead. The LATAs are hereby ordered to be so modified. The remaining exceptions for state line crossings and for the preservation of local calling arrangements in 20 exchanges whose local calling areas will be split by the West Virginia LATA boundary are likewise approved, but the request of the Public Service Commission for an exception for circle calling[188] service is denied.[189]

## VII

### *South*

■ AT & T proposes a total of 60 LATAs for the states of Virginia, North Carolina, South Carolina, Georgia, Louisiana, Mississippi, Alabama, Florida, Texas, Tennessee, Kentucky, and Arkansas, 21 of which would require SMSA exceptions. The Southeast Florida and the Birmingham, Alabama, LATAs proved to be the most controversial exchange areas proposed for the states of the South. The Court approves 57 LATAs as drawn by the various Operating Companies, orders the division of one (the Birmingham LATA) and orders the consolidation of two LATAs in Kentucky,

---

**185.** See section IV(G)(1).

**186.** The Operating Company would, of course, have less ability to dampen competition with AT & T or itself under a two-LATA arrangement than a one-LATA configuration.

**187.** Just as AT & T bears the "burden of proof" in requesting the SMSA consolidations of Wheeling with Weirton and of Charleston with Huntington-Ashland and Parkersburg-Marietta, so, too, does the Public Service Commission bear the burden with respect to the further consolidation of SMSAs that it requests. The PSC would have to show not only that its proposal is consistent with the decree but also that the AT & T-Department of Justice proposal is not.

**188.** Circle calling is an optional, instate discount calling service for station-to-station calls.

**189.** The strongest argument against such an exception is contained in West Virginia's own filing. If there will be as little calling between the two LATAs as the Public Service Commission maintains, it is difficult to see the necessity for a state-wide circle calling service. The Commission is incorrect, moreover, in likening circle calling to the foreign exchange service approved for Washington, D.C. exchanges located near Baltimore. The latter is akin to extended area service and is supplied for a flat fee. Circle calling is a budget instate calling service that would have the Operating Company carry long-haul calls between two LATAs, on a traffic sensitive basis, in competition with interexchange carriers. The Commission, of course, is free to authorize such a service within the Charleston LATA and within the Clarksburg LATA.

for a total of 60 LATAs in the southern states.

### 1. *Virginia*

The Commonwealth of Virginia is apparently the only state in the Union with a law which would preclude competition in the provision of intrastate telephone service.[190] The Virginia State Corporation Commission would extend this anticompetitive policy to interstate telecommunications involving Virginia telephone users by its recommendation that the five LATAs proposed by the Chesapeake & Potomac Telephone Company for Virginia be consolidated into one LATA.[191] This proposal is wholly inconsistent with the decree, involving as it would the consolidation of a number of SMSAs having different communities of interest, and the Commission has offered no persuasive reason for departing from the decree's provisions or for rejecting the LATAs drawn by the Operating Company.

To be sure, the five-LATA proposal is not free from problems. Because of Virginia's law forbidding competition in intrastate telephone service, if the state is divided into more than one LATA, any Virginia telephone subscriber who elects a non-AT & T carrier for interstate service will have to subscribe to three different telephone companies: C & P for intra-LATA calling, AT & T for calls into other Virginia LATAs, and to the chosen non-AT & T carrier for out-of-state calls. Such an arrangement may prove cumbersome for ratepayers some of whom may, as a result, decide to use AT & T for both intrastate and interstate long-haul calls even though they would choose a non-AT & T carrier in the absence of an AT & T monopoly over instate, inter-LATA calls. Thus, a five-LATA configuration could actually give AT & T an edge over its competitors in procuring interstate business.[192]

The establishment of a single LATA for the entire state would eliminate this advantage to AT & T by ousting it from the monopoly over intrastate traffic and by transferring that monopoly to the Operating Company, thereby placing AT & T on equal footing with its interexchange competitors vis-a-vis Virginia telephone users.[193] At the same time, however, under a single LATA there would be no check on the Operating Company's becoming a mini-AT & T, with a monopoly over all intrastate service, both short-haul and long-haul, charging unjustifiably high rates and discriminating against interexchange carriers. For this and other reasons, a single LATA

---

**190.** Virginia law provides that no public utility "shall engage in furnishing public utility service within the State without first having obtained from the Commission a certificate of public convenience and necessity authorizing it to furnish such service." Va.Code Ann. § 56–265.3. It further provides that "[n]o certificate shall be granted to an applicant proposed to operate in the territory of any holder of a certificate unless and until it shall be proved to the satisfaction of the Commission that the service rendered by such certificate holder in such territory is inadequate to the requirements of the public necessity and convenience." Va.Code Ann. § 56–265.4. Pointing to this latter provision, the Virginia State Corporation Commission asserts that the decree "will not force a state such as Virginia which permits no competition in the intrastate interexchange market to open these areas up to competition upon completion of the divestiture process." Reply Comments of the Virginia State Corporation Commission at 2.

**191.** The Virginia Commission would make an exception for those areas of Virginia that would be included within the Washington, D.C. LATA.

**192.** In another respect, the five-LATA configuration would redound to AT & T's competitors' advantage by obliging C & P to provide equal access from at least five points in the state. If the entire state were one LATA, the Operating Company would be under no obligation to provide equal access from more than one point in the state. Section IV(F). Given the large distances between the various Bell territories in Virginia, this could result in a large amount of backhauling with the accompanying deterioration of the quality of access transmissions. There is a concrete basis for these concerns since Virginia residents have already demonstrated a demand for competition in telephone service at least to the extent that it has been permitted in interstate service.

**193.** A subscriber would choose either AT & T or another carrier for out-of-state calls and the Operating Company would carry all in-state calls.

invites more problems than it would solve, and the Court will not accept the Commission's recommendation that the five LATAs be consolidated into one.

It should finally be noted with respect to this issue that all of the dilemmas referred to above are, of course, caused by Virginia's pro-monopoly law. The Court would not be justified in effecting fundamental alterations of the implementation of the decree solely to accommodate an anti-competition statute in a single state.[194]

Turning to the specifics of the five proposed Virginia LATAs proposed for Virginia, two intervenors have objected to the recommended consolidation of the Norfolk-Newport News SMSAs with the Norfolk LATA. However, the two cities are merely twelve miles apart and Newport News lacks a Class Four switch, and their consolidation in one LATA is therefore fully reasonable under the criteria the Court is applying generally in all the states. The consolidation is therefore approved.[195] The remainder of the LATA proposals for Virginia are

also reasonable and are likewise approved.[196]

### 2. *North Carolina*

Southern Bell proposes to establish five LATAs,[197] two of which would require consolidations of more than one SMSA. The Department of Justice concurs in this recommendation. The North Carolina Utilities Commission, however, requests that the Court trim the number of LATAs to three which would be "structured similarly to the three divisions of the federal court districts or the three well-known topographical division[s]." The Commission contends that three LATAs "would be more efficient for interexchange access," but it nowhere states why it believes this to be so.

The State's filing is insufficient to cause the Court to depart from the recommendations of both the Operating Company and the Department of Justice, particularly since the North Carolina LATAs are not challenged by any other party. Although the Commission's recommendation may be correct purely as a matter of geography,

---

**194.** It is possible that the Virginia state legislature will amend the anticompetitive provision of the law so as to enable competitive carriers to transport calls within Virginia. In any event, the appropriate course is to approve now a multi-LATA structure that will facilitate instate competition should this event come to pass.

**195.** The Virginia State Corporation Commission asserted in its two sets of comments and in various letters to the Court that C & P was withholding from it information it required to evaluate the "social or financial costs to either C & P of Virginia or Virginia ratepayers" of the proposed five-LATA configuration. Reply Comments at 10. The Commission has indicated that it was wary of the plan's impact on C & P and ratepayers because it believed AT & T had controlled the drawing of LATA boundaries and manipulated their configuration solely to its advantage. On December 8, 1982, the Commission filed a motion asking the Court to withhold approval of the Virginia LATAs pending receipt of the information it had requested of C & P. On the same date it filed a motion requesting an order compelling C & P to produce the requested records. The Commission has informed the Court that much information had been voluntarily released, and it withdrew the second motion, and at the same time, the

Commission renewed its request that the Court postpone approval of the Virginia LATA plan "until an evaluation of this new information can be completed and additional comments filed." Letter of December 17, 1982. The Court received three more communications from the Commission but nothing commenting substantively on the LATA plan. Although the Court has found the plan submitted by the Operating Company to be reasonable, if the Commission believes that its review has uncovered crucial information suggesting otherwise, it should so inform the Court within 15 days.

**196.** The Lynchburg LATA combines the Danville and Lynchburg SMSAs. Together the two SMSAs will result in fewer than 100,000 subscribers, and the consolidation thus cannot be faulted on size. In the Richmond LATA, the Petersburg SMSA, with a mere 56,000 subscribers, will be consolidated with Richmond which has 313,000, for a total of 369,000. Although the total is substantial, Petersburg is too small to stand on its own, and it is served from a toll center located in Richmond.

**197.** The five LATAs will be based on Asheville; Charlotte (consolidating the Hickory, Salsbury-Concord and Rock Hill SMSAs); Greensboro-Winston-Salem (consolidating Burlington); Raleigh; and Wilmington.

the Operating Company has taken into account the state's telecommunications networks, and it believes, based on that study, that five LATAs will mean less network rearrangement than three. Accordingly, the Court rejects the request of the Public Service Commission, and it approves the five LATAs and the consolidations of the relatively small SMSAs that the establishment of these LATAs will involve.[198] The state line exceptions also are approved.[199]

### 3. South Carolina

The Court approves the four LATAs proposed by Southern Bell: Charleston, Columbia, Florence and Greenville (consolidating Greenville with 253,000 subscribers and Anderson with 57,000). No comments were received objecting to these LATAs.

### 4. Georgia

The Court approves the five LATAs proposed by Southern Bell: Albany, Atlanta (consolidating Atlanta with 1.2 million subscribers, Athens with 67,000, and Columbus with 74,000),[200] Augusta, Macon, and Savannah. No comments were received objecting to any of these LATAs.

### 5. Louisiana

The Court approves the four LATAs proposed by South Central Bell: Shreveport (consolidating Shreveport with 200,000 subscribers, Alexandria with 70,000, and Monroe with 120,000), Baton Rouge, New Orleans (no SMSA exception required now but as of June 1983 the New Orleans LATA will include the new SMSA of Houma-Thibodoux), and Lafayette (consolidating Lafayette with 181,000 subscribers and Lake Charles with 88,000). No comments were received objecting to these LATAs.

### 6. Mississippi

The Court approves the two LATAs proposed by South Central Bell: Biloxi (consolidating Biloxi with 72,000 subscribers and Pascagoula with 38,000) and Jackson. No comments were received objecting to these LATAs.

### 7. Alabama

South Central Bell proposes three LATAs for Alabama—a northern LATA based on Birmingham, a central LATA based on Montgomery, and a southwestern LATA based on Mobile. The Justice Department objects to the proposed Birmingham LATA because it would combine the Birmingham SMSA with five other SMSAs in northern Alabama: Tuscaloosa, Gadsen, Anniston, Florence, and Huntsville. Each of these five SMSAs is far smaller than Birmingham, with populations ranging from 31,000 to 309,000; none would be likely to attract interexchange competitors on its own. However, the Department maintains that Florence and Huntsville, if combined, would present a viable, independent market—a point South Central Bell concedes—and that a LATA separate from Birmingham based on these two cities should be established. South Central Bell states that it would reluctantly accept the Justice Department's proposal as "the only other LATA configuration [other than its own] that satisfies the requirements and intent of the [decree] for the north Alabama area."[201] The Alabama Public Service

---

**198.** Burlington contains only 49,000 subscribers, while Hickory contains only five Bell exchanges, and Salsbury-Concord contains two.

**199.** The Court expects that the Justice Department will pursue further the matter of the independent companies in the Salsbury-Concord and Hickory SMSAs and their relationship with Southern Bell. Because most of the exchanges in these SMSAs are served by independent telephone companies, it may be appropriate at some point in the future to associate the Bell exchanges with the independent territory.

**200.** Initially the Operating Company proposed that Athens and Columbus be placed in two separate LATAs, but the Department of Justice asked for their consolidation on the basis that they are too small, standing alone, to attract multiple intercity carriers. The Operating Company agreed.

**201.** AT & T Response to Comments, Appendix A, tab 7 at 11. The Operating Company did not propose a separate Huntsville-Florence LATA because "[s]uch a configuration produces network inefficiencies." *Id.* The only economic penalty mentioned, however, is the

Commission supports one LATA for northern Alabama, but its position is apparently based solely on the views of South Central Bell.[202]

The Court is persuaded that the Birmingham LATA should be divided into two LATAs, one encompassing Florence and Huntsville, the other containing Birmingham, Gadsen, Tuscaloosa and Anniston, and it will approve two LATAs for that region. The consolidation of six SMSAs would involve the Operating Company too substantially in intercity service.[203] Moreover, Huntsville and Florence are geographically separate from the greater Birmingham region;[204] the distance between Huntsville and Birmingham is 100 miles; Huntsville is a sizable city with a population of 309,000, presenting a viable intercity market; and the cost of forming a separate Huntsville-Florence LATA will not be great.[205]

incremental cost of $1.485 million to build an intra-LATA switch.

**202.** It can be inferred that if the Operating Company would be willing to accept two LATAs as proposed by the Department, the Public Service Commission would acquiesce in that judgment. Additionally, the State relies in part on its perception that non-Bell carriers have expressed little interest in the northern Alabama area. This appears to be inaccurate. MCI already serves Huntsville, and it plans to begin service to a large area around Florence. Satellite Business Systems also plans to serve Huntsville.

**203.** No other LATA proposed by AT & T would involve the consolidation of as many SMSAs.

**204.** Subscribers in Florence and Huntsville call each other far more often than they call Birmingham (55 percent of all intrastate MTS originating or terminating within the two cities compared with 29 percent for Huntsville to Birmingham and 25 percent for Florence to Birmingham). These figures contained in South Central Bell's application indicate that Florence and Huntsville identify with each other more than either does with Birmingham. By contrast, two of the cities that would be included in the Birmingham LATA, Tuscaloosa and Anniston, have more substantial phone contact with Birmingham, 49 percent of all intrastate MTS calls and 43 percent respectively. This supports their inclusion in the Birmingham LATA.

The Court approves the Mobile and Montgomery LATAs as drawn. Both involve only minor state line exceptions, and no one has objected to them.

### 8. Florida

Of the seven LATAs proposed by Southern Bell for Florida, two have inspired substantial controversy because they involve consolidations of SMSAs: the Southeast LATA, running from Ft. Pierce southward to Key West, and the Orlando LATA.[206]

#### a. Miami-Ft. Lauderdale and West Palm Beach

The proposed Southeast LATA would consolidate the SCSA of Miami-Ft. Lauderdale with the SMSA of West Palm Beach.[207] As of June 1983, Ft. Pierce will be a separate SMSA, and it, too, would be included

**205.** The only apparent cost is that of building a Class Four switch to serve Huntsville-Florence. Yet the Operating Company states elsewhere that it might well install a new access tandem in Huntsville even if Huntsville is in the same LATA as Birmingham. Since the same switch is most efficiently used for both intra-LATA transport and exchange access, it would not appear that the Operating Company is being asked to incur costs that it otherwise, in all likelihood, would not incur.

The Court will, however, accept the recommendation of the Operating Company that the Southern Marshall County portion of the Huntsville SMSA remain in the Birmingham LATA since this area is served by a switch in Gadsen and has no direct lines into Huntsville. To construct direct facilities into Huntsville would cost approximately $1.2 million with no apparent offsetting gains to competition as the population of Southern Marshall County is only 30,000.

**206.** The other five proposed LATAs (Daytona Beach, Gainesville, Jacksonville, Pensacola, and Panama City) are based on one SMSA each, thereby conforming to the single-SMSA standard of the decree.

**207.** The SCSA was created as a result of the 1980 census. Although Southern Bell speculates that Palm Beach County would be included within the SCSA when review of the census data is completed, the information provided by the Office of Management and Budget regarding the final changes to SMSAs and SCSAs indicates that this will not be the case.

within the Southeast LATA.[208] The distance between Miami-Ft. Lauderdale and West Palm Beach is 66 miles, and calls between the two areas account for a significant amount of intrastate toll revenue, some $52 million annually.[209] The LATA would contain a total of 27 cities, some of which are over 200 miles apart, and would serve approximately 2 million Bell subscribers. Several intervenors object to the LATA as drawn.[210]

In its November 23, 1982 response, the Department of Justice reserved judgment on the Southeast Florida LATA, stating that Southern Bell had failed to persuade it "to approve the inclusion of the West Palm Beach SMSA with the Miami area."[211]

The Department announced its final position in a December filing. Its opposition to consolidation was restated, but the Department suggested that Southern Bell be allowed to continue carrying calls between Ft. Lauderdale (Broward County) and West Palm Beach so as "to preserve local trunking arrangements in the area."[212] The Department termed its proposal a corridor ex-

ception, similar to those proposed by AT & T for New York-New Jersey and Philadelphia-Camden.[213] Southern Bell's response to the Department's December filing urges approval of the consolidation but states that it would prefer the corridor exception over no corridor exception if the SMSA consolidation is not approved.[214]

The Department's opposition to the single LATA as proposed by Southern Bell is claimed to represent a policy decision in favor of the competitive objectives of the decree. However, the Department does not provide any details concerning the competitive potential of the intra-LATA market. The Department's two filings devote proportionately far more space to deflating the persuasive value of Southern Bell's proffered justifications for one LATA than to supplying evidence in support of its competition assertion.[215]

Southern Bell's argument is essentially that the Department has overstated the competitive benefits to be gained by separating the LATA and understating the costs that would result therefrom. Particu-

208. Information Release of March 18, 1983, No. OMB–83–11, Executive Office of the President, Office of Management and Budget, at 3.

209. Supplemental Response by the Florida Public Service Commission, December 14, 1982, at 2. This figure could both support consolidation and militate against it. On the one hand, the substantial amount of calling is an indice of community of interest. On the other hand, the profitability of the intra-LATA routes shows that there is a substantial intercity market in Southeast Florida.

210. These include MCI, Satellite Business Systems, Southern Pacific and Western Union.

211. Department of Justice Response to Comments at 108.

212. Memorandum of the United States Concerning the Proposed Denver, Miami, and Boston LATAs, December 22, 1982, at 5.

213. See note 54 *supra*. This corridor would be unique, however, in that it would not involve crossing a state boundary as do the other two corridors but it would cross an intrastate LATA boundary.

214. Another unique factor associated with the Southeast LATA that needs to be considered is

the home and business information service which will soon be marketed by a subsidiary of Knight-Ridder Newspapers, Inc. by means of packet switching technology (LADT, standing for Local Access Data Transport) to be operated by Southern Bell. Knight-Ridder and Southern Bell have been working on the new "videotex" service, the first of its kind in the country, for several years and have based their planning on an initial market area consisting of Dade, Broward and Palm Beach counties. The Department of Justice agrees that LATA boundaries should not be allowed to interfere with this project. For that reason, it stated that it was inclined to recommend that the Court approve a proposal, if made by Southern Bell, to permit it to provide LADT on an integrated basis throughout the Miami-West Palm Beach area. Southern Bell endorses this proposal as the next-best alternative to consolidation.

215. Indeed, the Department responds selectively and without specificity to Southern Bell's contentions. These contentions, in contrast, are buttressed by detailed information, both on the issue of competition within the LATA and on the overall impact dividing the LATA would have on the existing network, existing and future services, the consumers of basic telephone service, and the many users of special services in the area.

larly given the summary nature of the Department's filings, the Court agrees on several grounds with Southern Bell that the Department's decision does not represent a reasonable balance of the competing considerations.

First, a letter to the Court from the Governor of Florida and the filings of the Public Service Commission indicate that failure to consolidate the area into a single LATA would entail rate increases which would adversely affect the large number of retired persons living in Florida on fixed incomes. These fears appear to the Court to be well founded, given the demographics of the region.

Second, as the network now stands, all exchanges in the LATA home either on the No. 4ESS switch in West Palm Beach or on the No. 4ESS switch in North Miami. Southern Bell reports that by shuttling peak traffic between the two switches, it will be able to postpone the time when a third No. 4ESS switch, representing a capital outlay of some $14 million, will be needed. Because Southern Bell could not continue to reroute traffic between the switches if a LATA boundary crossed between them, the time when the new switch would be necessary would be substantially accelerated if the LATA were divided.[216]

Third, where one LATA might allow the company to provide equal access through one digital switch located in Ft. Lauderdale, two LATAs would necessitate the building

of a second access tandem in West Palm Beach.[217] There are also the 6,500 special service circuits that cross the Palm Beach-Broward County line which would cost an estimated $6.2 million to relocate if the corridor exception were not approved; the reluctance of the Court to countenance an intrastate corridor exception because it would single out this one LATA in the United States for special treatment; and the need to accommodate the LADT service (see note 214 *supra*) and again the Court's reluctance to achieve this objective through a special exception.

Finally, the Court is convinced that the competitive objectives of the decree will not be unduly hampered if a single LATA is created. As for inter-LATA competition, Southern Bell's filing indicates in unusual detail that it intends to offer equal access to AT & T's competitors in a manner that would be within the spirit of the decree.[218] With regard to intra-LATA competition, the Court notes that Florida has already licensed an intrastate carrier, Microtel, Inc., to compete with Southern Bell for intercity, intra-LATA calls.[219] The State Public Service Commission, in its filings with the Court, has persuaded the Court that it is a strong body and one committed to promoting competition.[220]

For these reasons, the Court approves the application of Southern Bell to consolidate

---

**216.** Southern Bell estimates that the acceleration factor could amount to as much as four years.

**217.** This point is not particularly significant, standing alone—and in fact has not weighed heavily in the Court's review of other LATAs since the decree's equal access provision is bound to require some adjustments and outlays—but in the case of the Southeast LATA, it is one more factor cutting against division.

**218.** Initially, the Operating Company plans to offer access from three No. 1A ESS switches and shortly thereafter, when the capacity of these switches is exhausted, it will invest in "a very large digital switch in Ft. Lauderdale." Presumably this will be a No. 4ESS switch, the type of switch that the intervenors regard as best suited for access.

**219.** Microtel intends to provide service between Miami and Ft. Lauderdale, between Ft. Lauderdale and West Palm Beach, between West Palm Beach and Melbourne, and "between dozens of 'local exchanges' in between said cities all of which are located within the Southeast LATA." Petition and Response of Microtel, Inc., November 3, 1982, at 3. Microtel's desire that the local, regulatory definition of "exchange" be applied to its operations for purposes of Florida law is a matter for state regulators.

**220.** For instance, the Commission only endorsed the Southeast LATA after it was assured by Southern Bell that Bell would provide access within the LATA to as many points of presence as an intra-LATA carrier such as Microtel requests.

Miami-Ft. Lauderdale and West Palm Beach into one Southeast LATA.[221]

### b. *Orlando*

Turning to the other LATAs proposed for Florida, Western Union and MCI oppose the consolidation of the Melbourne-Cocoa-Titusville SMSA into the Orlando LATA, pointing out that the smaller SMSA, Melbourne, has over 100,000 subscribers (111,000) and is located more than 40 miles away from Orlando. Southern Bell argues that consolidation is justified because Melbourne lacks a tandem switch and Southern Bell would have to build one, at an estimated cost of $9 million, if it were required to rehome the Melbourne exchanges from the Orlando Class Four office to a separate Melbourne tandem switch. The Court agrees with Southern Bell and the Department of Justice that it would be unreasonable to require such an expenditure when the size of the proposed LATA is not extremely large (305,000 subscribers). The consolidation is therefore approved.

Of the remaining five Florida LATAs, four involve no exceptions, and Pensacola requires only a minimal state line exception so that service may be continued to two Alabama communities. No one has opposed those five LATAs as drawn, and they are accordingly approved.

### 9. *Texas*

Southwestern Bell proposes 15 LATAs in Texas. It is evident from the company's filings that it has made a good faith effort to draw LATAs in compliance with the terms of the decree: seven would require no exceptions [222] and two others would require exceptions only for state line crossings; [223] as for the six in which Southwestern Bell proposes consolidations of SMSAs, they involve relatively small cities which in five cases do not presently have Class Four functions.[224]

The Court approves all of the LATAs proposed for Texas.[225] The Dallas LATA, however, merits separate discussion. That LATA does not involve a consolidation of separate SMSAs; it would, however, include the major cities of Dallas and Ft. Worth (which are in the same SMSA although separated by 28 miles); [226] and it

---

**221.** That approval is, of course, contingent on Southern Bell's living up to its promises to provide access to intra-LATA carriers. See note 220 *supra.*

**222.** These are the proposed LATAs for the following areas: Abilene (80,000 subscribers); Amarillo (123,000 subscribers); Austin (280,000 subscribers); Dallas (1.5 million subscribers); Houston (1.6 million subscribers); Lubbock (111,000 subscribers); and Wichita Falls (84,000 subscribers).

**223.** These are Beaumont (180,000 subscribers), requiring a state line exception for telephones in Livingston Island, La.; and El Paso (180,000 subscribers), requiring a state line exception to preserve wire centers in Anthony, Canutillo and El Paso that cross the Texas/New Mexico border.

**224.** Southwestern Bell proposes to consolidate McAllen (83,000 subscribers) into the Brownsville LATA (total of 160,000 subscribers); Victoria (51,000 residents) into the Corpus Christi LATA (218,000 subscribers total); Tyler (70,508 residents) into the Longview LATA (143,000 subscribers total); Odessa (90,027 residents) into the Midland LATA (154,000 subscribers total); Laredo (34,000 subscribers) into the San Antonio LATA (550,000 subscribers total); Killeen-Temple (90,000 residents) into the Waco LATA (130,000 subscribers total). Of the SMSAs proposed for consolidation, only Killeen-Temple currently has a Class Four function. Southwestern Bell expressed a willingness to "section" the Waco LATA and provide access from the Temple facility in addition to the Waco facility should sufficient demand arise.

**225.** There may be slight changes in the Houston and Dallas LATAs depending upon the results of negotiations over the Bell exchanges in Sherman and Denison that are proposed for inclusion in the Dallas LATA but currently home on a GTE facility in Sherman, and the Bell Hearne and Calvert exchanges that currently home on a GTE facility in Bryan but are included within the Houston LATA. The Texas Public Utilities Commission recommends that separate LATAs be formed out of these exchanges so that their relationship with GTE will not be disturbed. The Court will consider such a proposal if presented in conformity with note 95 *supra.*

**226.** It would also include nonsubstantial portions of the SMSA of Sherman-Denison.

would encompass 1.5 million subscribers. No specific exceptions are required, and the Department of Justice approves the Dallas LATA as proposed stating that "the fact that Dallas and Fort Worth are in the same SMSA strongly suggests that they are in the same major metropolitan area." Department of Justice Response to Comments at 166 n. ***.

Several intervenors complain about the large size of the LATA, and the Court agrees that the LATA as drawn could have anticompetitive effects.[227] However, this potential is not sufficient to cause the Court to reject the AT & T-Department of Justice recommendation. Southwestern Bell's plans for providing equal access in the proposed Dallas LATA are as yet undecided. In view of the anticompetitive potential of the Dallas LATA, it may become necessary, at an appropriate time in the future, to order the Operating Company to provide access by means of one or both of the No. 4ESS switches.[228]

The Texas LATAs are approved in all other respects.[229]

### 10. *Tennessee*

The Court approves the four LATAs proposed for the state by South Central Bell:

Memphis, Nashville (consolidating Tennessee portion of the Clarksville-Hopkinsville SMSA with 83,000 subscribers), Knoxville, and Chattanooga. No comments were received objecting to these LATAs.

### 11. *Kentucky*

South Central Bell proposes three LATAs for Kentucky, one centered on Owensboro (which requires an SMSA exception), one based around Louisville, and a third based around Winchester. The Department of Justice has approved the entire proposal.

The Winchester LATA contains no SMSA, but it is faulted by one intervenor as being too large and by another as being too small. GTE, which serves 234,000 subscribers in eastern Kentucky, claims that the contiguity terms of the decree are violated by the Winchester LATA,[230] while the state Public Service Commission complains that the LATA is not sufficiently large to present a viable interexchange market. The PSC would consolidate the Winchester LATA with the Louisville LATA in the north central portion of the state, so that the State would have two LATAs instead of three.

**227.** One LATA including both Dallas and Fort Worth could give AT & T an advantage over its competitors both in carrying intra-LATA calls between Dallas and Fort Worth and in carrying inter-LATA calls originating or terminating in either of the two cities. This could occur if AT & T becomes the owner of the No. 4ESS switch located in Dallas and the No. 4ESS switch located in Fort Worth. If AT & T owned both switches it would be extremely well connected to the local loops around both cities, and it would own the trunks connecting the switches, giving it excellent access to subscribers and a most efficient means of transporting calls between the two cities. AT & T's competitors, relying on access provided by the Operating Company, might be unable effectively to compete depending upon the means by which access is provided.

**228.** It is in part because this tool is available to the Court that it will decline to order the division of the Dallas LATA. As noted in the opening pages of the Opinion, it was not the purpose of this review process to enable the Court to substitute its judgment for that of the parties, but the Court would be doing just that if on this record it were to order the redrawing

of a LATA that does not involve any exceptions to the decree's definition of exchange areas.

**229.** The Court expresses preliminary concern, however, over the methods and facilities by which equal access is to be provided to all Bell LATAs in Texas. According to the Projected Switch Ownership Survey, no No. 4ESS switch is scheduled to remain with Southwestern Bell, and the local company will retain only one No. 4XB switch in the Dallas LATA. These switches are some of the most desirable for interconnection with the facilities of interexchange carriers. See note 124 *supra*. When the Court reviews the remainder of the plan of reorganization it may well conclude that at least until other switches can be·upgraded to supply suitable access—in some cases not until late 1986 or 1987 by AT & T's estimate—Southwestern Bell will be required to lease space from the AT & T-owned No. 4ESS switches for the provision of access.

**230.** This objection is disposed of at pp. 1011–1012 *supra*.

The Public Service Commission makes a persuasive case which goes largely unaddressed by the Department of Justice and South Central Bell. The Commission is concerned that without a core Bell SMSA in the Winchester LATA, the 165,000 subscribers in this "economically depressed region with high levels of structural unemployment and poverty" will not present an inviting market to AT & T's interexchange competitors.[231] AT & T's resulting monopoly over Bell telephones in the area could be avoided, the PSC asserts, if the Winchester subscribers could be reached via competitors' points of presence in Louisville, an area more likely to attract competitors.

As has been discussed *supra,* it may or may not be the case that the smaller interexchange carriers will choose to make their services available to outlying residents of large LATAs. Much depends upon the level of access charges and the quality of the access offered. It is also possible that Winchester telephone owners, numbering few businesses, could be particularly hard hit by the instant charges.[232] Additionally, the LATA contains a number of older switches serving a relatively small, sparsely located, poor population.[233]

Because the PSC has made a convincing showing that Winchester ratepayers would be substantially benefitted by a consolidation while competition would not suffer thereby, the Court will approve the PSC's request that the Winchester and Louisville areas be included within the same LATA, and South Central Bell shall submit a new LATA proposal which will effect this consolidation.

The Court approves the consolidation of Owensboro with the Kentucky portions of the Clarksville-Hopkinsville SMSA and the Evansville, Indiana SMSA. The total number of subscribers netted by this combination is 250,000, and no comments were received objecting to the LATA as drawn. The state-line exceptions requested for all three LATAs are also approved.

### 12. *Arkansas*

Southwestern Bell proposes three LATAs for Arkansas: Fort Smith, Little Rock, and Pine Bluff. The Department of Justice endorses the three LATAs, but GTE faults the Little Rock LATA for violating the decree's contiguity requirement. To be sure, the Little Rock LATA paints a long diagonal corridor across Arkansas starting at the Texas border near Texarkana and running northeast to Memphis and the Tennessee border, and it consists of eight separate pockets of Bell territory. Yet to make a separate LATA out of each pocket would result in tiny groups of isolated exchanges, far away from an SMSA, and would fragment the Operating Company's network. For a fuller discussion of the contiguity issue, see pp. 1011–1012 *infra.*

The Court approves the LATAs proposed for Arkansas. The consolidation of the SMSAs of Fort Smith and Fayettesville to form the Fort Smith LATA is reasonable since the total number of subscribers would be relatively small, 120,000. The interstate exception, allowing the inclusion of the one Oklahoma county in the Fort Smith SMSA, is also reasonable and it is therefore granted, as are the extended area service exceptions for Fort Smith and Little Rock, and the state line exceptions to allow Bell facilities in the Little Rock LATA to continue serving customers located in Missouri and Oklahoma. The Pine Bluff LATA requires no exceptions.

---

**231.** Reply Comments of Public Service Commission of Kentucky at 10.

**232.** If local rates are to be determined on a per LATA basis, so that the subscribers in a given LATA are to bear the costs of that LATA's facilities, Winchester subscribers would, of course, suffer serious injury.

**233.** The problem of inadequate demand for interexchange service could theoretically be curbed by making the Winchester LATA part of GTE's Lexington market area, since this would yield a combined market of 400,000 subscribers, but such a joinder would not alleviate the economic burden on Winchester Bell subscribers of having to pay for widely scattered and expensive local facilities out of a depressed rate base.

## VIII

### Midwest

■ AT & T has proposed to divide most of the Midwestern states (Indiana, Ohio, Illinois, Wisconsin, Iowa, Michigan, Minnesota, Kansas, Nebraska, South Dakota, North Dakota, Missouri, and Oklahoma) into either two or five LATAs each. Illinois is a notable exception, the Operating Company there having proposed a total of 11 LATAs, including several of the smallest in the country. Of the 51 LATAs proposed in all, 16 would require exceptions for SMSA consolidations. The Court approves 40 of the LATAs as drawn; orders the division of the Cleveland and Davenport LATAs; withholds approval of the Chicago, Southeast Wisconsin, Detroit, and St. Louis LATAs; consolidates the two LATAs proposed for South Dakota; consolidates one Illinois LATA; and orders slight modifications of one LATA in Minnesota and one LATA in North Dakota. These actions yield 47 LATAs for the midwestern states, a figure that will change depending upon actions taken with respect to the four LATAs for which additional information is required.

### 1. Indiana

The Court approves the five LATAs proposed by Indiana Bell and concurred in by the Justice Department. Four of these are relatively clear-cut and simple: the Auburn-Huntington LATA requires no Court approval; the Evansville LATA requires minor state line exceptions because it crosses into Kentucky to serve several exchanges there; the South Bend LATA requires approval for EAS arrangements into Niles, Michigan; and the Bloomington LATA requires a state line exception into West Point, Illinois and two EAS exceptions running into the Indianapolis LATA.[234]

The Indianapolis LATA is the only one of Indiana Bell's proposed LATAs which requires an SMSA exception, for it would consolidate the Indianapolis-Anderson SCSA, the Muncie SMSA, and the Kokomo SMSA. Although the consolidation will result in a LATA of 16,000 square miles, it will be approved. Indiana Bell has provided the Court with a great deal of information about its network arrangements, the cost of dividing the LATA, and its judgment about the viability of separate LATAs for Kokomo and Muncie should consolidation not be approved.[235] The Court approves both the SMSA consolidations, the state line exception requested for the Indianapolis LATA, and the relatively minor exceptions requested for the Evansville, South Bend, and Bloomington LATAs.

### 2. Ohio

Ohio Bell proposes five LATAs for Ohio, which the Department of Justice insists should be increased to six. Specifically, the Department objects to the Operating Company's proposal to combine the Bell-served portions of Cleveland-Akron-Lorain SCSA[236] with the Canton SMSA.[237]

A good case is made for the consolidation of Akron and Canton, the Department concedes, because by 1984 a single Class Four switch from Akron will provide service to both Akron and Canton.[238] By contrast, the

---

**234.** The only comments received with regard to Indiana's LATAs, from the Indiana Public Service Commission and from GTE, relate to the effect of Indiana's LATAs on independent telephone companies, a topic more appropriately considered during the review of the proposed classifications of Operating Company-independent traffic which will be undertaken in connection with the second phase of the plan of reorganization.

**235.** Additionally, the Justice Department notes that Kokomo contains only 49,000 Bell subscribers, and Muncie contains 90,000 subscribers.

**236.** Ohio Bell does not serve Lorain; it serves approximately 1.13 million subscribers in Cleveland and Akron.

**237.** Ohio Bell serves 159,000 subscribers in Canton.

**238.** In the Court's view, Ohio Bell has amply demonstrated that substantial costs and ratepayer inconvenience would result from making separate LATAs out of Akron and Canton. Ohio Bell estimates, with more detail than most Operating Companies, that it would cost $2.8 million to make separate LATAs out of Canton and Akron.

Department states, "the materials suggest that, for the most part, Cleveland, with its own Class Four switch, is separately designed and operated." [239]   For these reasons, the Department believes that Cleveland should stand on its own as a separate LATA.   The Court agrees.

Although Cleveland and Akron are part of the same SCSA, each is a separate SMSA, and their respective Bell territories are geographically divided by a wide moat of independent telephone territory entirely encircling Cleveland.   Akron and Canton, on the other hand, are not divided by independent territory;  looking at a map, they are on the same Bell "island" while Cleveland forms a separate "island."   From a telecommunications standpoint, then, Cleveland does not share a community of interest with Akron and Canton as much as Akron and Canton do with each other. [240]

There is no question that Cleveland presents a viable inter-city market on its own, and that Akron and Canton, together, also contain sufficient numbers of densely positioned business and residential phone users to attract competitive interexchange carriers.   At least one such carrier already serves all three cities, and another states that it intends to locate a point of presence in each of the cities.   Two LATAs would clearly advance the competitive purposes of

the decree, while Ohio Bell has pointed to no network readjustment costs that would be incurred as a result. [241]

The Court, therefore, will approve the consolidation of Akron and Canton into one LATA and approve the Department of Justice's recommendation that Bell territory in the Cleveland SMSA be configured into a separate LATA.   Ohio Bell shall submit a new application to the Court and the Department of Justice within 15 days conforming to this order and objections thereto may be filed within ten days thereafter.

The four remaining LATAs, based on Columbus, Dayton, Toledo, and Youngstown are reasonably drawn and will be approved, together with the state line and EAS exceptions requested for Columbus, Dayton, and Youngstown.   There is no objection to any of them, [242] and they all appear to the Court to be reasonable.

### 3.   *Illinois*

Illinois Bell and the Illinois Commerce Commission have cooperated to make the task of this Court in reviewing the 11 proposed Illinois LATAs a relatively simple one.   Illinois Bell has done an excellent job of proposing LATAs which, with the exception of the Chicago LATA, require no exceptions whatsoever. [243]   The Commerce

**239.**   Department of Justice Response to Comments at 128.

**240.**   This is demonstrated by Ohio Bell's application, which shows that 50 percent of all calling between Akron and Canton is local in character, effected through extended area service and special rate plans.   Calls between Akron and Cleveland or Canton and Cleveland are, in contrast, primarily toll calls.

**241.**   The Ohio Office of Consumers' General submitted a one-page statement supporting the consolidation of Cleveland, Akron, and Canton and claiming that "breaking up the proposed Cleveland-Akron-Canton LATA would result in a $6 million to $10 million per year loss of toll revenue associated with traffic between these areas."   The statement provides no supporting materials whatever for these figures.   Moreover, the figures appear to be based on a fragmentation of the LATA into three LATAs, which will not be the case.   The Consumers' General office supplies no estimate as to what a division of Cleveland alone from Akron and

Canton would cost.   Furthermore, loss of toll revenue by itself is not a particularly telling figure and has not been the basis for Court approval of a consolidation as a matter of course.   Expenses saved, investment eliminated, and increased competition must, of course, also be taken into account.

**242.**   GTE recommends that the Ohio Bell exchanges in the Columbus LATA be configured into a separate LATA which will obtain access from GTE's Athens facility.   This issue may be considered in accordance with the methodology outlined in note 95 *supra*.

**243.**   The ten LATAs that require no exceptions, and the number of subscribers in each, are: Cairo (6,200), Centralia (49,500), Champaign (109,000), Decatur (51,300), Forrest (700), Peoria (128,500), Quincy (27,000), Rockford (102,-800), Springfield (104,200), and Sterling (16,-100).   As is apparent from the numbers, Illinois will have several of the smallest LATAs in the country.   This is due to the unusually large

Commission, in turn, took many of the decree's guiding principles and applied them comprehensively—in a regulatory proceeding that included participation by Illinois Bell, the Illinois Telephone Association, the Independent Telephone Association and many independent telephone companies—to the entire State of Illinois rather than merely to areas served by Bell.[244] As the Commerce Commission states in its report to the Court, "the impending restructuring of the entire telephone industry requires that the division of telephone service areas into LATAs must be performed 'comprehensively,' that is, with a regard to both Bell and independent telephone companies, in order to completely evaluate the single 'costs' of any particular configuration." At the conclusion of this process, the Commission determined that most of the 11 LATAs proposed by Illinois Bell will both serve the interests of competition and minimize service disruptions and rate increases.

The Commission recommends that relatively minor changes be made affecting three LATAs proposed by the Operating Company. Specifically, the Commission would merge Springfield with Decatur but sever the Beardstown exchange from the Springfield LATA and place it in the Quincy LATA. In addition, it recommends that the Centralia LATA, which does not contain an SMSA, be appended to the St. Louis, Missouri, LATA to its west proposed by Southwestern Bell.[245]

The Court has stated previously that it would give great weight to the views of state regulatory commissions. This is a particularly appropriate instance in which to do that, given the active role that the Commerce Commission has taken in supervising the LATA process within Illinois, and it will accept the modifications urged by the Commerce Commission. Should any party believe strongly that the Commerce Commission's report is in error, it may submit comments to the Court to that effect within 15 days.[246]

The proposed Chicago LATA, containing 3.7 million Bell subscribers, and including 148 exchanges located in the Chicago-Gary-Kenosha SCSA and the Kankakee SMSA, would be one of the largest LATAs in the country. The LATA would include one small exchange located in Wisconsin,[247] and it would also include 13 substantial exchanges in northwest Indiana.[248]

Bell requests a state line exception to include these exchanges, on the basis that the communities they serve are within the inner ring of Chicago suburbs, and because they have been served via local trunks jointly owned and operated by Illinois Bell and Indiana Bell for years. Illinois Bell estimates that the cost of disrupting this Traffic Grant Agreement would exceed $17 million because of the many circuits that would have to be rearranged. Local Area Telecommunications, Inc. objects to the size of the Chicago LATA, but its suggestion

presence of independent telephone companies in Illinois. A number of Illinois Bell's exchanges home on switches owned by the independents; for instance, Bell's Forrest exchanges home on a GTE toll center in Pontiac and Bell's Cairo Class 4 office homes on a GTE toll center located in Marion. Provided that the independent companies provide assurances to the Court and the Department of Justice that they will provide equal access to these exchanges, interexchange carriers will reach these Bell subscribers via independent telephone facilities. See note 95 *supra*.

**244.** Far more of Illinois is served by independent telephone companies than is served by Illinois Bell.

**245.** The Commerce Commission notes that 16 of the 18 exchanges in Centralia fall within the

St. Louis SMSA and five would require rehoming if separated from the St. Louis LATA.

**246.** Unfortunately, because the Commission's report was submitted after the close of the comment period, the Court does not have the benefit of a response to the report from either the Department of Justice (which approves of all of the Illinois LATAs as drawn by the Operating Company) or from Illinois Bell or Southwestern Bell.

**247.** The North Antioch exchange.

**248.** These are exchanges located in Cedar Lake, Crown Point, Dyer, East Chicago, Gary, Hammond, Highland, Lake Village, Lowell, Merrillville, Morocco, St. John, and Whiting.

that a state line exception be denied for Northwest Indiana is not an appropriate way to trim the LATA's size. Ratepayers on either side of the Illinois-Indiana border are accustomed to calling one another via the local network, the affected Indiana areas are closely aligned with Chicago,[249] and rearrangement would be extremely costly with no apparent offsetting benefits to ratepayers. The state line exceptions for Indiana and Wisconsin are therefore approved.

The request for an SMSA consolidation to include six Kankakee exchanges within the Chicago LATA presents a different set of variables. Illinois Bell asserts, somewhat tersely, that the city's relatively small size, 103,000 residents, and its close ties with Chicago warrant its inclusion in the same LATA as Chicago. Unfortunately, Illinois Bell has provided no network justification for this consolidation. Moreover, it appears that the Department of Justice accepted the consolidation without demanding network justification, for its filing states simply that the number of Bell subscribers in Kankakee, 50,000, "is within the Department's criteria." [250] In fact, this is only partially true. The number of subscribers is less than the Department's purported ceiling of 100,000 to 125,000, but the distance between the two cities is 54 miles, over twice as far as the Department's guideline of 25 miles. Local Area Telecommunications, Inc. advocates making a separate LATA out of Kankakee.

The Court has not been given sufficient information to evaluate the wisdom of this suggestion, particularly in light of the fact that the Chicago LATA is already so large,[251] and it, therefore, withholds approval of the consolidation of Kankakee with the remainder of the Chicago LATA. Illi-

nois Bell will be expected within 15 days to submit more information justifying inclusion of Kankakee, or, in the alternative, to propose a separate Kankakee LATA if it finds, on reevaluation, that this would be more consistent with the decree. The Department of Justice, the Illinois Commerce Commission, and other interested parties may respond within ten days thereafter.

#### 4. *Wisconsin*

Wisconsin Bell has requested that the Court approve four LATAs corresponding to the southeast, southwest, northeast, and northwest parts of the state, but it has failed entirely to submit a response to the comments and objections that were filed in response to the request.[252] This cavalier attitude is particularly troubling when three of the proposed Wisconsin LATAs would consolidate SMSAs and will therefore require specific Court approval. The Justice Department, in its summary of the Wisconsin LATAs, does not even mention the proposed northwest LATA. Thus, the Court is confronted with respect to Wisconsin with an unusual paucity of information or justification.

The proposed LATA with the largest number of subscribers is that anchored in the southeast region of the state around Milwaukee. This LATA would also include Kenosha in the south (50 miles from Milwaukee) and Sheboygan in the north (32 miles from Milwaukee). This consolidation is supported by the fact that a large number of Class Five, local trunks connect Sheboygan with Milwaukee and Kenosha with Milwaukee. On the other hand, Sheboygan contains its own toll center so that, unlike the remaining exchanges in the proposed southeast LATA, the Sheboygan exchanges

---

**249.** Eleven of the exchanges are within the Chicago-Gary-Kenosha SCSA. The remaining two are included because they home on a facility within the SCSA.

**250.** Department of Justice Response to Comments at 142.

**251.** It would also seem that 50,000 subscribers might be an adequate basis for a separate LATA in a state where one LATA, the Forrest LATA, will have a mere 700 Bell subscribers. See note 243 *supra.*

**252.** Wisconsin Telephone was the only Bell Operating Company not to submit a response.

are not dependent on the Bell toll center at Waukesha. The parties have inadequately addressed these factors or explained why Kenosha and Sheboygan should be included in the Milwaukee LATA. Because the burden is on Wisconsin Bell to justify the proposed consolidation of Milwaukee, Sheboygan and Kenosha, the Court will withhold approval of the proposed southeast LATA pending the receipt of additional information within 15 days from the Operating Company justifying its proposal and any filing the Department of Justice wishes to make at the same time. Others may reply within ten days thereafter.

The proposed northeast LATA would consolidate the SMSA of Green Bay with the SMSA of Appleton-Oshkosh for a total of 250,000 subscribers. The distance from Oshkosh to Green Bay is 42 miles. Both the Green Bay and the Appleton areas have Class Four offices. However, Wisconsin Bell asserts that the combination of the two regions is justified "because there already exists an efficient intra-LATA network between them," the company stating that all Bell toll centers in the two SMSAs home on the Appleton cross bar switch and that exchanges and EAS routes cross the SMSA borders. Because Wisconsin Bell states that it would provide access to the entire LATA by means of the Appleton switch, and because the population is primarily rural so that ratepayers would benefit from aggregating their demand for long-distance service, the Court will approve the consolidation.[253]

The Court approves the proposed southwest LATA and the consolidation of the Madison and Jamesville SMSAs that it entails. The resulting LATA territory is far smaller than that involved in the proposed southeast and northeast LATAs. In addition, the toll function for Beloit, which is included in the southwest LATA, is served from Madison rather than from Jamesville, and it is therefore difficult to see how the LATA could be divided without an impractical rupturing of the existing network.

The proposed northwest LATA does not require specific Court approval because it would consolidate only insubstantial portions of Minneapolis, St. Paul, and Duluth with the SMSA of Eau Claire. Although the diffusion of pockets of Bell territory in this LATA is considerable, the proposed LATA does not depart from the express terms of the decree and no parties have objected to it. The Court is therefore approving the northwest LATA as proposed.

### 5. Iowa

Like a number of the other midwestern states, Iowa contains Bell territory that is fragmented into many individual islands.[254] Last spring Northwestern Bell proposed that these pockets of Bell territory be combined into ten LATAs. The Department of Justice informally responded that ten LATAs would be too many. Then, in its October 4, 1982, application, Northwestern Bell proposed three LATAs for the entire State,[255] and the Department of Justice replied that this would be too few.

In any event, it would not appear to be in the ratepayers' interest for Wisconsin Bell to undertake the expense of dismantling this arrangement or to jettison what both companies apparently believed was the most efficient arrangement. The Court, therefore, will consider ordering the exclusion of Stevens Point from the northeast LATA if such a proposal is submitted to it. See note 95 *supra*.

254. There are 47 such pockets in Iowa.

255. In addition a small part of southwest Iowa would be included within the Omaha (Nebraska) LATA.

253. The Court questions the necessity to rehome traffic from Stevens Point to the Operating Company toll center at Appleton. Since 1980 Stevens Point has homed on a GTE Class 3 toll center at Wausau as a result of joint planning studies by Wisconsin Bell and GTE. The Wausau center was only installed in 1979. It is one of eight Class 3 switches owned by GTE, compared with the 200 owned by AT & T. Wisconsin Bell's Stevens Point Class 4 toll center is one of only two BOC Class 4 toll centers that home on GTE Class 3 centers. Thus the Stevens Point area presents a rare case of integration of separate phone companies, responding to changes in customer calling patterns, and there is no reason why AT & T's divestiture should disturb such cooperative ventures.

There is no controversy with respect to two of the LATAs, a western LATA centered on Sioux City, and a central LATA based around Des Moines.[256] There is controversy, however, with respect to the eastern LATA. That LATA would consolidate the five SMSAs of Dubuque, Cedar Rapids, Iowa City, Waterloo, and Davenport-Rock Island-Moline. The Department of Justice recommends that the LATA be separated into two smaller LATAs, arguing that a LATA of such large size would present impediments to competition.

Northwestern Bell states that it would "be a mistake" to divide the eastern LATA, arguing that network efficiencies would be sacrificed unnecessarily were the LATA to be divided. Specifically, the Operating Company claims that only a small addition to intercity competition would be realized by such a division while new switches would have to be built to accommodate equal access to a two-LATA configuration.

This argument based on network considerations is difficult to accept considering that it was Northwestern Bell which initially proposed to draw a separate LATA around each of five cities it now proposes to consolidate. It is also difficult to credit the assertion that the net gain to competition from the separation would be minimal, in view of the fact that 74 percent of Iowa's intrastate toll calls originated in the five SMSAs which would be within the proposed LATA. Moreover, the area covered by the proposed eastern LATA would be extensive.[257] In the Court's view, Northwestern Bell has failed to meet its burden of demonstrating why the five SMSAs should be consolidated in a departure from the standards of the decree.[258]

The Court will approve a consolidation of Dubuque with Davenport into one LATA since both Northwestern Bell and the Justice Department believe this to be reasonable, and Dubuque contains a relatively small number of subscribers (41,000). However, the Court will not approve the further consolidation of Waterloo, Cedar Rapids, and Iowa City within that LATA as requested by Northwestern Bell. The Operating Company will have to draw and present to the Department of Justice and to the Court a separate LATA containing these cities.

Because of the very high number of independent telephone companies in Iowa,[259] the comments received with respect to Iowa highlight the unresolved questions of what will become of independent-BOC relationships once the Operating Company has been divested from AT & T. The ancillary proceeding (see note 88 *supra*) regarding classification of traffic between the independent companies and the Bell Operating Companies should settle some of these questions.[260]

256. The Des Moines LATA, which requires no exceptions, is hereby approved. The Sioux City LATA which requires exceptions to preserve wire center arrangements and EAS routes that cross into South Dakota, Nebraska, and Minnesota, is also approved.

257. Some points in the LATA would be 200 miles apart, and the distance between the Davenport and Waterloo SMSAs is approximately 150 miles.

258. Northwestern Bell has not provided any cost data that would support its assertions about the impracticality of dividing the eastern region into two LATAs.

259. There are between 150 and 160 independent companies presently doing business in Iowa.

260. The Iowa State Commerce Commission, one of the intervenors particularly concerned with the decree's effect on independents, urges the Court to delay approval of any Iowa LATAs until information it claims is presently lacking is made available. As has been previously noted, the Court's approval of any and all LATAs is tentative; the parties should not feel that if significant information dictating changes in LATA boundaries comes to light in the next few months the Court will be unwilling to consider it. Furthermore, the Commerce Commission is prematurely concerned with the effect that access charges will have on the telecommunications industry. Access charges will be set by state regulatory commissions and the FCC. While speculation about these charges may to some extent inform this review process, uncertainty as to their actual levels, particularly regarding local charges, is not a reason for withholding approval of the LATAs.

### 6. *Michigan*

Michigan Bell proposes five LATAs for that State. Two of the five proposed LA-TAs—Detroit and Grand Rapids—have been adversely commented upon by AT & T's competitors because of the numbers of cities they would consolidate.

If the proposed Detroit LATA were approved, Michigan Bell would carry traffic between six moderately-sized to large cities: Detroit, Dearborn, Ann Arbor, Pontiac, Flint, and Port Huron. Four of these cities compose the Detroit SCSA: Detroit, Dearborn, Ann Arbor, and Pontiac; and Michigan Bell desires to consolidate this SCSA with the SMSA of Flint.[261]

The cities included in the proposed Detroit LATA are characterized by a degree of interdependence. At the same time, however, there are sufficient distances between them, differences among their populations, and differences in their activities that these cities may present viable autonomous markets.[262]

Inasmuch as this LATA would have the Operating Company transport a significant amount of intercity traffic, the Department of Justice believes that the LATA "raises concerns," but it nevertheless approved the proposed LATA due to network efficiencies expected to result from a Flint-Pontiac toll consolidation and "Michigan Bell's intention to make use of those efficiencies in the provision of intra-LATA and access services."[263] Both the Operating Company and the state bodies urge the Court not to require a division of the LATA that would place Flint into a separate LATA because of the Flint-Pontiac toll consolidation project that has been under way since 1977 and will be completed during 1983.[264]

It appears that the sunken investment and the efficiencies to be realized from this arrangement cut against separating Flint from Pontiac. However, it is not at all clear whether consideration has been given to dividing the LATA in a different fashion, by drawing a LATA boundary south of Pontiac. If this were done, the Pontiac-Flint toll consolidation could come to fruition but Michigan Bell's participation in intercity telecommunications would be reduced. There is no evidence in the Operating Company application or in its November response to comments that it is crucial due to network arrangements that the Detroit, Dearborn, and Ann Arbor areas be in same LATA as Pontiac.[265]

It may well be that placing Flint and Pontiac in an autonomous LATA and making a separate LATA out of Detroit, Dearborn, and Ann Arbor would not be in the public interest. At this time, however, the Court lacks information sufficient to enable it to make such a determination. The Court will therefore for the time being withhold approval of this LATA. Michigan Bell should comment on the feasibility of dividing the LATA in an alternative manner (perhaps between Pontiac and Detroit) within the next 15 days. The Department of Justice and any other interested parties may respond within ten days thereafter.

The same competing interests of encouraging competition, on the one hand, and protecting the Operating Company's viability, on the other, are implicated in the proposed Grand Rapids LATA. Michigan Bell would carry traffic between several cities in this LATA—Grand Rapids, Kalamazoo, Battle Creek, and Benton—just as it would

---

**261.** Port Huron is not an SMSA. The LATA would also include an insubstantial part of the Toledo, Ohio—Michigan SMSA.

**262.** Competitive interexchange carriers already serve most of the cities.

**263.** The Department does not set forth the data that caused it to reach this conclusion, but more detailed information is available in the Michigan Bell filing as well as in the comments of the State of Michigan and the Michigan Public Service Commission.

**264.** Under this project, a Flint tandem, a Pontiac tandem, and the Pontiac 4A toll machine traffic will be consolidated in a new No. 4 ESS machine in Pontiac. The projected savings to be realized over time from this project are estimated at $27.9 million.

**265.** Indeed, the application refers to the eventual establishment of access tandems in both Pontiac and Detroit, indicating a certain independence between the two regions.

under the proposed Detroit LATA.[266] The Department of Justice disapproves the Grand Rapids LATA.[267] The Court agrees that, if all else were equal, Grand Rapids and Kalamazoo should not be in the same LATA. Indeed, the geographical configuration of the cities in the western region of Michigan would favor making one LATA out of Kalamazoo, Battle Creek, and Benton, and a separate LATA out of Grand Rapids and the non-SMSA territory to the north. Several factors militate against this result, however.

First, as in the case of Detroit, Michigan Bell is engaged in consolidating its facilities in western Michigan. Under the plan, two toll switches in Kalamazoo and Grand Rapids will be replaced by a new toll switch in Grand Rapids. The projected savings from this reconfiguration are estimated to be $16.7 million. Although this project is further from completion than is the proposed Pontiac-Flint consolidation, it has been under way since 1977, costs have been incurred, and completion is expected in 1984. There appears to be no way both to divide the LATA on a reasonable basis and salvage the consolidation of the Kalamazoo and Grand Rapids toll functions.[268] Second, it would not entail a loss to competition of great magnitude to defer to the strong network interest represented by the Grand Rapids toll consolidation. For example, the total population of the proposed Grand Rapids LATA is far smaller than that of the Detroit LATA.[269] There are four cities involved, each with smaller populations than the satellite cities in the Detroit LATA.[270] Third, interexchange carriers have shown less interest to date in the Grand Rapids area than in the Detroit area. Fourth, significant funds have been invested not only by Michigan Bell but also by General Telephone of Michigan in a rehoming project that would place the Benton exchanges on GTE's switch in Three Rivers. Michigan Bell and the Michigan Public Service Commission believe that this rehoming will result in efficiencies for Michigan telephone users in the Three Rivers area, and they wish to see it preserved. That project will not be completed, however, according to Michigan Bell, unless Kalamazoo is tied to Grand Rapids.[271]

Finally, since it is one objective of the decree to affect independent telephone companies as little as possible,[272] the Court is not prepared unnecessarily to take an action which may deprive an independent[273]

266. The land mass of the proposed Grand Rapids LATA is far larger than that of the Detroit LATA due to much non-SMSA territory to the north that would be included within the Grand Rapids LATA.

267. Several competitors of AT & T criticize the Grand Rapids LATA as too large. The LATA is also on the United Church of Christ's list of the nine most questionable LATAs.

268. It would make no sense to consolidate Battle Creek and Benton in a separate LATA, for instance.

269. The population of the Detroit LATA is 4.5 million compared with 1.4 million in the Grand Rapids LATA. In Detroit this results in 2.3 million subscribers compared to 668,000 in the Grand Rapids LATA.

270. In fact, Benton became an SMSA just last year.

271. It is not entirely clear why the Three Rivers homing project would disintegrate if two LATAs were carved out of the Grand Rapids area. In fact, one of the alternative ways that access could be provided for a separate Kalamazoo LATA is through GTE's Three Rivers switch. Nevertheless, in the absence of countervailing evidence, the Court will take Michigan Bell and the State of Michigan at their word when they state that it is most likely that the Three Rivers project would not be completed unless Grand Rapids and Kalamazoo are contained within the same LATA.

272. See *supra* at pp. 1008–1011.

273. The State of Michigan and the Michigan Public Service Commission express concern with the procedure the Court has adopted to classify traffic between the independents and the Operating Companies, arguing that it exceeds the mandate of the decree and usurps authority properly vested in state regulatory commissions. The Court agrees with the Illinois Public Service Commission that AT & T's divestiture cannot be accomplished in a vacuum and that the process of divestiture must show solicitude for the interests of the independent companies, and for that reason has established the procedure for classifying Operating Company-Independent traffic outlined in note 88 *supra*.

of the expected benefits from a sizable investment already made.[274]

For the reasons detailed above, the Court approves the Grand Rapids LATA.[275]

The proposed Saginaw, Lansing, and Upper Peninsula LATAs are also approved. The Upper Peninsula LATA requires no exceptions and has been challenged by the interexchange carriers solely on the basis that its various parts are widely scattered. Considering that the area does not include even one SMSA, it would be imprudent to divide this LATA. The proposed Lansing LATA and the Saginaw LATA involve exceptions allowing the major city in each of these LATAs to be combined with a smaller SMSA.[276] The actual territory covered by both LATAs is relatively small, and both Michigan Bell and the State Public Service Commission have persuaded the Court that the combinations are reasonable.[277]

### 7. Minnesota

The only comments received with respect to the Minnesota LATAs were submitted by state bodies which, not atypically, are concerned that the LATAs proposed for their state are too small. The Minnesota Public Utilities Commission is concerned that the proposed Brainerd LATA will contain only 60,000 telephones. It suggests that five border communities[278] in Minnesota now

scheduled to be contained within the Fargo, North Dakota, LATA be placed instead within the Brainerd, Minnesota LATA. The Minnesota Department of Public Service, on the other hand, would deal with the relatively small size of the Brainerd LATA by combining its territory with the Duluth LATA.[279]

The Justice Department approves all of the Minnesota LATAs as proposed by Northwestern Bell.

The Department's rejection of the Minnesota Public Utilities Commission's request that the border communities be appended to the Brainerd LATA is based on the premise that the independent subscribers in the Brainerd area would be combined with the Bell territory to form a total market of 168,000 subscribers. The Court agrees with the Commission that at this point this is highly speculative. Since it appears that the communities in question have as much in common with other communities in Minnesota as they do with communities across the border in North Dakota, the Commission's request that they be combined with the Brainerd LATA is reasonable, and, due to the decree's presumption against state line crossings, is more in keeping with the terms of the decree than the proposal to include them within the North Dakota

**274.** Michigan Bell has invested $500,000 to date and claims that if the project were not completed it would lose $200,000 of this amount. General Telephone has invested $3.79 million to date of which $1.8 million would be lost in terms of estimated stranded capacity if Michigan Bell were to withdraw from the project.

**275.** The Court expects that Michigan Bell will offer inter-exchange carriers the benefits of the toll consolidation by providing access through the new No. 4ESS switch.

**276.** Bay City would be consolidated with Saginaw and Jackson with Lansing. Although Michigan Bell asserts that the portion of Jackson to be included with Lansing is insubstantial, thereby making specific Court approval unnecessary, the prudent approach is to treat this "close case" as if the portion were substantial.

**277.** For instance, 97.8 percent of all telephone calls placed between Bay City and Lansing are

local calls. Application of Michigan Bell at I–37. A strong community of interest between Lansing and Jackson is also demonstrated by the application.

**278.** These are Saint Vincent, East Grand Forks, Moorhead, Breckenridge, and East Fairmont.

**279.** In addition, the Department asks the Court to combine the St. Cloud LATA, which will encompass approximately 76,000 Bell subscribers, with the Minneapolis-St. Paul LATA. The Countryside Council's Telecommunications Task Force also urges that the five LATAs proposed for Minnesota be reconfigured into three LATAs. It would accomplish this by merging Brainerd and Duluth and by merging St. Cloud and Rochester. Alternatively, it proposes a two-LATA configuration consisting of a Minneapolis-St. Paul LATA and a second LATA encompassing the rest of the state.

LATA.[280] Accordingly, the Court requires that the Minnesota border communities listed in note 278 *supra* be included in the Brainerd LATA. The Court approves Northwestern Bell's LATA proposals for Minnesota in all other respects.[281]

### 8. *Kansas*

The Department of Justice endorses the two LATAs proposed by Southwestern Bell for Kansas,[282] but MCI complains that these LATAs depart from the decree's contiguity requirement in particularly egregious ways. The Court does not agree. To be sure, much independent territory separates the various parts of the proposed Topeka and Wichita LATAs. However, as discussed above,[283] the decree's contiguity requirement was never intended to mean that every single pocket of Bell territory must become a separate LATA. This is particularly true in midwestern states such as Kansas, where the islands of Bell territory are mostly stretches of rural, sparsely populated land situated many miles from a major city.

If the contiguity challenge is really a disguised objection regarding the size of the LATAs proposed for Kansas,[284] it could only be met by creating several LATAs containing no major city. It is difficult to see how such a decision would advance the competitive purposes of the decree, since the demand for competitive interexchange carriers in very rural areas is likely to be minimal for some time to come. The only effect of such a decision would be to oblige Southwestern Bell to make network rearrangements in order to be capable of providing access to the rural areas' local loops from decentralized facilities rather than from one facility located more centrally. Yet if fragmented into separate LATAs, the rural exchanges would be unlikely to aggregate sufficient demand for interexchange carriers in the first place, leaving the access facilities largely idle.

Naturally, an interexchange competitor such as MCI is concerned that LATAs of much area, such as those proposed for Kansas, carry the potential for high access charges should the State decide to average such charges.[285] This concern is of insufficient weight, however, and too speculative at this time, to justify the Court's ordering changes in LATAs that do not deviate from the terms of the decree in any significant respect.[286] The two LATAs proposed for Kansas are therefore approved,[287] together

---

**280.** Northwestern Bell does not state either in its application or in its November comments what the cost would be of including the five border communities within the Brainerd LATA. Presumably, if this cost were prohibitive, Northwestern Bell would have advanced it as a reason favoring the communities' consolidation in the Fargo LATA.

**281.** The Court resolves the disagreement over whether the resulting Brainerd LATA, the Duluth LATA, and the St. Cloud LATA present viable interexchange markets in favor of Northwestern Bell and the Justice Department since these LATAs do not require exceptions to consolidate more than one SMSA. The presumption is that they are properly drawn and any intervenor has the burden to show otherwise. Neither the Department of Public Service nor the Countryside Council has satisfied this burden.

**282.** The Kansas State Corporation Commission also endorses the LATAs as appearing to "strike a reasonable balance between the various criteria in the modification of final judgment."

**283.** See pp. 1010–1011.

**284.** The Wichita LATA, for instance, stretches approximately 400 miles across southern Kansas and consists of eighteen noncontiguous pieces. The Topeka LATA contains another fourteen isolated pieces.

**285.** See notes 78 and 79 *supra.*

**286.** Although the LATA proposed for northern Kansas does involve the consolidation of two SMSAs, Topeka and Lawrence, the cities are adjacent and are in the northeastern corner of the state. Therefore, a denial of the request for their consolidation would do little to decrease the size of the proposed Topeka LATA. Moreover, Lawrence is a small city with only 32,000 subscribers, and at present, it lacks a Class Four switch.

**287.** The distribution of Bell territory in Kansas is similar to that in Iowa, but there are significant differences between the geographies of the two states. A greater number of SMSAs exists in Iowa and they are distributed more evenly throughout the state than are the SMSAs in

with the various exceptions requested by Southwestern Bell.[288]

### 9. Nebraska

The Court approves the two LATAs proposed by Northwestern Bell: Grand Island, consisting entirely of non-SMSA territory in western Nebraska, and Omaha, encompassing northeastern Nebraska and southwestern Iowa. No comments objecting to these LATAs were received, and they appear to be reasonably drawn.

### 10. South Dakota

Northwestern Bell proposes two LATAs for South Dakota—Rapid City and Sioux Falls. The South Dakota Public Utilities Commission expresses concern that Rapid City, with 52,000 subscribers, will be unable on its own to attract competitive interexchange carriers, and it therefore recommends combining the two LATAs. The Operating Company was initially reluctant to support consolidation of the two areas because of the great distance between them and the fact that the land in between is sparsely populated. More recently, however, Northwestern Bell has stated that it would be amenable to one LATA "if the Court should determine it is consistent with the needs of the [decree]." The Department of Justice, which based its approval of the two-LATA plan on Northwestern Bell's initial hesitation over consolidation, apparently would not object to consolidation if the Operating Company regards it as feasible.[289]

In view of Rapid City's relatively small size,[290] the Court will grant the State's request to establish a single LATA in South Dakota. Such a consolidation is likely to increase the viability of the Operating Company. Moreover, and this is especially important in a sparsely settled area such as this, a single LATA may be expected to enhance service in all parts of the State, both because of the centralization of direction that would flow from it and because the resulting increase in the viability of the Operating Company will render it less likely that substantial rate increases would be required to provide service to isolated ratepayers.[291]

### 11. North Dakota

Two LATAs are proposed by Northwestern Bell for North Dakota—Bismarck, comprising the western Bell exchanges, and Fargo, encompassing the eastern exchanges. The Fargo LATA would require the consolidation of the Fargo-Moorhead SMSA with 156,000 subscribers, and the Grand Forks SMSA, with 76,000 subscribers.

Although the Department of Justice reported in its November response that no comments were received with respect to these LATAs, this is in error. The North Dakota State Public Service Commission filed a comment urging that the two LATAs be combined into one. The Commission is concerned with the relatively small size of the LATAs and also with what it perceives to be its loss of regulatory control

---

Kansas. Thus, the pockets of Bell territory in Iowa are more neatly separated into groups centering on a single SMSA, and the proposed eastern LATA in Iowa will therefore be divided, even though the longest distance between two points in it is half that of the proposed Wichita LATA. Because division could be accomplished with SMSAs falling into both halves, both would present viable interexchange markets and division therefore serves the competitive purposes of the decree. By contrast, it appears that little or nothing is to be gained in terms of increased competition by making separate LATAs out of the rural pockets in Kansas.

**288.** These include approval for the consolidation of Lawrence and Topeka in the Topeka LATA, and, concerning the Wichita LATA, approvals for extended area service and state line crossings.

**289.** Department of Justice Response to Comments at 154.

**290.** Rapid City is no longer an SMSA.

**291.** The exceptions for state-line crossings into Wyoming, Iowa, Nebraska, and North Dakota are also approved, as is the exception for the non-optional EAS arrangement with Hawanden, Iowa.

over intrastate calls should more than one LATA be established.

As discussed *supra,* the states will continue to exercise regulatory authority over intrastate telephone activity, so that this latter concern is specious. As for the Commission's concern about size, the Bismarck LATA would include 90,000 subscribers, nearly twice that of the Rapid City LATA in North Dakota which the Court has agreed to consolidate. In addition, the Bismarck LATA contains three cities, one of which, Bismarck, is the state capital, and according to the Operating Company's application, the area is economically healthy. In sum, there is every indication that the Bismarck LATA, unlike the Rapid City LATA, will be able to stand on its own. The Court will therefore follow the recommendations of the Operating Company and of the Department of Justice, and it will approve the two LATAs for North Dakota.

The consolidation of Fargo and Grand Forks is reasonable because of the large degree of integration of the telephone systems of the two areas. The Court will allow the Fargo LATA to include the three exchanges located in South Dakota that are currently served from North Dakota wire centers but it denies Northwestern Bell's request for a state line exception into Minnesota in conformance with the recommendation of the Minnesota Public Utilities Commission.[292] All other exceptions requested for the Fargo and Bismarck LATAs are approved.

### 12. *Missouri*

Between the spring of 1982 and October 1982, when it filed its application for LATA approval, Southwestern Bell reduced the number of LATAs it regarded as appropriate in Missouri from 15 to three. Some of the reduction was attributable to comments informally made to Southwestern Bell by the Justice Department which expressed its consistent concern that LATAs not be so small as to give AT & T a virtual monopoly over the interexchange business. This resulted in two Missouri LATAs being appended to larger LATAs.[293] Southwestern Bell has further explained that it reduced the number of LATAs for all five of the states it serves because "it was determined that the community of interest standards had been too narrow in scope. Specifically, the community of interest between small rural communities and the larger metropolitan areas were [sic] not considered.... In addition, existing network arrangements had been inadequately considered." [294] However, no examples applicable to Missouri are given. As with Arkansas, the fact that Southwestern Bell at least for a time believed that a large number of LATAs would be in its interest undercuts the largely conclusory arguments it now advances to the effect that network considerations compel a very small number of LATAs,[295] two of which, Kansas City and Springfield, involve SMSA consolidations.

The Court will approve the Kansas City and Springfield LATAs as currently proposed. Although each involves a consolidation of SMSAs about 50 miles apart the size of the SMSAs is relatively small. With regard to the Springfield LATA, the SMSA of Joplin, which has 62,000 subscribers, would be combined with Springfield itself

---

**292.** See *supra* at 1044–1045.

**293.** The exchanges in and around Kirksville, in northern Missouri, were thus included within the Kansas City LATA in western Missouri, and exchanges in and around Eldon, in central Missouri, were placed in the St. Louis LATA, to the east. AT & T Response to Comments, Appendix A, tab 13 at 4.

**294.** *Id.* at 3.

**295.** The State Public Service Commission made no specific recommendations about the LATAs proposed for Missouri, stating that while it might be true that a proposal which includes a small number of relatively large LATAs "is in the best interests of Missouri ratepayers and the future viability of Southwestern Bell," the Commission was not certain that "an assessment of the Missouri LATA proposal can properly be based solely upon this assumption' but must be informed by comparative revenue analysis. However, the Public Service Commission had nothing concrete to offer regarding the configurations actually proposed for Missouri.

with 95,000 subscribers—not an enormous number. Moreover, the total territory of the LATA would be relatively small. As concerns the Kansas City LATA, although the Kansas City LATA would be sizable, numbering one million subscribers, the number of subscribers in St. Joseph, which would be added, is small (40,000 subscribers). The Court is persuaded that the two areas have a strong community of interest and that network considerations make consolidation appropriate.[296]

The third LATA, St. Louis, includes an interstate SMSA, and it is extremely large in both population and geographical area. While it appears reasonable to include both the Illinois and Missouri portions of the St. Louis SMSA within a single LATA,[297] inadequate justification has been presented to support the vast extension of the LATA to the south of St. Louis all the way to Missouri's bootheel when the LATA also extends far to the west and northwest.[298] There are Class Four switches located in two cities in the southern portion of the St. Louis LATA—Sikeston and Cape Girardeau. According to Southwestern Bell's application, more traffic originating in Cape Girardeau terminates south of Flat River than to the north in St. Louis. It appears, therefore, that a separate LATA could well be formed based on Cape Girardeau and Sikeston.[299] The Department of Justice approves the St. Louis LATA in an extensively terse discussion which ignores both the LATA's size and the feasibility of dividing it. Because of the lack of justification presented, the Court will withhold approval of the St. Louis LATA. Southwestern Bell should

within 15 days submit either additional justification concerning the St. Louis LATA notwithstanding its size or information regarding the feasibility of a separate LATA based around Sikeston and Cape Girardeau.

All other requests for exceptions (other than the St. Louis matter discussed *supra*), including the state line exception requested to continue service to two Illinois communities from the St. Louis area, are approved.

### 13. *Oklahoma*

The Court approves the two LATAs proposed by Southwestern Bell: Oklahoma City (consolidating Oklahoma City, with 647,000 subscribers, Lawton, with 74,000 subscribers, and Enid, with 49,000) and Tulsa. No comments objecting to the LATAs were received, and the LATAs appear to be reasonably drawn.

### IX

### *West*

■ Aside from California, for which Pacific Telephone & Telegraph proposed nine LATAs, the Operating Companies serving the western states applied for approval to serve their respective states either through one or two LATAs. The total number of LATAs proposed for the West is 25 of which 13 would require the consolidation of SMSAs. The Court approves 21 of the LATAs as drawn; grants the request of the Utah Public Service Commission to consolidate the two LATAs proposed for Utah; denies one of the SMSA consolidations proposed for the Seattle (Washington) LATA;

---

**296.** No comments were received specifically objecting to the consolidation and the Department of Justice supports it.

**297.** The Court has granted similar exceptions for interstate SMSAs or SCSAs, see, *e.g.*, Chicago, Ill., and Washington, D.C.

**298.** The expanse will be even greater than that proposed in Southwestern Bell's application since the Court is approving the Illinois Commerce Commission's recommendation that Centralia, Ill. exchanges be made part of the St. Louis LATA. See pp. 1038–1039 *supra*. The St. Louis LATA would therefore include more

than the 1.3 million subscribers referred to in the Operating Company's application.

**299.** This may be particularly desirable to ensure high quality access through minimal backhauling, and it appears to be feasible since Southwestern Bell has not yet committed itself to supplying equal access through one St. Louis switch, its plans for providing equal access being wholly undecided. As of October 1982 the Operating Company stated only that it would either supply access via direct trunking or would upgrade one or more ESS offices and provide connecting trunks to Class Four offices.

and orders modification of the Los Angeles (California) LATA. These decisions yield a total of 26 LATAs for the western states.

### 1. Colorado

The Court approves the two LATAs proposed by Mountain Bell: Colorado Springs (consolidating Pueblo, with 62,000 subscribers) and Denver (consolidating Fort Collins, with 74,000 subscribers and Greeley, with 61,000). Initially the Department of Justice had reserved judgment on the proposed Denver LATA because it believed that Fort Collins and Greeley could combine to form a viable market on their own. In December 1982, however, the Department informed the Court that it supported the consolidation as proposed by Mountain Bell because it was persuaded that the network rearrangements necessary to sustain Fort Collins and Greeley as a separate LATA made separation impractical.[300] The Court concurs in this analysis.

### 2. Nevada

The Bell Telephone Company of Nevada, a subsidiary of Pacific Bell, proposes that all Bell territory in Nevada be included within one LATA.[301] The Department of Justice concurs, commenting that "[t]he existing network configuration reflects the realities of serving a vast but sparsely populated state."[302]

The approximately 161,000 telephones in Nevada served by the Bell System are dispersed into 24 individual pockets scattered throughout Nevada's approximately 11,500 square miles. The LATA does not require an SMSA exception since only the SMSA of Reno is involved, and the only party which has specifically objected to the proposal, the Centel Corporation,[303] has not shown that the LATA as drawn is unreasonable given network considerations.[304] It appears that equal access will be provided to the widely dispersed end offices by means of a No. 4ESS switch located in Reno, even though this switch is likely to be owned by AT & T under the predominant use test.[305] Appendix to Application of BOCs for Approval of LATAs at Q–40.

In view of Nevada's sparse population, the expressed willingness of the Operating Company to cooperate with the 11 independent telephone companies which serve the majority of telephones in Nevada, and the plans to provide equal access through a No. 4ESS switch, the Court will approve the proposal for a single LATA in Nevada.

### 3. Idaho

The Court approves the single LATA proposed by Mountain Bell for Idaho. No comments were received objecting to the LATA, and no exception for consolidation of SMSAs is required. The inclusion of eight northern exchanges in the Spokane, Washington LATA, and the other requested state line exceptions are reasonable and are also approved.

### 4. Wyoming

The Court approves one LATA as proposed by Mountain Bell. No comments were received objecting to the designation of all Wyoming Bell territory as one LATA.

---

**300.** It is worth pointing out that the Department was not prodded into scrutinizing the Denver LATA by an intervenor; rather, the Department's preliminary reservation flowed from its own analysis. This fact inspires faith in the staff's thoroughness and indicates that the Department did not rubber stamp the AT & T-Operating Company proposals nor seek merely to fend off the criticisms of intervenors.

**301.** The Nevada Public Service Commission supports that proposal.

**302.** Department of Justice Response to Comments at 190.

**303.** Centel serves 236,743 customer lines in and around Las Vegas, the largest of its markets for telephone service. Centel is the fifth largest telephone system in the U.S.

**304.** Centel's objection that the Nevada LATA violates the decree's contiguity requirement is disposed of by the Court's general discussion of the contiguity standard at pp. 1010–1011 *supra.*

**305.** The Operating Company can achieve equal access by leasing space from AT & T.

## 5. *Arizona*

The Court approves the two LATAs as proposed by Mountain Bell: Phoenix and Tucson. No comments were received objecting to the proposal.

## 6. *New Mexico*

Mountain Bell has good reason to feel, with respect to its proposed New Mexico LATA, that it is caught in a tug of war between the Justice Department and AT & T's competitors. Initially, Mountain Bell proposed that two LATAs be formed in New Mexico, one including the SMSA of Albuquerque, the other including the SMSA of Los Cruces. The Department advised Mountain Bell that it believed that the Los Cruces SMSA was too small to attract sufficient competition for interexchange services. Mountain Bell then submitted its formal application in October 1982 requesting that all Bell territory in New Mexico be included within a single LATA. Subsequently, MCI and U.S. Telephone Communications, Inc. objected to a LATA configuration that would include both Albuquerque and Los Cruces within the same LATA.

In land mass New Mexico is the fifth largest state in the United States. It is sparsely populated, however, containing only approximately 1.1 million inhabitants who have 441,000 telephone access lines. The entire state's demand for competitive interexchange telephone service will therefore be low, whether the state consists of one LATA or two. The State Corporation Commission strongly supports the one LATA configuration, observing that the approximately $1 million capital investment that would be required to provide equal access under a two-LATA arrangement would be spread over a relatively small rate base. The Court is persuaded that for these reasons New Mexico's circumstances warrant consolidation of the two SMSAs, and it

approves the proposal of Mountain Bell to have all Bell territory in New Mexico included within a single LATA.[306]

## 7. *Utah*

The original Operating Company proposal was for two LATAs in Utah, one centered on the Salt Lake City-Ogden SMSA, the other around the Provo-Orem SMSA. The Operating Company (Mountain Bell) and the Utah Public Service Commission recommend that the two areas be combined in a single LATA; the Department of Justice states that it "would not object" to a single LATA in Utah. MCI, in contrast, objects not only to this consolidation but recommends that the Provo LATA should be further divided.

It appears that the Salt Lake City and Provo areas are but 38 miles apart, and are similar in population mix and economic activity. There is also a considerable amount of commuting between Provo and Salt Lake City. On the basis of these facts, the Public Service Commission argues that the "Salt Lake-Provo metropolis thus constitutes a single social, cultural, religious, and economic community of interest as defined in section IV(G)(1) of the decree." Further, as the Public Service Commission correctly points out, a single LATA might well be regarded in the circumstances existing in Utah as procompetitive because, while Provo contains too few subscribers scattered over too large an area to attract the investment necessary to bring digital service to the region, a consolidation is likely to result in extension of such service from Salt Lake City to Provo.

These arguments are persuasive to the Court, as apparently they ultimately were persuasive to the Department of Justice. In addition to raising generalized and rather simplistic objections,[307] those opposing

---

306. MCI's objection based on Mountain Bell's supposed deviation from the contiguity requirement is addressed *supra* at pp. 1010–1011. U.S. Telecommunications, Inc. is mainly concerned that the Court make it clear that intra-LATA competition will be allowed, which the Court has done *supra* at pp. 1004–1006.

307. U.S. Telecommunications, Inc. is critical of the proposal for two LATAs in Utah and the LATA applications in nine other states because "these are large and diverse states and by no stretch of language could one believe that half of any of these states is a single locality."

the consolidation rely basically on the argument that one cannot know whether the state will allow a competitive climate to be established since it is unknown exactly how and at what levels state and federal regulators will compute access charges. The best answer to such concerns is that the Department of Justice and the Court will be open to complaints, should they arise, that Utah and Mountain Bell are using the single-LATA formation to discriminate against carriers wishing to transport intra-LATA calls.

As the Department of Justice and others recognize, the decision as between a single or a divided LATA for Utah represents a close question. In this instance, however, the Court believes that the issue should be decided in favor of consolidation, not only because that is proposed by the Operating Company and not objected to by the Justice Department, but also because a single LATA will aid in the stability and vitality of the Operating Company (see pp. 995–998 *supra*), without significant adverse effects on competition.[308]

### 8. *Montana*

There is a superficial similarity between Montana and Utah, and the arguments offered by the various interested parties on the single versus multiple LATA problem with respect to Montana are also similar to those raised with respect to Utah.[309] Unlike in Utah, however, the Department of Justice strongly opposes consolidation.

The Court agrees with the Department of Justice that Montana requires different treatment than Utah. In the first place, Billings and Great Falls are 200 miles apart, as distinguished from the 38 miles which

separate Salt Lake City from Provo, Utah. Second, the uniform community of interest demonstrated in Utah by the State Public Service Commission does not exist in Montana. The northwest half of the state revolves around energy development and agriculture, with Billings as its hub of air, rail, and road transportation. In southeast Montana, with Great Falls as the focal point, trade, state and local government are the major sources of personal income. Third, if Mountain Bell is to reap the benefits of the not inconsiderable traffic between the two LATAs, it would have to duplicate AT & T's existing lines[310] at considerable cost. Finally, the fact is that, unlike in Utah, no competitors now operate in Montana, and this gives rise to some doubts concerning the Commission's past and future policies in regard to competition generally.

The Court will not approve the consolidation requested by the state commission,[311] but it approves the two LATAs recommended by the Department of Justice.

### 9. *Washington*

Pacific Northwest Bell's proposal would consolidate four SMSAs in western Washington into a Seattle LATA, and it would consolidate two SMSAs in eastern Washington into a Spokane LATA.[312] In addition, the small northern SMSA of Bellingham, geographically separated from the rest of the LATA by a significant expanse of GTE territory, would also be included within the Seattle LATA.

The proposed Seattle LATA with a population of 2.2 million and a total of over one million telephone subscribers, has engendered considerable controversy because of

---

**308.** Utah states that it will encourage permits intrastate competition, and interexchange carriers other than AT & T already operate in certain Provo, Salt Lake City, and Ogden.

**309.** Thus, the Public Service Commission suggests consolidation of the proposed Billings and Great Falls LATAs; Mountain Bell states that it "would not resist" consolidation; and various intervenors prefer at least two LATAs.

**310.** Under the predominant use test, the existing lines will probably be awarded to AT & T at the time of divestiture.

**311.** However, the Court approves the state line and EAS exceptions requested for the Billings LATA to permit continued service into isolated communities in North Dakota and Wyoming.

**312.** The Spokane LATA would also include nonsubstantial portions of the Richmond-Kennewick-Pasco SMSA.

its relatively large size in numbers of persons and included communities.[313]

The Seattle LATA would include four major areas: the SMSAs of Olympia, Bellingham, and Bremerton, and the SCSA of Seattle-Tacoma. A division of the Seattle LATA would be feasible only if Olympia were to be included in the non-Seattle LATA: since Bremerton and Bellingham together account for only 83,000 subscribers and are separated by some 100 miles, it is unlikely that they would present a viable market unless they were joined with Olympia, which contains 113,000 subscribers. However, Pacific Northwest Bell argues that cost penalties and long-term inefficiencies would result if its proposal to include Olympia in the Seattle-Tacoma LATA is not approved. Thus, the Court's decision whether to grant the requested exception or instead to order that Olympia be the linchpin of a second western Washington LATA, depends in large part upon the weight to be given to the Operating Company's asserted network considerations.

The most detailed explanation of these considerations is found in Pacific Northwest Bell's response dated November 22, 1982. Since 1978, according to this filing, as part of an overall consolidation, Pacific Northwest has been engaged in rehoming toll customers from a 5XB switch in Olympia to the modern, large No. 4ESS switch in Seattle. The creation of a separate LATA out of Olympia would, it is said, frustrate this project and necessitate a $3.5 million alteration of the Olympia 1ESS machine to accommodate the subscriber lines which have been or are in the process of being rehomed on the Seattle No. 4ESS switch.

This explanation is persuasive. The consolidation project is likely to promote the objectives of the decree, particularly if the No. 4ESS switch were to be used by Pacific Northwest Bell to provide interexchange carriers [314] with equal access to both the Seattle and the Olympia local networks. Clearly, access via the Seattle No. 4ESS switch would be preferable to any of the three alternatives proposed for providing equal access to a separate Olympia LATA.[315]

With the expectation that the No. 4ESS switch will be used for equal access, the Court will allow the toll consolidation to proceed, and it hereby grants the exception for the consolidation of Olympia with Seattle-Tacoma. The consolidation of Bremerton is also approved.

The Court will not grant the requested exception to include Bellingham within the Seattle LATA, however. The Court agrees with the Department of Justice that by all indications Bellingham area exchanges can receive their access from GTE's Everett facilities, and that this is appropriate given the gulf of independent territory that separates Bell's Bellingham exchanges from the rest of the Seattle LATA. The Court will therefore approve a proposal to make Bellingham a separate LATA if and when an appropriate application is submitted in accordance with note 95 *supra*.

---

313. The United Church of Christ, Satellite Business Systems and the Department of Justice have all identified Seattle as one of the most questionable LATAs. GTE and Western Union also filed documents critical of the Seattle application.

314. Pacific Northwest Bell apparently has not decided how it will provide equal access in the Seattle LATA. Its October 1982 application speaks in terms of "building a single tandem switch and combining inter-LATA exchange access with intra-LATA exchange service." The combination of exchange and transport functions on the same switch has certain advantages, but it might be even more efficient and procompetitive for the Operating Company to

effect this combination by means of the existing No. 4ESS switch. Although this particular No. 4ESS switch is projected to belong to AT & T under the predominant use test (see Projected Switching System Ownership Study at 186) the Court may of course disregard that test if it finds that the switch is necessary to the provision of equal access. 552 F.Supp. at 200, 206.

315. Of the other alternatives mentioned in Pacific Northwest Bell's October application, the installation of a new tandem takes time, direct trunking may impose extra costs on interexchange competitors and result in overcapacity given Olympia's relatively small size, and backhauling to Seattle might impair transmission quality.

No challenge has been mounted against the consolidation of the Yakima SMSA with the Spokane SMSA to form the Spokane LATA.[316] Pacific Northwest Bell states that this exception to the single-SMSA standard is reasonable [317] for "[i]f Yakima is not included in the Spokane LATA, extensive trunking re-arrangements would be required, additional tandems would be required and costs to provide service would increase." This statement is more conclusory than informative.

It is noteworthy that Yakima presently has a Class Four switch—the only switch in Yakima—but that this switch is slated to be owned by AT & T under the predominant use test. It is unclear how Pacific Northwest Bell intends to provide access to Yakima, but if it expects to do so from facilities located in Spokane, some 165 miles away, quality problems may arise.[318] It is possible that the preferable means to provide access to Yakima—a market that at least one interexchange carrier in addition to AT & T plans to enter—is through the existing Class Four cross bar switch in Yakima.[319] The Court will grant the requested exception because Yakima is small but, for the foregoing reasons, it may order at the appropriate time in the future that access to the Yakima loop must be provided from a facility in Yakima.[320]

### 10. *Oregon*

Northwestern Bell proposes two LATAs for Oregon. According to the State, the two LATAs are too small. According to the competitors, they are too large. By the standards of the Department of Justice, the LATAs are reasonably drawn.

As proposed by Pacific Northwest Bell, the Portland LATA would include Portland, by far the largest SMSA in the state with a population of 366,383, and the SMSA of Salem, which has a population of 250,000 and includes approximately 102,000 access lines. The LATA would also encompass a large expanse of rural Bell territory to the east and southeast. The other LATA, centered on Eugene, would consolidate the relatively small SMSAs of Eugene and Medford in the west and southwest areas of the state.

The Department of Justice initially questioned the inclusion of Salem in the Portland LATA, but it eventually approved the consolidation "because of the strong community of interest between the two [cities], the relatively small size of the Salem SMSA, and because of the planned consolidation of the Salem Class 4 functions into Portland." [321] The Court is persuaded that the consolidation is both reasonable and consistent with the decree. To separate Salem and Portland would serve little pur-

---

**316.** It is not accurate, however, as Pacific Northwest Bell asserts in its November 22, 1982, response, that "no intervenor has questioned to any decree at all the Spokane LATA," for GTE argues that the Walla Walla and Franklin County exchanges which are slated for inclusion in the Spokane LATA ought to be configured instead into a separate LATA and served from GTE's Kennewick facilities. The Court will consider such a proposal if and when one is submitted in conformity with note 95 *supra.*

**317.** Yakima is small, having only 55,000 subscribers.

**318.** Although AT & T has stated that noise levels will not vary from 15 to 200 miles, no such pledge has been made with respect to loss, echo return loss, or blocking.

**319.** Since it is doubtful the Operating Company would run a direct trunk from a Spokane point of presence to the Yakima end offices, it would

be instructive to know where an access tandem will be located and what sort of switch it will be.

**320.** The remaining issue with respect to the Washington LATAs revolves around a lengthy filing of the Washington Public Utilities Commission (WPUC). The Commission is primarily concerned with the changing technologies which may eventually enable interexchange competitors to bypass Operating Company facilities and achieve access into homes and businesses on their own. Pacific Northwest Bell provided a well-reasoned response, to which little needs to be added.

The state line crossings into Oregon and Idaho are also approved.

**321.** According to Pacific Northwest Bell, it will be more efficient to offer interexchange access and intraexchange service from one Portland switch rather than to provide such service in duplicate as a division of the LATA would require.

pose. Indeed, it would not significantly reduce the geographical size of the LATA since so much of the LATA is composed of rural areas far to the east and southeast of both Portland and Salem.

The consolidation of Eugene and Medford is consistent with the decree's objective not to disrupt existing network arrangements or to impose costs on consumers where there is no good reason to do so. Together, Medford and Eugene include fewer than 250,000 subscribers (Eugene contains 154,-000; Medford, 93,000). As in the case of the Portland LATA, Pacific Northwest Bell intends to provide interexchange access and intraexchange service from a single switch in Eugene, an efficiency that will be encouraged by the consolidation.

The State's comments in support of a single LATA for Oregon deserve some discussion. The State claims that a toll study completed in 1979 projected a substantial increase in telephone usage, so much so that a relatively autonomous network based around Eugene was thought to be justified in addition to the existing network based around Portland. To that end, Pacific Northwest Bell intended to upgrade the existing switch in Eugene so that there would be tandems in both Eugene and Portland. The State maintains that due to the recession the projected growth in phone calling did not occur, and Pacific Northwest Bell now does not intend to upgrade the Eugene switch until 1986 or later, and it accordingly urges one LATA as more appropriate for the lighter amount of telephone usage that is now projected.

There are two problems with that line of argument. First, Pacific Northwest Bell is

in the best position to know what adaptations its network will support. If it advocates two LATAs, it must believe there are some advantages to this arrangement. Second, the LATA boundaries will affect communications development for many years to come, so that it is not too important whether the upgrading will take place in 1984, 1986, or 1988; the important consideration is that this is the direction in which telecommunications in Oregon is heading. Considering that the establishment of a single LATA would represent a greater deviation from the presumptions of the decree than would a two-LATA configuration,[322] the Court will not accept the State's position but will approve two LATAs as proposed by Pacific Northwest Bell, with the various minor exceptions requested.

### 11. *California*

Pacific Telephone has proposed nine LATAs for the State of California. The Los Angeles LATA would be the largest, in terms of numbers, serving 4.2 million stations, or 41 percent of Pacific Telephone's California subscribers.[323] The San Francisco LATA would follow, with 3.3 million stations, or 32 percent of all subscribers.[324] The largest of the remaining seven LATAs, San Diego, would contain approximately one million stations, or 9.8 percent of the total, and the smallest, Monterey, would include 137,660 stations, representing 1.3 percent of all California Bell subscribers.

The State of California and the California Public Utilities Commission endorse the six largest LATAs proposed by Pacific Tele-

---

**322.** Four SMSAs would be consolidated.

**323.** As drawn by the Operating Company, the Los Angeles LATA would consist of two geographically separate parts. The southern part would include Los Angeles proper, and span from Santa Ana in the south to Fillmore and Palmdale in the north. The other section of the LATA consists of most of San Luis Obispo County. The County is separated from the southern section of the LATA by a very large expanse of territory, including Santa Barbara, that is served by GTE.

**324.** The San Francisco LATA is larger in area than the Los Angeles LATA. It extends along 400 miles of the Pacific Coast, while the Los Angeles LATA would extend 200 miles. The San Francisco LATA begins at Watsonville and Santa Cruz in the south and run northward to Mendocino and Westport. It also includes isolated exchanges just south of Eureka, in Humboldt County. As drawn, this LATA contains 43 cities with a population of over 25,000 each.

phone.[325] Both urge, in two joint filings, that the three smallest proposed LATAs—Monterey, Bakersfield, and Chico—be appended to other, larger LATAs because of their comparatively small size and low population densities. If this were not done, it is claimed, the per subscriber access charge will be unduly high in these areas, placing a further economic strain on California's rural residents and possibly dissuading competitive carriers from entering these markets.[326]

In contrast to the State's position, two other intervenors, the United Church of Christ and Local Area Telecommunications, Inc., assert that several of the LATAs are too large. Specifically, Local Area Telecommunications criticizes the proposed Los Angeles and San Francisco LATAs, while the Church of Christ criticizes the proposed consolidation of the Stockton and Modesto SMSAs into one Stockton LATA.[327]

The State makes several points relating to the influence that LATA boundaries might have on the setting of post-divestiture access charges. The State observes that if access charges are computed on a LATA-specific basis—that is, if separate access charges are set for each LATA on the basis of the fixed costs of the facilities within that particular LATA—rural telephone users would face higher charges than would urban residents in the same state. According to the State, to the extent that subscribers are directly billed an access charge, the higher costs attributable to rural areas [328] would mean that rural residents' local rates are likely to rise proportionately more steeply than would the rates of residents of more densely populated and larger LATAs. To the extent that part of the access charges will be levied on interexchange carriers, it would also have a deleterious effect on rural areas for the reason that such carriers are likely to be dissuaded from doing business in these markets where the cost of reaching subscribers is higher and the amount of business to be gained by reaching them is smaller.[329]

To remedy this problem, the State recommends that the Chico LATA be merged with the Sacramento LATA directly to its south; that the Bakersfield LATA be merged with the Fresno LATA directly to its north; and that the Monterey LATA be merged with the San Francisco LATA to its north. The mergers would mean that larg-

**325.** The state bodies also addressed the question of Operating Company-independent relations and expressed concern over the ultimate disposition of the most technologically-advanced of AT & T's switches.

**326.** In its November 23, 1982, response the Department of Justice did not analyze, but only described tersely, the state's initial comments proposing an alternative six-LATA configuration. This is unfortunate given the thoroughness of the California submission, a caliber repeated in the State's reply comments. Pacific Telephone likewise did not address the proposal on its merits, but merely stated that if its nine-LATA proposal is not accepted, it would agree to the state's alternative as second best.

**327.** It may also be observed that five of the proposed LATAs would require an exception to consolidate two or more SMSAs or SCSAs. These are Chico (consolidating the Chico SMSA with the Redding SMSA), Stockton (consolidating the Stockton SMSA and the Modesto SMSA), Sacramento (consolidating the Sacramento SMSA with the Yuba City SMSA), Fresno (consolidating the Fresno SMSA with the Visalia-Tulare-Porterville SMSA), and San Francisco (consolidating the San Francisco SCSA with the SMSA of Santa Cruz). There also is an issue with respect to whether San Luis Obispo County ought to be attached to the Los Angeles LATA, to the Bakersfield LATA, or to GTE's facilities in Santa Barbara. Pacific Telephone proposed the first, the Department of Justice proposed the second, and the third is the preferred compromise of the State of California and the Public Utilities Commission.

**328.** The State's premise—which is probably correct—is that the facilities needed to serve sparsely populated areas differ in scale and cost from those adequate to serve densely populated areas such that ratepayers in sparsely populated regions suffer not only from having fewer individuals to share costs but must also collectively pay for facilities that are more expensive per call than facilities in more densely populated areas. See note 78 *supra*.

**329.** The State is particularly concerned that this state of affairs will characterize the three smallest LATAs proposed for California: Chico, with 137,660 stations and a density of 24.1 stations per square mile, Bakersfield, with 154,040 stations and a density of 40.2, and Monterey, with 137,660 stations and a density of 58.3.

er groups of ratepayers would be available to bear the costs of the rural facilities, and access charges would thus be lower for the rural ratepayers than they would be if these areas stood on their own.

This argument will not be accepted because the State is not correct in its basic premise: that access charges will be set on a LATA-specific basis. The State's comments and reply comments were filed before the FCC released its decision regarding the setting of interstate access charges on December 22, 1982. See *supra* at pp. 998–1000. That decision essentially forecloses the possibility that separate access charges will be set for each LATA according to the costs of the Operating Company's nontraffic sensitive plant in that LATA. See *In the Matter of MTS and WATS Market Structure, supra* at ¶¶ 323–26. It appears from that decision that, with the possible exception of setting some access charges on a "study area" basis, see *id.* at ¶ 326, the FCC will establish access charges which apply to the entire territory served by an Operating Company. Similarly, California as well as the other states will have full authority to transcend LATA boundaries in the computation of access charges for intrastate calls.[330] There is thus little need to combine proposed LATAs in an attempt to spread the Operating Company's costs and thereby to equalize access charges within a state. Due to the foregoing, and given that the Bakersfield, Chico, and Monterey LATAs each contain no fewer subscribers than many other LATAs, the Court will not approve the State's requested consolidation,[331] but will approve the LATAs as proposed.[332]

Turning to the remaining LATAs, the Court approves the consolidation of Modesto and Stockton because of Pacific Telephone's plan to rehome Modesto's Class 4 traffic onto its Stockton facilities when the Modesto Class 5/4 office exhausts its processor capacity as is expected to occur in 1985. This plan will minimize the impact on ratepayers caused by network adjustments.

No objections were received pertaining to the Sacramento, Fresno, and San Diego LATAs. The Department of Justice and the State of California recommend their approval, including the consolidation of Sacramento and Yuba City in the Sacramento LATA, and the consolidation of Fresno and Visalia-Tulare-Porterville in the Fresno LATA. The Court approves these LATAs.

The Court will not approve the inclusion of San Luis Obispo County in the Los Angeles LATA. Upon notification by the Department of Justice that it has received the necessary assurances from GTE, see note 95 *supra,* the Court will approve the State's compromise recommendation that the County's residents be served from GTE's facilities in neighboring Santa Barbara, rather than from the Bakersfield LATA, which was the Department of Justice's alternative proposal. In addition to joining the San Luis Obispo's exchanges to facilities in a community with which the county's residents identify, this solution will reduce the size of the Los Angeles LATA somewhat.[333]

The Court approves the Los Angeles LATA in all other respects, and grants the consolidation of Santa Cruz and San Fran-

---

**330.** See Response of the United States to Public Comments on Proposed Modification of Final Judgment, May 20, 1982, at 42 ("as a matter of regulatory policy, a state may decide to pool the costs of providing intrastate access within a state and thus require the filing of access charges that reflect the average cost of providing intrastate access").

**331.** These three LATAs are not the only ones proposed for the nation which include sparsely populated areas. The Northwest LATA in Wisconsin, for example, would serve about 90,000 stations in an area described by Wisconsin Telephone as "thinly populated [and] primarily rural." The Upper Peninsula LATA in Michigan would serve about 117,000 stations and has

no population center even large enough to constitute an SMSA. Yet the respective state regulatory commissions from these states did not protest these LATAs, and the Court, in fact, has approved them as reasonably drawn. By contrast, the Chico LATA contains two SMSAs, Chico and Redding, and a total of 167,660 subscribers, and both the Bakersfield and Monterey LATAs contain one SMSA each and well over 100,000 stations.

**332.** This includes the combination of Redding and Chico in the Chico LATA.

**333.** As proposed by Pacific Telephone, the Los Angeles LATA would contain 86 cities with populations of over 25,000. This number will

cisco to form the San Francisco LATA. The Los Angeles LATA does not require specific Court approval because, although it includes four SMSAs, the four together constitute only one SCSA. The LATA is large, as some intervenors point out, but the cost of dividing the LATA would be prohibitive.[334] This is also true with respect to the San Francisco LATA.[335] The exceptions for EAS routes are also approved as requested.

X

*Conclusion*

After having fully considered AT & T's LATA application as well as the decisions of the Department of Justice with respect thereto and the comments of the intervenors, the Court takes these actions.

The following LATAs proposed by AT & T are ordered to be consolidated: Centralia (Illinois) with St. Louis (Missouri); Winchester (Kentucky) with Louisville (Kentucky); Rapid City (South Dakota) with Sioux Falls (South Dakota); and Provo (Utah) with Salt Lake City (Utah).

Sixty-seven of the proposed LATAs include more than one standard metropolitan statistical area, and for that reason, absent a court-ordered exception, they would be required, pursuant to section IV(G)(3) of the decree, to stand on their own. Nevertheless, for the general reasons outlined at pp. 997–98, *supra*, and the more specific reasons detailed under the heading of the respective states, the Court allows the consolidation of the metropolitan areas within these LATAs, with the exception of the following: Eastern Massachusetts; New York Metro (New York); Birmingham (Alabama); Davenport (Iowa); Seattle (Washington); and Cleveland (Ohio).

Because the justification advanced or the information supplied is inadequate, the Court withholds approval of, and requests more information regarding the following LATAs: Albany (New York); Syracuse (New York); St. Louis (Missouri); Detroit (Michigan); Southeast Wisconsin; and Chicago (Illinois); as well as regarding the

proposed state line crossings in the New England states. In addition, the Court orders modifications of the Brainerd (Minnesota); Fargo (North Dakota); and Los Angeles (California) LATAs.

The approval of all the LATAs is contingent upon the filing of commitments by the Operating Companies that they will grant equal access to the various interexchange carriers with respect to their intra-LATA as well as their inter-LATA traffic.

With these modifications and exceptions, that part of the plan of reorganization which embodies the LATA application submitted by AT & T and the Department of Justice is hereby approved in accordance with section VIII(J) of the decree.

---

be reduced if San Luis Obispo County is made a separate LATA.

**334.** Pacific Bell estimates that to divide the Los Angeles LATA into four SMSA components would cost $218 million in capital and expense.

**335.** To divide the San Francisco LATA into its four SMSA components would cost an estimated $166 million. Clearly all Pacific ratepayers would be penalized if costs of this magnitude were incurred, and the Court will not be justified in imposing this solution.